Walsh v. Apple, Inc. et al
Doc. 74 Att. 1

# EXHIBIT C

Dockets.Justia.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

BEFORE: CHARLES A. LEGGE, JUDGE (Ret.)

--o0o--

ORACLE CORPORATION, a Delaware Corporation; ORACLE, USA, INC., a Colorado corporation, and ORACLE INTERNATIONAL CORPORATION, a California corporation,

Plaintiffs,

vs. No. 07-CV-01658-MJJ

SAP AG, a German corporation, SAP AMERICA, INC., a Delaware corporation, TOMORROWNOW, INC., a Texas corporation, and DOES 1-50, inclusive,

Defendants.
_______________________________/

HEARING IN RE DISCOVERY ISSUES

_______________________________

Tuesday , March 4, 2008

JAMS
2 Embarcadero Center, 15th Floor
San Francisco, California

REPORTED BY: WENDY E. ARLEN, CSR #4355, CRR, RMR
JOB 406804



f330ae8e-1c3f-46b0-b5c5-8449d6999fcb

Page 54

from the SAP defendants that we need to identify the deponents.
JUDGE LEGGE: When you set this original schedule with Judge Jenkins, did you really anticipate this volume of stuff?
MR. HOWARD: We did, your Honor, and we didn't ask for this schedule. We knew it was complicated material, it was going to require terabytes of complicated code to analyze and that there was going to be an enormous volume of material. They took a different position, and they asked for an expedited discovery schedule and said that they could produce everything and that everything was in the SAS database.
We now know that isn't true, and we know we're getting squeezed because we're not even getting documents from the SAP defendants until April now.
JUDGE LEGGE: I'm going to pin you down on a date. If only a target. Your answer is you're going before Judge Hamilton on April the 3rd and undoubtedly she's going to set a new schedule, and at that point you'll be able to say here's where we are in this litigation. In terms of the production by them, I only have this. I need this before we can get to the next phase of designating people for depositions.
MR. HOWARD: And we fully intend to do that,

Page 55

your Honor. It's just that as we sit here today, without knowing what Judge Hamilton will do, we have to litigate according to the dates that we have.
JUDGE LEGGE: I understand. I understand. I think the reality of it is you don't really, but obviously it's the only order that's in effect at the moment. So that's it.
Now, can you give me any ideas here on the size of the documents you're producing on behalf of the SAP defendants compared with TN's?
MR. FUCHS: It's not going to be near the same amount of data. They've asked for every shred of paper TomorrowNow has ever created in both electronic and hard copy form. They have not asked for the same scope, but there is a difference, and the difference is it's more like finding a needle in a haystack. There aren't business units within SAP that are responsible for TomorrowNow. It's more like one employee here, one employee there. Identifying some of those more key custodians and getting their data, it's going to be a smaller amount, but it's still going to be --
JUDGE LEGGE: How far along are you in identifying the key custodians?
MR. FUCHS: We've identified who we believe have had interaction with TomorrowNow and then the

Page 56

question comes identifying even further that subset of employees that really are going to likely have the data they asked.
JUDGE LEGGE: I'm going to give you a date to produce the SAP stuff by April 15th. Another great tax day.
MR. FUCHS: All SAP stuff or key custodians?
JUDGE LEGGE: Where are you going to start? I mean, I thought you said you could complete it by the end of April.
MR. FUCHS: I could compete key custodians. For example, ten custodians by the end of April, and you're talking about, you know, 500,000 to a million Bates numbered pages for that many people with their 64 requests.
JUDGE LEGGE: I'm saying April 15th. You get before Judge Hamilton and you scream at what I'm recommending, okay, and by then, which is going to be another three weeks from now, you better be prepared to give some better explanation what you think a reasonable time basis is going to be, but I do think in looking at this with identifications that go back into October of last year and others in December, I realized that's only two months back --
MR. FUCHS: Your Honor, one point about those

Page 57

identifications. We gave them ten custodians as well. They have produced zero, not one shred.
JUDGE LEGGE: That's a motion I'll address. This isn't the school yard. We're not saying nyah-nyah-nyah-nyah.
MS. HOUSE: How do you spell that? The final issue is resolved, your Honor, on the identification. The only other issue --
JUDGE LEGGE: Was resolved?
MS. HOUSE: We've talked it out and the identification of individuals we've actually come to agreement on.
JUDGE LEGGE: So it's been agreed.
MS. HOUSE: The only other issue that remains from our affirmative motion is a reference in a footnote to production of TomorrowNow documents, specifically financial damages related documents. We noted in our --
JUDGE LEGGE: Give me your footnote.
MS. HOUSE: It's in the opening brief. It is number --
JUDGE LEGGE: Seven.
MS. HOUSE: Thank you. You're ahead of me. Number seven. We reference the fact that while we have received documents from TomorrowNow, we have yet to get a single document related to financial information.





f330ae8e-1c3f-46b0-b5c5-8449d6999fcb

Page 86

MR. HOWARD: And the equitable core of all those defenses is the same as well. Particularly with respect to audit, you know, the failure to do that is not an overt act, and what Oracle did, Oracle is not required to sue all of its customers in order to be able to enforce as against somebody like TN going in and taking things to use for its business. So this really is so far afield.

MR. McDONELL: Again, he keeps circling around and around under the same argument again. Under the abandonment doctrine, it's the finding that there has been a widespread dissemination and use without enforcement. That is the predicate fact.

JUDGE LEGGE: Submitted?

MR. McDONELL: Submitted.

JUDGE LEGGE: Next numbers 25 and 27. I find number 25 just absolutely staggering in breadth.

MR. McDONELL: That's why we've narrowed it in the process.

JUDGE LEGGE: What have you limited?

MR. McDONELL: In the meet and confer, we've limited it to contacts with TomorrowNow employees about TomorrowNow's business. And I believe that's --

JUDGE LEGGE: Well, I wouldn't view that as a narrowing. It seems to me that concerning TN,

Page 87

TomorrowNow, it necessarily means its business. It's the aspect of all Oracle employees contacting any current or former TN employees. It's that part, not the subject matter part of it?

MS. GLOSS: It's the search, not the subject.

JUDGE LEGGE: Yeah, I just find staggering.

MR. McDONELL: But how much contact have Oracle employees had with their competitor, TomorrowNow? It's likely limited.

JUDGE LEGGE: It probably is.

MR. HOWARD: Exactly.

JUDGE LEGGE: But how can they answer this question without going to everybody in the office?

MR. McDONELL: By doing electronic searches on the term TomorrowNow. Identify the number of people who have had any reason whatsoever to have contact with TomorrowNow and then conduct an electronic search for the name TomorrowNow.

JUDGE LEGGE: Now, what are you going to get out of this? Suppose something pops up? What do you hope to get? Consent?

MR. McDONELL: Consent would be one example. We have cited in the brief to a document which I have copies of here which is precisely that. It's a historical record that Oracle consented to one of its

Page 88

customers turning over a software program to TomorrowNow for TomorrowNow's use.

JUDGE LEGGE: Now, they respond to that. Of course, I haven't seen the document, but this is a general PR document that never had any -- never had any secrecy to it at all. It's available for distribution and use by anybody who wanted to consider using the Oracle system.

MR. McDONELL: I don't think that's quite right.

MR. HOWARD: Let me clarify, your Honor. The allegations in this case are about downloading software and support material, these bug fixes and patches. This document is not about any of that. It's about the underlying software being provided by a customer, presumably a licensed customer, to TomorrowNow.

So it doesn't have anything to do with the bug fixes and patches. It doesn't have anything to do with downloading. In other words, it doesn't have anything to do with the core allegations of the complaint. And there is nothing in it to suggest at all that the use to which that's going to be put is improper in the way that we've alleged the use of the downloading SSM's as improper.

JUDGE LEGGE: You refer to it as a

Page 89

demonstration CD.

MR. HOWARD: Yeah, it's the CD that contains the software that runs on the customer's system.

MR. McDONELL: The term a little misleading. By demo, my understanding is what is not meant is it's like your demonstration software that anyone can pick up AOL demo.

JUDGE LEGGE: See, that's exactly what I thought it was.

MR. McDONELL: It's not that. It is the product, the software product that Oracle sells itself. So Oracle has sold this product to its customer and then consented to it being turned over to TomorrowNow for use.

Now, if counsel is saying that's not a downloaded software and support material item, and I guess that's how he's defining the scope of his claims, but frankly based on the discovery they're conducting in depositions, we had thought they were exploring other issues as well.

Now, if counsel is not making any claim in this case and doesn't intend to make any claim in this case about TomorrowNow's use of such software, then that's another matter.

MR. HOWARD: Well, that's something quite





f330ae8e-1c3f-46b0-b5c5-8449d6999fcb

different.
JUDGE LEGGE: I just misunderstood. I thought by a demo CD you mean a CD that Oracle probably made for the purpose of selling its products to -- or going out and licensing new customers.
MR. HOWARD: In their brief they say that this document shows Oracle knowingly consented to its customer providing SSM's, software and support materials, which are defined in the first amended complaint, for the purpose of TN supporting the customer. That their representation in their brief.
And what we pointed out is this document does nothing of the sort. They know what an SSM is. They downloaded tens of thousands of them onto their servers. They know that's the basis of the claim in the complaint. And this document doesn't have anything to do with SSM's.
But the bigger point, your Honor, is that Oracle has never said and it would never say that TomorrowNow or a third-party support provider like TomorrowNow can never have its fingers on some form of software. There are circumstances in which the third-party support providers are legitimately providing support, and Oracle welcomes that competition.
The question is whether they're doing it within



the scope of the customer's license or not. That's why Oracle brought this case is because TomorrowNow is downloading materials that the customers weren't entitled to and, therefore, TomorrowNow wasn't allowed to access or use.
The problem with this document is that it doesn't say anything. It doesn't say anything about, first of all, an SSM, but also whether or not this was something that TomorrowNow was allowed to do or not. It just doesn't have any bearing on any allegation. And what they have wanted us to do, which we confirmed in discovery, is they want us to go through -- we literally asked them, Do you intend us to go through the files of all 69,000 employees to get this background chatter with an unknown group of TomorrowNow current and former employees? And they said yes.
And that -- we don't know who they are, we don't know how to find it, there is no business purpose for that communication with TomorrowNow because there's no open, formal, approved, official open channel of communication with TomorrowNow. I mean, this is just the most egregious kind of fishing expedition.
JUDGE LEGGE: I understand what you have agreed to do is one sentence on page 4 of your February 25th letter. "Oracle has already agreed to produce documents



responsive to those requests from numerous custodian files it has collected." So you are going to go through the custodial -- custodian files you have collected for purposes of seeing whether there is anything responsive.
MR. HOWARD: Yes, we have, your Honor, because we've already collected it. I want to make it very clear, I want to make sure we don't get hung on our own petard here. We agreed to a vastly overbroad collection and search with respect to these custodians, and it's not -- we're not agreeing to do it because we think this is relevant and we're not agreeing to do it because we think it's proper, but we do have the stuff already collected and we can do a term search for TomorrowNow and we can see what that turns up.
That won't, unfortunately, turn up a specific communication with somebody at TomorrowNow because TomorrowNow could turn up for other reasons, but what we strongly resist is, and regardless of what happens in this case, that we would have to go out beyond this current group of custodians, go to the extraordinary expense of collecting additional information just to do this term search that Mr. McDonell has suggested is appropriate to find this gossip between low level employees. We think that's absolutely improper.
MR. McDONELL: Your Honor, the one thing that I



have never heard them say is that these identified custodians from whom they will seek this information is for some reason a logical group of custodians who might have had communications with TomorrowNow. I mean, at some point in the process they have to exercise some kind of thought and identify custodians who would have been likely to have had communications with TomorrowNow, if any, and what they're doing, it seems to me, is largely arbitrary.
They're saying, well, we've collected documents from certain persons and we'll look at their files to see if these kind of communications, but they have never said that they've made a good faith effort to determine that it is that group of custodians who would likely have had communications with TomorrowNow.
JUDGE LEGGE: Well, aren't you both on both sides first of all going to the custodians who seem like the most knowledgeable custodian to have information that you want and they want? Aren't you both doing that?
MR. HOWARD: Well, I hope so. We certainly are, but let's be clear. We objected to this request and said that we would not produce documents responsive to it. It's overbroad, it's too far afield, it's burdensome.





f330ae8e-1c3f-46b0-b5c5-8449d6999fcb

As a compromise, we said that the custodians that we have identified and collected from that we already have where there is no incremental expense and effort required to go out and collect material, we'll search them and we'll produce if there's communications that we can determine as to a current or former TomorrowNow employee. But the idea that we would have to go through the entire company is --

JUDGE LEGGE: No, I understand what you're saying.

MS. GLOSS: And I believe we did tell them that we don't believe that as a business practice, as a purpose of running our company, we don't believe that there are categories of Oracle employees who as part of their jobs would be expected to be communicating with TomorrowNow employees.

We think to the extent those kind of communications come up they're more likely to be on a friendship level because TomorrowNow employees used to work with PeopleSoft and J.D. Edwards employees many years ago. But as a business practice, we don't think that there are identifiable groups of people who we think should be having these conversations.

JUDGE LEGGE: Do you have a standard operating procedure telling your employees not to talk to



competitors?

MS. GLOSS: Of course, we have policies that prohibit our employees from sharing proprietary information with competitors. Of course, we do not prohibit our employees from communicating.

JUDGE LEGGE: Get together for the Warriors game next week.

MS. GLOSS: Precisely.

MR. HOWARD: Exactly right. And we also ask them, well, if you think there are specific employees that you have that were communicating with us on relevant subjects, tell us who the Oracle employees are, and they decline to do that.

MR. McDONELL: As of today, it's a black box. We don't know who these custodians are at all, period. They're controlling that.

JUDGE LEGGE: How are you, both of you doing this? You are now making some demands on one another on a per custodian basis. How are you identifying these custodians?

MR. McDONELL: Based on judgments. Conferring with the client.

MR. HOWARD: By names or job titles or what?

MR. McDONELL: It starts with the request.

JUDGE LEGGE: I understand that.



MR. McDONELL: What is the request. Then you go to the client, okay, here the type of request. Who would most likely have this kind of information. It's go to those people and it's like peeling an onion.

JUDGE LEGGE: How do they know who your custodians are? How do you know who their custodians are?

MR. McDONELL: On one level it's been negotiated and names have been identified and they've made a request that we search X custodians first, but in some case they don't know. Here where we've got this pointed issue, where it's their idea, their concept that they'll look for this information but only in the files of unnamed custodians, it causes us to be concerned that we're not doing our job unless somewhere in the process we have an assurance that that's a reasonable group of people to search.

Now, what Ms. Gloss just said, it's conceivable it's been told to me before, but I don't remember it, frankly, and I think what she's saying is that maybe this is the best group to approach to try to find these types of communications. But I don't recall that ever being said, and the standard of discovery is you make a reasonable search and we're just trying to make sure that we're not accepting this notion of this black box



without questioning whether that's an appropriate group of people to be searching for.

JUDGE LEGGE: Okay. Go ahead.

MR. HOWARD: Well, at the risk of repeating myself, your Honor.

JUDGE LEGGE: Don't do that.

MR. HOWARD: We've never represented that we identified these custodians in an effort to respond to this request. We said no to this request. As a compromise --

JUDGE LEGGE: Now, you're comprising.

MR. HOWARD: Right, with the existing group of custodians. I just didn't want there to be any misunderstanding about that.

JUDGE LEGGE: Okay. Anything further?

MR. McDONELL: Submitted.

JUDGE LEGGE: All right. Now, number four is again one that I find rather staggering in scope. Requiring Oracle to ferret out all customer complaints it's ever had. Let's get the precise language here. I don't want to exaggerate it.

All documents relating to customer complaints. Okay. That's pretty staggering with a company the size of Oracle. What do you think information like this is relevant to in this case? What's our relevancy here?





f330ae8e-1c3f-46b0-b5c5-8449d6999fcb

confidentiality.
MR. HOWARD: Your Honor, can we just decide that? You can probably decide that right now.
JUDGE LEGGE: I could, but it would be totally arbitrary.
MR. HOWARD: Isn't it going to be arbitrary after we brief it?
JUDGE LEGGE: I hope the decision may be arbitrary, but I hope the rationality for making the decision will not be.
MR. McDONELL: It would be highly thought through, but can we keep things confidential until we get a decision, Counsel?
MR. HOWARD: We agreed until there was a decision 30 days would run from the production.
MS. GLOSS: 30 days is the most they've ever asked for.
MR. FUCHS: 30 days before the hearing, 30 days after the hearing for everything that came in. That's what was on the record last time.
MS. HOUSE: Correct.
JUDGE LEGGE: This is by way of suggestion here, an attempt to step back and take a macro look at what's going on. You've sort of -- not sort of, you have dropped a shoe on all of us that this action is



going to be expanded into something broader.
MR. HOWARD: Yes.
JUDGE LEGGE: I don't know how much explanation you'll give of that, if any, of what that's going to be, and I don't know as you sit here. You're now at the point of realizing how much work each side of you have to get together the information that each needs to prosecute and defend the case.
I think before you go before Judge Hamilton on April 3rd you have to agree on some kind of a generalized road map and try to agree on one so that it's one you can both live with. Are you going to amend your complaint? If so, when are you going to do it? What's the amended complaint going to do to the scope of the discovery before you can get this case to trial? How much longer is it going to take each of you to produce the stuff you've agreed to produce to the other people? How long is it going to take each of you to process the information once you get it?
For every writer, there's a reader. You've got to read this stuff and understand it and send it to your right people to get adequate responses. And when can all this paperwork be done so that you're then in a position to take some meaningful depositions? How long do you think that deposition process is going to take?



Then, as I'm suggesting, I think you ought to defer as much damage discovery as you can until after the liability issue discovery. So a time period for damages document discovery plus the production of your experts and their depositions is going to have to take another length of time, and be realistic about it.
It doesn't do anybody any good to -- I was going to say fan the air and paw the ground. I don't mean to be pejorative about that if you have your tactical reasons or strategic reasons for either wanting to move ahead rapidly or not, but I think it is something you ought to recommend something to Judge Hamilton that you can both live with.
That's all I have to say.
MR. McDONELL: Adjourned? Thank you, your Honor.
JUDGE LEGGE: We're adjourned.
(Whereupon the hearing was adjourned at 12:23 p.m.)



CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, WENDY E. ARLEN, hereby certify that I am a Certified Shorthand Reporter; that I reported in shorthand writing the foregoing matter at the time and place therein stated; that the foregoing pages are a full, true and complete transcript of my said shorthand notes and is a full, true and correct record of the proceedings had in said matter at said time and place.

Dated:________________________

________________________
WENDY E. ARLEN
Certified Shorthand Reporter
California License #4355





f330ae8e-1c3f-46b0-b5c5-8449d6999fcb

# EXHIBIT D

Hon. Charles A. Legge (Ret.)
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111
Telephone: (415) 774-2644
Fax: (415) 982-5287

Special Discovery Master

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE CORPORATION, a Delaware corporation, ORACLE USA, INC., a Colorado corporation, and ORACLE INTERNATIONAL CORPORATION, a California corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>SAP AG, a German corporation, SAP AMERICA, INC., a Delaware corporation, TOMORROWNOW, INC., a Texas corporation, and DOES 1-50, inclusive,<br><br>Defendants. | **CASE NO. 07-CV-1658 (MJJ)**<br><br>**JAMS Reference No. 1100053026**<br><br>**REPORT AND RECOMMENDATIONS RE: DISCOVERY HEARING NO 3** |

## JURISDICTION

The undersigned has been appointed to be the Special Discovery Master pursuant to an order of this Court dated January 8, 2008. The jurisdiction of the Special Discovery Master is to hear all discovery disputes and report and make recommendations to the Court with respect to the resolution of disputes.

## AMENDMENT TO REPORT OF HEARING NO. 2

Defendants have requested an amendment to this Master's Report and Recommendations re hearing number 2. Page 4, lines 19-21 of the report stated: "After discussion, the parties agreed as follows: The information from defendant TN will be supplied to plaintiffs by the end of March, and the information from the SAP Companies will be supplied by April 15, 2008."

Defendants first object that they did not agree to that production schedule. The Master's notes of the hearing indicate agreement, but that appears contrary to the later transcript and to the parties' stated positions. Accordingly, the language "the parties agreed as follows" on line 19 of page 4 is changed to read "the Special Discovery Master recommends as follows:"

Defendants also object to the ordered scope of production being "the discovery information". The Master agrees and Page 4, lines 20-21 are amended to read as follows: "information from the priority custodians of defendant TN will be supplied to plaintiffs by the end of March 2008, and the information from the priority custodians of the SAP Companies will be supplied by April 15, 2008. The priority custodians have been identified in correspondence between the parties. The timing of the production should give first priority to information relevant to the depositions of the soon-to-be deposed Rule 30 (b)(6) witnesses."

Since this is an amendment to a prior order, and since it reduces defendants' obligations, this order is entered nunc pro tunc as of the date of Report and Recommendation No. 2, March 19, 2008. The time for defendants to object to the recommendations as amended above shall run from March 19, 2008.

## DISCOVERY HEARING No. 3

The parties each filed discovery motions by letters to the undersigned dated March 11, 2008, and filed oppositions to one another's motions on March 17, 2008. Additional motions and oppositions were filed on March 21, 2008, March 24, 2008, and were submitted to the Master on the date of the hearing, March 25, 2008. In addition, the Master received a declaration of Safra Catz and a tabulation of defendants' responses to specific documents requested in the Rule 30 (b)(6) depositions.

This is the report and recommendations of the Special Discovery Master to the Court with respect to those motions.

The Special Discovery Master submits this report and recommendations to the Honorable Phyllis Hamilton pursuant to the paragraph 3(a) of the stipulation and order of January 8, 2008.

Respectfully submitted.

Dated: April 4, 2008

Charles A. Legge

Hon. Charles A. Legge (Ret.)
Special Discovery Master

# EXHIBIT E

# JONES DAY

555 CALIFORNIA STREET • 26TH FLOOR • SAN FRANCISCO, CALIFORNIA 94104-1500
TELEPHONE: 415-626-3939 • FACSIMILE: 415-875-5700

Direct Number: (415) 875-5820
jmcdonell@JonesDay.com


February 19, 2008

**Contains Confidential Information Under Protective Order**

**VIA EMAIL AND HAND DELIVERY**

Hon. Charles A. Legge (Ret.)
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

**Re:** ***Oracle Corporation, et al. v. SAP AG, et al.***
Defendants' Motion to Compel No. 2
Hearing Date: March 4, 2008 at 9:00 AM

Dear Judge Legge:

Defendant TommorowNow, Inc. ("TN") submits this as its second motion to compel.[1]

## I. INTRODUCTION

This motion asks the Court to compel discovery relating to four subjects. First, it seeks discovery of Oracle's knowledge of the dissemination of its alleged intellectual property and the measures, if any, it has taken to protect that property (Section II.A). Second, it seeks discovery of Oracle's communications with TN employees, including, but not limited to, evidence that Oracle knew or should have known about TN's practices and consented thereto (Section II.B). Third, it seeks discovery of complaints from Oracle's customers as relevant to, among other issues, the real reasons Oracle loses customers (Section II.C). Finally, it seeks production of Oracle's Change Assistant software, which is a search engine that operates with Oracle's Customer Connection website (Section II.D).

Oracle's claims require proof that the information TN downloaded from Oracle's Customer Connection website, and thereby allegedly "stole" was, in fact, properly protected intellectual property that TN was not authorized to possess or use.[2]

---

[1] Defendant requests an in-person hearing and will arrange for a court reporter.

[2] *See, e.g.*, First Amended Complaint ("FAC") at ¶ 103 (TN allegedly infringed copyright because it was "not authorized to copy, download, reproduce..." Oracle's software); *Thurmond v. Compaq Computer Corp.*, 171 F.Supp.2d 667, 675 (E.D.Tex. 2001) (elements of a civil claim under Computer Fraud and Abuse Act include the "knowing 'transmission' of a 'program, information, code, or command' and the 'transmission' causes intentional 'damage without authorization'"); *Therapeutic Research Faculty v. NBTY, Inc.*, 488 F.Supp.2d 991, 998 (E.D.Cal. 2007) (focus of a claim under the Computer Data Access and Fraud Act is upon "unauthorized access"); FAC at ¶ 128 (breach of contract alleged as a result of "unauthorized" access); FAC at ¶¶ 133 & 143 (TN's alleged "unauthorized access to Oracle's computer systems" caused interference with prospective economic advantage);

customers are not limited to the customers' names that Oracle has uncovered during the course of its investigation."[7] Indeed, during the hearing on the first motions to compel, plaintiffs' counsel conceded that they "do in fact expect it to expand" beyond the sixty-nine customers. *See* Rough Draft Transcript, February 13, 2008, p. 150.

Oracle's strategy seems clearly intended to prevent defendants from learning about Oracle's activities with other customers and support providers. Oracle's objection to discovery beyond the Identified Customers should be overruled.

**2. Audit Rights (Requests Nos. 49-50)**

Requests Nos. 49 and 50 seek discovery of Oracle's rights, policies and practices with respect to *audits* of its customers' access to, or downloads from, Customer Connection, and any associated SSMs. Again, Oracle has refused to produce such documents, except those related to Identified Customers.

This discovery is appropriate for the same reasons as discussed in the preceding section concerning Termination Policies. Among other things, defendants need all documents showing whether Oracle was aware of downloads by customers that were allegedly beyond the scope of the customers' contractual rights and Oracle's responses in such situations. The production should also include any documents reflecting any auditing or monitoring of usage by customers and third party support vendors of passwords to access SSMs.

**B. Contacts with TN Employees (Requests Nos. 25-27)**

Requests Nos. 25 and 26 seek documents relating to communications between Oracle, or anyone acting on its behalf, and any current or former TN employees concerning defendants. Request No. 27 seeks documents reflecting the terms of employment with Oracle for TN employees who formerly worked for Oracle. Oracle has refused to produce any documents in response to these requests.

Requests Nos. 25 and 26 are appropriate for the reasons discussed in the section concerning Termination Policies, *supra*. It most certainly is relevant if Oracle employees had knowledge of or consented to use by TN or its customers of Oracle information at issue in this case. Furthermore, Oracle seems to claim that TN was hiring Oracle employees to get information about Oracle. For example, Oracle alleges in the Complaint that "SAP intentionally targets Oracle's employees to extract their knowledge of Oracle's new products."[8]

Oracle's objection is primarily one of burden, in that it does not want to search for the files of "low-level Oracle employees around the globe" to locate the evidence concerning TN. In order to address that concern, defendants agreed to narrow the request to documents relating to

---

7 *See* Letter, Alinder to Lanier, October 9, 2007, p. 2.

8 FAC at ¶ 71.

communications *concerning TN*.[9] Because the requests are limited to communications with or concerning the employees of a single third party (*i.e.*, TN), they are reasonably focused.

This is not an unfounded fishing expedition, as Oracle has suggested. To the contrary, there is direct evidence that Oracle knowingly and deliberately consented to the provision of its SSMs to TN for use in supporting TN's customers. For example, a document located on the SAS database shows that in April of 2004 Oracle knowingly consented to its customer, Lockheed Martin, providing SSMs to TN for the purpose of TN supporting the customer. This is important in three respects. First, it shows that Oracle knew and agreed that TN could have SSMs that the customers were entitled to get from Oracle. Second, this relates to a customer that is *not* among the Identified Customers to which Oracle seeks to limit discovery. Third, this is a communication between Oracle and Seth Ravin, who is now a former employee of TN. Under Oracle's approach to discovery, Oracle would never have produced this document to defendants, despite its obvious importance. As such, it is essential for defendants to discover the full extent to which Oracle was aware of or consented to TN's practices, including via communications between Oracle and current and former TN employees.

Documents in response to Request No. 27 should be produced so that TN can evaluate the restrictions, if any, that Oracle believes it has imposed on its former employees. Oracle's suggestion that defendants get these documents from the employees themselves is not a valid excuse. Many employees may no longer work for TN and, in any case, the fact that defendants may have other means of locating some of the requested documents does not relieve plaintiffs of their duty to produce all of them. Indeed, it should be relatively easy for Oracle to locate and produce these documents.

### C. Customer Complaints (Request No. 64)

Request No. 64 seeks documents relating to customer complaints about Oracle's support or maintenance services for products at issue in this litigation, including complaints about the cost of such support or maintenance, the length of time it takes Oracle to respond to customer requests or resolve customer problems, Oracle's failure to provide adequate support or maintenance or the prospects of Oracle providing long-term, quality support, and the "software upgrade cycles" referenced in ¶ 47 of the FAC. Oracle has limited its response to documents related to the Identified Customers for products allegedly unlawfully downloaded by defendants.

These requested documents are relevant to the damages analysis, including the issue of the causation of damages. To the extent that Oracle alleges that it has lost sales as a result of the actions of defendants, defendants should be given broad discovery of the reasons that Oracle loses customers. *See, e.g., Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147 (1st Cir. 1994) (evidence that plaintiff would have inevitably lost the customers irrespective of defendants' copyright infringement relevant to causation).[10] These documents may show that

[9] Defendants reserve the right to seek other responsive documents at a later time, if necessary.

[10] Additionally, in *Grumman*, the defendants argued that, even if it did not use the plaintiff's copyrighted support tool, customers would have switched to (or remained with) defendant for service in order to take advantage of its lower prices and higher-quality service." *Id.* at 1171. Likewise, this "but for" causation is relevant to Oracle's fifth and sixth causes of action of intentional and negligent interference. *See, e.g., Silicon Valley Test & Repair, Inc.*

as "Titan." TN has produced all of the source code for Titan, which is software that has functionality that Oracle will no doubt compare to Change Assistant. Oracle continues to assert that its customers are able to determine through Change Assistant and Customer Connection which software and support materials their licenses permit them to download. Defendants must have access to the Change Assistant software, its source code and associated databases in order to respond to Oracle's claims that Change Assistant allows a customer to download only those items to which it is licensed. Moreover, the databases that Change Assistant uses to perform its search and retrieval functions will provide part of the data defendants continue to seek regarding the mapping of all downloadable software and support materials to all of the licensed products that are implicated by Oracle's claims in this case.

This issue demonstrates Oracle's unfair approach to discovery in this case. Oracle contends that TN must produce TN's software and source code for its automated search and download tool (Titan). Yet Oracle refuses to produce the same information for its own tool (Change Assistant), notwithstanding the fact that Oracle intends to use a comparison of the two to support its claims. And, Oracle contends that the parties' burdens are equal regarding the mapping of all downloadable software and support materials to all of the licensed products that are implicated by Oracle's claims in this case, yet Oracle continues to refuse to produce some of the most information-rich data (the databases used by Change Assistant) that would greatly assist that mapping exercise.

## III. CONCLUSION

For the foregoing reasons, defendant's second motion to compel should be granted in its entirety.

Very truly yours,

Jason McDonell by D.H.

Jason McDonell

cc: Christopher B. Hockett, Esq. (via email)
Geoffrey Howard, Esq. (via email)
Zachary Alinder, Esq. (via email)
Holly House, Esq. (via email)
Bree Hann, Esq. (via email)

SFI-578557v1

# EXHIBIT F

PeopleSoft, Inc.

4305 Hacienda Drive

P.O. Box 8015

Pleasanton, California 94588-8615

July 10, 2002

**Via FEDERAL EXPRESS**

Mr. Seth Ravin
TomorrowNow, Inc.
720 North Rosemary Drive
Bryan, Texas 77802

Dear Mr. Ravin:

It has come to our attention that TomorrowNow has written a letter to PeopleSoft customers in which it offers those customers extended support services. That letter purports to describe such services by including the following representations:

> "[TomorrowNow provides] . . . highly responsive, around-the-clock product support delivered by experienced, PeopleSoft-trained specialists."
>
> "[A] retired release is likely to have hundreds – sometimes thousands – of unresolved and unknown software issues . . ."
>
> "[Operation of a retired release in production could lead to] . . . serious issues that could lead to future system failures and extended downtime . . ."

These representations, and TomorrowNow's marketing materials, in general, violate PeopleSoft's rights under the federal Lanham Act and other laws that prohibit product disparagement, false advertising, interference with contract and/or interference with prospective economic advantage, and entitle PeopleSoft to recover damages against you and TomorrowNow. Specifically, the representations in your letter, coupled with the numerous references to PeopleSoft in TomorrowNow's marketing materials, are clearly intended to create the false impression that TomorrowNow is affiliated with or sponsored or endorsed by PeopleSoft. First, every page of your website is devoted to PeopleSoft. Second, the only link on your website to any technology company links to PeopleSoft's website, PeopleSoft.com. Third, and perhaps most objectionable, you claim to be a "Vice President, PeopleSoft Solutions Group". As a result, there is no doubt that a PeopleSoft customer reviewing your materials would likely believe, erroneously, that TomorrowNow is somehow associated with PeopleSoft.

Moreover, your characterizations of PeopleSoft products and of your abilities to service them are misleading, and therefore also violate PeopleSoft's rights under the law. For example, some recipients of your letter -- with its reference to "thousands – of unresolved and unknown software issues that will never be addressed by PeopleSoft" -- may conclude that you are disparaging PeopleSoft and/or some of its products. Such statements may wrongfully cause PeopleSoft customers to terminate existing agreements

PEOPLESoft

with PeopleSoft or to refuse to enter into new agreements with PeopleSoft. Furthermore, because TomorrowNow is not a certified member of PeopleSoft's alliance network, it is misleading for the TomorrowNow website to claim that TomorrowNow has the ability to perform upgrades to PeopleSoft 8.

In addition to misleading the recipients of your letter, it appears that you may also have violated your direct contractual obligations to PeopleSoft by misappropriating and utilizing proprietary and confidential PeopleSoft information. We understand that, in order to effect your mailing and solicit PeopleSoft customers to subscribe to your support services, you may have improperly utilized a proprietary PeopleSoft customer list. PeopleSoft's proprietary information may also have been misappropriated if TomorrowNow's Customer Support Specialists developed their knowledge regarding PeopleSoft and its products from access to confidential PeopleSoft information in your possession. To the extent that you are using PeopleSoft's proprietary and/or confidential information to advance the interests of TomorrowNow, your actions violate the Proprietary Information Agreement (the "Agreement") that you signed when you began your employment at PeopleSoft. In the Agreement, a copy of which is attached, you agreed that, both during and after your employment with PeopleSoft, you would:

> "hold in the strictest confidence, and not . . . use, except for the benefit of PeopleSoft, . . . any trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, . . . *customer lists*, . . . or other subject matter pertaining to any business of the Company . . . "

In light of the foregoing, we insist that you immediately cease the publication and distribution of the solicitation letter discussed above, and that you take steps to ensure that TomorrowNow's website and all future correspondence, marketing pieces and press releases, and any and all other oral or written communication from TomorrowNow, affirmatively state that neither TomorrowNow nor its services are associated with, aligned with, sponsored by or endorsed by PeopleSoft.

Within five days of the date of this letter, please provide us with your written assurance that the solicitation letter will cease to be distributed and that your website and all other communications have been or are in process of being modified to include a disclaimer which clearly states that TomorrowNow is neither affiliated with nor endorsed by PeopleSoft. We look forward to receiving your positive response.

Very truly yours,

David Chavez
Assistant General Counsel
PeopleSoft, Inc.

# EXHIBIT G

# JONES DAY

555 CALIFORNIA STREET • 26TH FLOOR • SAN FRANCISCO, CALIFORNIA 94104-1500
TELEPHONE: 415-626-3939 • FACSIMILE: 415-875-5700

Direct Number: (415) 875-5820
jmcdonell@JonesDay.com


March 21, 2008

**VIA EMAIL AND HAND DELIVERY**

Hon. Charles A. Legge (Ret.)
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

**Re:** ***Oracle Corporation, et al. v. SAP AG, et al.***
Letter regarding Timing of Production Contained in Report and Recommendations Re: Discovery Hearing No 2

Dear Judge Legge:

This letter seeks clarification of the "Timing of Production" section of the Report and Recommendations Re: Discovery Hearing No. 2 ("Recommendations").

On page four, the Recommendations state:

"After discussion, the parties agreed as follows: The information from defendant TN will be supplied to plaintiffs by the end of March, and the information from the SAP Companies will be supplied by April 15, 2008."

Defendants' purpose in writing this letter is threefold: (1) to request clarification on the meaning of "information;" (2) to make clear that Defendants are unable to comply with the deadlines contained in the Recommendations; and (3) to confirm that Defendants did not agree to comply with the deadlines during the hearing.

At the hearing, Defendants said that they were trying to have productions from Oracle's list of 18 priority custodians completed by the end of March, and could have **"key"** SAP custodians produced by the end of April.[1] But, Defendants did not and could not agree to produce **all** TomorrowNow or SAP data by the dates in the Recommendations. Your Honor did, while evidently recognizing the complexities and large amounts of data at issue, set a date of

---

[1] JUDGE LEGGE: Now, what kind of dates can you give?

MR. FUCHS: I can say that their priority custodians we're shooting to have completed in their entirety by the end of this month.

JUDGE LEGGE: By the end of March.

MR. FUCHS: By the end of March, which will be in the neighborhood of 2,500,000 pages, and then we should come after that start producing key SAP custodians that are in addition to those 18 custodians.

Hearing in Re Discovery Issues, March 4, 2008, at 48 (rough).

April 15 for the SAP information, but Defendants did not agree to that deadline during the hearing.[2]

Defendants are also unclear as to whether the "information" referred to in the Recommendations is intended to mean the priority custodians and "key" custodians discussed during the hearing or **all** of TomorrowNow and SAP data. As Defendants said during the hearing and is still true today, Defendants can only attempt to produce the priority custodians identified by Plaintiffs and certain SAP "key" custodians by those dates. Defendants cannot agree to complete the entire TomorrowNow and SAP productions by the dates contained in your Recommendations.[3]

Defendants are working diligently on the review and production of data in this case. Approximately forty attorneys are reviewing and producing data. In accordance with Your Honor's suggestion, Defendants have agreed to cooperate with Plaintiffs in advance of the next CMC to extend deadlines and to attempt to create a new discovery plan.[4] Toward that goal, Defendants are taking the appropriate steps by proposing a discovery plan to Oracle that will allow Defendants to complete their remaining productions within a reasonable timeframe.

In light of the hearing record and the points made above, Defendants' request that your Honor clarify the "Timing of Production" section of the Recommendations: (1) to state explicitly that by "information" you meant the priority custodians identified by Plaintiff and "key" SAP custodians; and (2) to remove the "agreed" notation from the Recommendations.

We will be prepared to discuss this request at the hearing on March 25, if pleases.

Very truly yours,

Jason McDonell

cc: Donn Pickett, Esq. (via email)
Geoffrey Howard, Esq. (via email)
Zachary Alinder, Esq. (via email)
Holly House, Esq. (via email)
Bree Hann, Esq. (via email)

SFI-580450v1

[2] Hearing in Re Discovery Issues, March 4, 2008, at 52-54 (rough).

[3] Hearing in Re Discovery Issues, March 4, 2008, at 52-54 (rough). Defendants anticipate completing production of Plaintiffs' entire list of priority custodians by the end of March, with the exception of two, and those two should be produced in early April. In addition, Defendants have and will continue to produce additional data that is outside of Plaintiffs' priority custodian list. Defendants also anticipate producing data from the following additional SAP custodians' files by April 15th, although the production will not be complete by that date.

[4] At the end of the hearing, Your Honor made it clear that the parties need to sit down and try to agree to a realistic schedule, Hearing in Re Discovery Issues, March 4, 2008, at 144-46 (rough).