Walsh v. Apple, Inc. et al Doc. 133



United States District Court

Northern District of California

Before The Honorable Elizabeth D. Laporte

Oracle Corporation, )
Plaintiff, )
vs. ) No. C07-1658 EDL
SAP AG, et al., )
Defendants. )

San Francisco, California
Thursday, July 24, 2008

**Reporter's Transcript Of Proceedings**

**Appearances**:

For Plaintiff: Bingham McCutchen
Three Embarcadero Center
San Francisco, California 94111
**By: Geoffrey M. Howard, Esquire**
**Holly A. House, Esquire**
**Zachary Alinder, Esquire**

Oracle, USA, Inc.
500 Oracle Parkway, M/S 5op7
Redwood City, California 94070
**By: Jennifer Gloss, Esquire**

(Appearances continued on next page.)

***Reported By: Sahar McVickar, RPR, CSR No. 12963***
***Official Reporter, U.S. District Court***
***For the Northern District of California***

(Computerized Transcription By Eclipse)



Dockets.Justia.com

**Appearances, continued:**

For Defendant: Jones Day
1755 Embarcadero Road
Palo Alto, California 94303
**By: Jane Louise Froyd, Esquire**

Jones Day
717 Texas, Suite 3300
Houston, Texas 77002
**By: Scott Wagner Cowan, Esquire**

**---o0o---**

**Thursday**, **July** **24**, **2008** **3:00 p.m.**

**P R O C E E D I N G S**

***THE CLERK:*** Calling civil 07-1658, Oracle Corporation, et al versus SAP AG, et al.

Counsel, please state your appearances for the record.

***MR. HOWARD:*** Geoff Howard for Oracle Corporation.

With me, Holly House, Zack Alinder and Jennifer Gloss from Oracle.

***MR. MCDONELL:*** Good afternoon, Your Honor.

Jason McDonell for defendants, with Scott Cowan and Jane Froyd with Jones Day. And Mr. John Hickey from the SAP legal department.

***THE COURT:*** Good afternoon.

All right, so what's the progress?

***MR. HOWARD:*** Your Honor, we have submitted to you a -- I'm going to address the first item in the -- in the report that we submitted to Your Honor, which is the extrapolation proposal.

We have worked very hard and in parallel with the beginning of the remote access inspection, which has been progressing slower than we might have liked, but, nevertheless, certainly progressing.

We have been looking, from our conference room, at their servers and exploring them and trying to figure out a

systematic way to tag things for later inspection and production. That is an important background to the extrapolation proposal.

We have submitted to the defendants a -- a detailed proposal on extrapolation in which we have attempted to address what we think is the most -- currently the -- the more significant, but also the more fully fleshed-out area of discovery, which are the local environments envisioned by your order and the support materials that were generated using those environments.

There are other areas that we think would be susceptible, likely very susceptible, to sampling, but we are going to need some additional discovery in order to come back with a proposal on those.

It is a draft proposal. We have had a meet and confer on it. And, on our side, I think we would like to finalize it, at least in -- resolve what we can agree to and not agree to by the time of the next discovery conference in August, and either submit a joint proposal to you or submit competing proposals and ask you to make a ruling.

***THE COURT:*** All right.

What are your thoughts on that?

***MR. COWAN:*** Your Honor, I think Mr. Howard accurately reflects the progress. There is a couple of things we'll comment on.

One, for this initial piece, that they presented in this proposal, it addresses updates and fixes and a number of other things that we believe aren't as directly tied to the data warehouse issue as they do. For all practical purposes, as we sit here today, I don't know that it's that relevant because we are where we find ourselves. But, with that, I think we do have, still, faith that there is a way through this to do it and do it in an efficient way.

The real issue, as with anything, comes down to the details. And, what we want to make sure of, through this proposal, is that the end result is a fairly accurate, or as accurate as possible, representation of what the reality is, not some mechanism that the parties create themselves to agree what a alternative reality is.

***THE COURT:*** Um-hmm.

***MR. COWAN:*** And so we have engaged a statistician, an expert statistician, to look at it and comment on their proposal. There is a number of fundamental gaiting issues there, that we have talked to them on the meet and confer. I won't bore the Court with the details, unless you want to hear them.

***THE COURT:*** Well, I think -- let me make this preliminary observation: I think that if you don't stipulate to waive -- waive objections as to whether it's essentially reliable enough to be admissible testimony, I don't think I can

order you to that effect. I doubt, I mean, on first blush.

I might be able to order you to do something that you didn't stipulate to, that was statistically significant, you know, and did -- not otherwise vulnerable to the challenge that it was inadmissible.

I would -- seems to me you could waive that, if you wanted to. And, I mean, you know, I -- often people bring motions in limine about unreliable expert testimony, and it goes to the weight, and, you know, it's overruled. But, but -- you know, if you can agree on something that you are both comfortable with, as being statistically valid, that's fine with me.

I think it's wise to, even if so, to include such provision, if you can stipulate to it, because it just eliminates the uncertainty. The fact that, you know, some statistician somewhere can say anything that is not reliable and it would just create trouble. But, that is just an observation.

***MR. COWAN:*** Right. And I think that's very helpful, Your Honor, for us to try to get closer to finding a middle ground here because we, our clients, defendants have as much of a vested interest, we think, as plaintiffs do in trying to cut through a lot of the expense associated with comprehending and presenting the whole to a jury.

***THE COURT:*** And possibly more so.

***MR. COWAN:*** Potentially, more so, given the concerns that we have raised about the cost of discovery, et cetera, absolutely.

And -- but the issue is, for us to be able to advise our client, hey, we believe this process, regardless, if you went the full way or this way, you are going to come out the same way, we have to have a high level of confidence that the two are going to --

***THE COURT:*** All right. I know one of the client's representatives is here, I mean, you could -- I think there is something to that, but, I mean, I would think that also, and I would -- I long ago studied some political science philosophy, and there is the theory of the veil of ignorance, if any of you know John Rawls; do I see anybody?

**(Laughter.)**

***MR. HOWARD:*** I did read him. Do I know him? I can't say at that point.

**(Laughter.)**

***THE COURT:*** In other words, well, anyway, if nobody knows who it's going to favor, and there is no reason to think it's going to favor one side or the other, and you may never be able to know what the, quote, "real reality" is, if that would require, you know, a hundred years and a billion dollars, then, you know, provided that the process is such that it's not skewed to favor either side, it ought to be something you may

be able to live with.

***MR. COWAN:*** I think, conceptually, it sounds like we are all on the same page, on that point.

There are a number -- as you can imagine, there are a number of different categories of data that will lend themselves to extrapolation in different ways.

***THE COURT:*** Right.

***MR. COWAN:*** It's not just taking a huge subset, taking the data -- taking a huge collection of data, taking a subset of that and making the same extrapolation across the board. There will be have to be dividing those into baskets and determining, okay, of these things that are in baskets how can they be extrapolated. And that is where we are.

***THE COURT:*** Well, and I can see you want to make sure that, somehow, the baskets aren't such that they overrepresent an area where you might have more problems than some other subset.

***MR. COWAN:*** Absolutely.

***THE COURT:*** That should be doable. You put in a lot of categories. And, you either think there should be other categories on top of that or --

***MR. HOWARD:*** We put in the categories we are aware of.

***THE COURT:*** Um-hmm.

***MR. HOWARD:*** Without trying to cherry-pick the ones

that we thought there were more or less of. And we put the language in that you say you randomly select within those categories.

Then, I think you get, from that, what you get from that. The point is that you are sampling. And then, each side has its arguments from that subset, but you are not stuck with, having been precluded for cost considerations from having gone beyond -- to getting beyond the sample you get to use the sample, to, you know, make your arguments about the evidence that you would find in the larger universe that, for cost considerations, you weren't allowed to explore.

***THE COURT:*** Um-hmm.

***MR. COWAN:*** I do have one comment on that because, I think, that is where we have a fundamental disagreement.

We believe that we will have to agree on, not only how we take the sample, how we select the sample, but what the sample size is, et cetera, which is a more procedural piece. But, the substantive piece of that is which characteristics of the sampled items are going to be analyzed, and how are those characteristics going to be extrapolated to be the evidence for the entire population?

And, I think what I heard Mr. Howard suggest, which is consistent with what is in their current proposal is, no, they'll decide that later, after they look at the sample set and see what the characteristics are of the sample set, and try

to take advantage of whatever's there.

We cannot agree, ahead of time, to say, okay, here is how we are going to select the sample, and then agree to be bound by whatever comes out of it without understanding the methodology that, once the sample is selected, how is that sample going to be used to be extrapolated? Which stiff attributes of the data are going to be extrapolated for the -- you know, into the entire population? And, that is a big, big difference of opinion.

***THE COURT:*** Why is that?

***MR. COWAN:*** Because anyone, any good lawyer and any good expert, given any population, can twist or turn whatever they want with a given set of data, but -- and that's fine when you are dealing with a whole. That is what lawyers and experts do for a living. But, when you are trying to extrapolate a small set and have the implications across the entire universe, it's much more -- there needs to be much more precision about how that is done and an agreement up front of how that's done.

***MR. HOWARD:*** And, I think, Your Honor, that's exactly where the veil of ignorance comes into play, because we all don't know, and we -- it would defeat the point of the exercise, if we were to -- to attempt to, or set as a goal, figure out where we're going before we start the path to get there. We don't know what we are going to find in the sample set. The point is that you create a sample set, and then it's

sort of every side for themselves as to what they get from that.

But, to take what Mr. Cowan just said to its logical extreme, for example, if there was a test document within a fix in the sample set, and we wanted to argue that there was ten pages in every fix document, we would have to, before we embark or this or agree on it, know that there is ten pages in the fix document in the sample set so that we could say there is ten pages in every test document.

And that's just not the point of the exercise.  The point is to bound a category, an identifiable category, select it in a fair way, select the subset from it in a fair way, and then, whatever is in there is in there.

We don't, know, you know, what it is that we are going to argue from that. We have a good idea about some things, but to be able to say with certainty every single evidentiary characteristic or fact that you would want to draw from what is still going to be a very complicated set of materials is a -- is allowing the perfect to defeat the good and is going to make it, I think, logistically, impossible to embark on the exercise.

***MR. COWAN:***  I think it is doable, and here is why. They have brought a number of claims against our clients.  Each of those claims has a series of elements.  They know already what data points they need to prove each element of their

claim. They have already taken extensive deposition discovery of our client through 30(b)(6) depositions. They have all these, or many of these, fixes available and have been analyzing them and questioning our witnesses about them.

They know the attributes of these updates and fixes and these environments that they are concerned about. They know which ones they think create the liability implication. They can identify up front how they intend to use those attributes to extrapolate across the population, and that's the big difference. They don't want to show their hand, at this stage in the process, where we, then, can consider that and say, yeah, okay, we'll agree, we'll take that, and, as you say, waive what otherwise would be a substantive right of how the --

***THE COURT:*** I don't have -- I can't say right now, or won't say what I think makes more sense on those things, and it may not need to be, but it seems to me that it's one thing if you are saying waiving any arguments of statistical significance when you really think there genuinely may be some.

***MR. COWAN:*** Correct.

***THE COURT:*** Alternatively, you two agree on a large enough sample set and a good enough -- I mean, the random seems fine, I don't know how you can object to that, but determining the size you have to know the population and what percentage you are taking, I assume, to know whether it's statistically significant.

If you can agree on that -- I still think a waiver is a good idea, but, in reality, you are not really waiving anything. You are assuming that it's not really genuinely attackable. It just would be sort of an exercise in lawyering that, otherwise, might get engaged in, but shouldn't be.

At that point, I don't know whether you need to know what they were going to do with it because, if it's genuinely statistically representative, it should be correctly predicted. So, but, I don't know where you are going to end up on that. So, why don't you see.

Seems to me that that would be more -- in other words, if you were really satisfied that it was going to be a very adequate representative sample, there shouldn't be any reason to think that whatever method they pick is going to matter in terms of the -- that it's not a cherry-selected sample, and it's validly predicted by the universe.

***MR. COWAN:*** And, I this that's the point.

***THE COURT:*** So there can't be any skewing under that set of assumptions.

***MR. COWAN:*** Potentially. And, I think that's the point that Mr. Howard's making.

And, our point is, simply, we don't know until you see the set. And, what we may end up coming back -- we may, I hope, and Mr. Howard and I talked before the hearing and we have had substantial discussion in meet and confer, I hope we

come back in August and say: here are the things we have agreed to, here are some examples from both sides of why they think they are right, why we think we're right on more of these issues where we can physically show them to you, maybe much in the same way we did some of the technical issues where you can see the attributes. And then, that may help.

***THE COURT:*** Well, maybe.

It would seem to me you want to have your statistical experts talking to each other.

***MR. COWAN:*** We agree.

***MR. HOWARD:*** That is what we discussed before the hearing, Your Honor.

***THE COURT:*** I think that is essential, ASAP.

And maybe you could also, you know, maybe there is some middle ground where you don't have to disclose everything you could possibly do, but you run through some test examples, or something.

***MR. COWAN:*** Exactly, and, at least, have a good feel for at least some of the attributes and try to understand where we're headed.

***THE COURT:*** There must be some that are no big surprise.

***MR. HOWARD:*** I think the idea that we are trying to hide the ball, here, I don't think is quite fair. The detail of the proposal itself addresses exactly the attributes and the

things that we are examining. It's very carefully spelled out.

***THE COURT:*** There could be another way to do it. You could agree that there are certain things you are going to look at. And, to the extent that you are, rather than trying to hide the ball trying to keep from precluding yourself from something you later realize is very significant, you could have a two-tier thing and see if you could stipulate to that, and, if not, have some kind of motion -- to me, is that, in any way, abusing the sampling? Or, is it a fair --

***MR. COWAN:*** I think that's an excellent idea.

***THE COURT:*** I'm not crazy about that because it's more problems for me.

***MR. COWAN:*** I understand. But, that might be a way to get past some of the impasse, is to get -- do this thing in phases and get to that point.

There's one thing that Mr. Howard said that spelled out the attributes, and you may not want to focus on this now, or even later, but let me point you to one place in the proposal where, to me, it's kind of the gating issue of what we are taking about.

***THE COURT:*** I saw a lot of the use of the word "generally"; is that what you're going to --

***MR. COWAN:*** No, it's two things.

One, their proposal, really, the meat of it, if you will, doesn't begin until page 6, line 9.

***THE COURT:*** Um-hmm.

***MR. COWAN:*** I'm sorry, page 5, line 24. And so, it's really about two pages of the technical part. The rest of it is all definitional and prefatory.

But, if you turn to line 10, page 6, they are talking about taking the arithmetic -- at lines 9 and 10:

"The parties agree that for any given characteristic of the fixes and updates in the sample set, the arithmetic mean of that characteristic across the sample set shall be admissible at trial." That sentence is what we are focused on, because that is where the rubber hits the road, in terms of what the implications are on our client.

What we need to know is what characteristics are being, you know, dealt with, because you are taking some subjective interpretations of characteristics, having to give them some numeric quantifier and then taking a numeric mean. And, we've got to know how that's going to translate. So that is where I think we are going to spend the bulk of our --

***MR. HOWARD:*** If I may, just briefly, Your Honor, this is already constrained discovery. If this was a case about one fix, we would be entitled to explore that fix, in detail, without two tier, without this kind of bounding. And so, if we are going to have a sample set, it ought -- we ought to have the same type of discovery with respect to the sample set that we would have in the -- in the pursuit of evidence and

facts, generally.

So, we are happy to talk about characteristics, but you're right, it is important not to be precluded from finding what people find when they go through discovery in general.

***THE COURT:*** Okay, well, I mean, this is -- a lot of this is a chicken and the egg issue. If you can phase it or figure out -- I think that it's true -- I mean, again, I know less than you do, by far, and would prefer to keep it that way --

**(Laughter.)**

***THE COURT:*** -- but -- and operate on a need-to-know basis because there are a lot of other things I need to know about.

But, I can understand the idea that, if you don't know -- if there is a way of manipulating what a mean is by how you define characteristic that that could be problematic.

And so, you know, maybe you need to have a sample list of characteristics. And then, if a like thing had to be added, that might be okay, but something that would sort of allow "mean" to be more subjective where something else might not be.

I mean, you know --

***MR. HOWARD:*** Let's work on this.

***THE COURT:*** Yeah. But, I think the concept is a good one, I still think so. I want you -- I know it's

difficult to move fast, but we really have to, given the schedule.

***MR. COWAN:*** And we are.

As Mr. Howard indicated, we are continuing with the data warehouse, working with them, working through any technical issues on that part of it. We think a lot of this can take place in parallel with the discovery we are doing.

***THE COURT:*** All right.

I do think you should get your statistical experts together right away. To the extent they can agree on what is a statistically valid means of sampling, that is going to eliminate a lot of the fear.

***MR. COWAN:*** Okay.

***THE COURT:*** Because you are just no worse off than you would be, except you are saving a ton of money and time.

***MR. COWAN:*** Exactly.

***THE COURT:*** What else do we need to talk about?

***MR. COWAN:*** One issue, before I forget, and I have talked to opposing counsel about this before we came in; on the DOJ materials, just so you understand, we are continuing, despite our taking objection to the ruling you made last time, we are continuing to ready those documents for production. If we're unsuccessful in pursuing --

***THE COURT:*** You know, I issued a timing order.

***MR. COWAN:*** You did, and we are thankful for that,

but I wanted to raise one issue.

In your order, you specified that we could not list any privileged documents because of Ms. Boersch's representation that we are not waiving the privilege in communicating with the DOJ, and we are not. But, we have undertaken a substantial review of the delta between what has already produced to them versus the DOJ, what you ordered us to produce, to look for those things that are wholly irrelevant, and log those. And, we have made substantial progress, and we will be able to meet the time lines if, in fact, we are ordered to do that. But there are 11 documents that we have discovered that are privileged that we are communicating with the U.S. Attorney's Office on a claw-back procedure. So there will be 11 documents that will show up --

***THE COURT:*** If you succeed in clawing them back. But we need a timetable for that, I suppose.

***MR. COWAN:*** I would expect we can effect that this week. We just discovered it -- it was just brought to my attention last Friday. I didn't want to be here today -- we've communicated with the DOJ, and I wanted to make sure -- I didn't want to be here, and not tell you that. So, that was just an issue.

***THE COURT:*** You want to comment on that?

***MS. HOUSE:*** I think we'll just wait to see what the redacted log looks like.

***THE COURT:*** If you succeed in clawing them back, unless there is some argument I haven't thought of, I would be inclined to say, then, they're still privileged.

In general, I am very much a believer and supporter of claw-backs because I think that the volume of discovery is such that you can't work without them.

***MR. COWAN:*** I wasn't pleased that there were 11 there, but, quite frankly, given the volume, it's a very reasonable portion involved.

***THE COURT:*** So, yeah. My idea there, obviously, is that obviously, if Judge Hamilton reverses that, that is what is going to govern. But, if she doesn't, I want to keep thing moving.

***MR. COWAN:*** We understand that. And that is why we will stand ready to comply, if we're put in that situation.

***THE COURT:*** All right.

***MS. HOUSE:*** Just moving down the list, the damages causation evidence --

***THE COURT:*** Um-hmm.

***MS. HOUSE:*** And that still remains in flux. We had expected to have an annotated list from the other side per your order; the list we got was not annotated.

We have had a meet and confer with the other side about that; they are going to get us more information. We think that information is necessary in order to figure out what

additional delving down is going to be required. In addition to the materials, they gave us some samples; we don't think that materials that they provided us -- the general material -- is comparable to what we have provided. But, in order to really figure out what did additionally we need and from which customers we want to start that process because, obviously, with a limited amount of time we want to focus, as you suggested, on the ones that are most likely to be the hot ones. But, we are still awaiting information from them on that. And, I think we have to just defer a discussion on where we are on that until the next conference on the 28th.

***THE COURT:*** So there was a -- was the prioritized list of customers due on Friday?

***MS. HOUSE:*** Right, per your order. And we got a list, but it was just a non-prioritized alphabetical list of 61 customers with no gradation at all. According to our last conference about, you know, gee, which one -- there is specific language in your order, we called it to their attention. They have come back with a proposal to give us additional information. We'll evaluate that once we get it. I don't know -- I would like to know when I am going to get it.

***THE COURT:*** So what is the story with the holdup on that?

***MR. MCDONELL:*** Yeah, let me tell you the background.

So, the subject here is which customers of SAP will

be subject to discovery, especially as it relates to the causation of damages issue. And, when we were last here, I think I was the one who raised this issue and explained to the Court that there was -- for this discovery to exist at all, the starting point would be, well, did the customer have a TomorrowNow contract at all, and then, if so, did the customer also have an SAP contract? And, you had made some insightful comments about that about, well, how can you -- well, excuse me for --

***THE COURT:*** Groveling?

**(Laughter.)**

***MR. MCDONELL:*** Yes, thank you.

You had followed up on what I said, that even within that class of customers for which there is both a TomorrowNow and an SAP contract that there are going to be variations on the theme.

***THE COURT:*** Right.

***MR. MCDONELL:*** And I knew that, generally. And I'm absolutely convinced that there is going to be variations. And you said, well, why don't you give that them that list and annotate it so the clear ones are clear and the fuzzy ones are fuzzy. And I said that is what we will do.

So, we went back and began trying to do that. And, as fate would have it, it's not at all a simple task. In fact, as we thought about it, the things we can do and are proposing

to do are to get objective data points that should assist in this process.

So the things that made sense to us were to get the list of customers and to take all of the customers that we have been able to confirm as both a TomorrowNow and an SAP contract. So, that is the universe.

Then, in terms of trying to get some data with which to do an evaluation of that, it seemed to us the things that made sense would be contract dates -- now, they have all the TomorrowNow contracts, so that is not at issue. The product's at issue. So SAP sells a number of products, and then by giving products that the SAP customer has, they can do whatever mapping they think is appropriate back to the TomorrowNow contract.

Contract dates, if we can get them, and the plot thickens a little bit on that, but we should be able to, and then, dollar volumes of the contracts. And by getting that objective data, then either side can draw whatever conclusions they want about what it all means.

But, we concluded that we didn't think that the right thing to do would be to try to do the subjective qualitative kind of statements about, well, we think this one is a winner and that one is not, because that is what the discovery is ultimately intended to be directed to.

So that is -- I have told counsel that that is what

we are working on. Tougher than we thought. There is no --

***THE COURT:*** How many are we talking about?

***MR. MCDONELL:*** Sixty-one.

***THE COURT:*** When do you think you can do that?

***MR. MCDONELL:*** My goal is to have it done before we are back here on August 28th and to provide them with whatever list we have. And obviously, we have an incentive to get this done.

***THE COURT:*** That just seems like a long time. Maybe you can do it at least in a rolling fashion.

What are your thoughts on that?

***MS. HOUSE:*** And then, in addition, we need to see the underlying contracts, which we also haven't received.

Part of the problem is this was all supposed to be the filler information that would then inform our discussion about what additional information we need in order to figure out what really was the motivation behind going to an SAP application.

So, every one of these is just a stage to the next thing. Obviously, the sooner we can get that underlying information, the soon are we can say, well, gosh, we want to start with these top ten and get this kind of e-mail that has to do with the customer's -- that anything that customer had to say about TomorrowNow or what, you know, because that is the piece of the contract that we find the most interesting, how

did the TomorrowNow piece of the puzzle work to entice them into the SAP purchase.

***MR. MCDONELL:*** And, I'm not proposing to slow down, in any way, the production of the SAP contracts themselves for these 61 customers. So, to the extent that we have obtained the customer files for those 61, and, I believe, it's the majority, by far, we should have them all by next week, I hope, we'll produce those. So we'll get that rolling right away.

***THE COURT:*** All right. So, produce the actual contracts by next week. Is that --

***MR. MCDONELL:*** Unless, I put my foot squarely in the mouth again --

Ms. Freud is closer.

***MS. FROYD:*** We have been collecting them from the U.S., and I think will be able to get the vast majority of the North American ones done in the time period. The international ones are sort of coming in piecemeal, and will take a bit longer to collect.

***THE COURT:*** And what -- how many are U.S.?

***MS. FROYD:*** Unfortunately, I don't have the list in front of me. I would say at least half of them are the U.S.

***THE COURT:*** All right. All the U.S. customers by the end of next week.

And, can you also give the dollar value by the end of next week for those customers?

***MR. MCDONELL:*** Your Honor, we will try. I just can't promise I can get it done. It's a large company is about the simplest way to say it.

***THE COURT:*** I don't want to wait a whole other month for this to get going.

***MR. MCDONELL:*** Your Honor, I will commit to try to start pushing this information to counsel of -- you know, reasonably promptly after we get it and confirm it, and so forth, but I am doubtful that it will be completed much before August 28.

But, I understand the need to be working on everything simultaneously here.

***THE COURT:*** Right.

***MR. MCDONELL:*** So, we will push out what we reasonably think --

***THE COURT:*** All right, I think that is as far as we go on that.

Search terms?

***MS. HOUSE:*** The search terms has been, you know, meet and confer, meet and confer, meet and confer. We have -- my understanding is we have the latest proposal of what the German terms are going to be, and we are running them. We have been trying to help them. There is another meet and confer on Monday.

I would say my understanding is that the process has

been, you know, courteous, and we are trying. And there seems to be hope that there will be resolution.

***MR. COWAN:*** I think it's even stronger than that. And Mr. Alinder may confirm, at least did confirm, from the last meet and confer we had; we have a substantive agreement on a list. We are -- as you ordered us to have that agreement over a week ago, we reached that. But, we both believe we can do better than that list and are continuing to work to do that. And we're exchanging -- we're having our consultants work on this concept. And we are feeding information to -- Mr. Alinder and his team are working from their side and are commenting on it. My understanding from the last meet and confer, where we were was very close to having a final list.

We have, since the last hearing, reduced the number of responsive documents not hit by the search terms and increased the number of documents that won't get reviewed as a result of the search terms. So that is very good progress, absolutely.

We are working closely with them to get the list finalized and translate that list to German, where it can be applied to both sets of documents.

And, I'm hoping a week to ten days we should be done. And, correct me if I'm wrong.

***MR. ALINDER:*** I pretty much agree with that, Your Honor, I think, you know, we've made substantial progress in

the last two weeks. And, I think we are continuing to make additional progress, including we are scheduled to meet on Monday specifically to work out German terms and to make some further progress.

***THE COURT:*** Good.

***MR. COWAN:*** And, as we indicated in the joint statement, we do not anticipate coming back to the Court for relief on that. I think we are that close.

***THE COURT:*** All right.

Then the targeted searches, the issue seems to be the -- just down to whether they are correlated with previous requests for production or not?

***MR. MCDONELL:*** That's correct, Your Honor.

***MS. HOUSE:*** The language we propose -- we each put in different proposals for language. We feel the whole point of a targeted search is to try to ease the thing, make it very clear what it is that is targeted so you go out and shoot for the target.

One of the problems with the initial draft of the targeted searches we got from defendants is that they would list, in some cases, dozens of RFPs in the actual targeted search, which completely means you have to then go back, read all those RFPs, which is often two paragraphs long, then go back and read your objections, figure out if there has already been a ruling on it related to any of those RFPs from Judge

Legge. That sort of defeated the purpose. When the rationale came in as to why, it was, well, we don't want you to increase the number of RFPs that have been ordered.

All of these targeted searches are clearly the ones that are in the heart of the litigation. They are going to be covered by discovery. But having a very clear delineation of this is the search, then you know what you are responding to. To us, really made it a lot easier, both in terms of responding, but, if there is a dispute that comes up to Your Honor, then you don't have to go and have -- look at 40 different RFPs and then the objections and prior rulings.

***THE COURT:*** Right.

***MR. MCDONELL:*** So, Your Honor, our concern was that Rule 34 does govern document discovery. Both sides have issued broad documents requests, and this entire exercise of targeted searches has evolved out of what steps the parties will take to search for responsive documents to those written document requests.

So, custodian searches is part of the efforts to look for those documents, but, as a supplement to that, both sides have agreed that there would be targeted searching as well. Our view is we shouldn't become completely disconnected from the document requests that are at issue because that's the foundational point here.

So the process the parties have established accounts

for any concerns counsel has about ambiguities or vagueness. We've put forth in the joint statement there a proposed process: After exchanging the targeted searches, one week later the receiving party can express any concerns about vagueness or ambiguity or objections in general and try to work them out, and at the same time try to give some type of statements about what they will do to conduct the search and how long they expect it to take. So, those types of concerns about ambiguity, and so forth, are going to be dealt with through that process.

But, I don't think we should suddenly be inventing a new class of discovery under the Federal Rules.

***THE COURT:*** You have to refresh my memory.

The targeted searches have not been written, in other words?

***MR. MCDONELL:*** We have exchanged drafts. We have.

***THE COURT:*** I mean, there is something above what both of you are saying. I'm really just concerned with the practicalities. I don't want to have to parse out, just like she says. I mean, I hate those exercises. And, there is so much water under the bridge already, in this case, some of which you are asking me to redo and some of which I won't have to. So I don't want to go back into that.

On the other hand, I -- I mean, if a targeted search is asking something that is not fair game for discovery because

it's not relevant, it shouldn't be asked. And if -- and I do want to try to enforce the limit that Judge Hamilton has set for you, which is the point you made, 150. I'm not sure how to reconcile those two things.

***MS. HOUSE:*** There's a --

***THE COURT:*** I do think there a valid point that Oracle is making. If you agree on what the right targeted searches are, as long as they're -- it sounds like they are all going to be a subset of responsiveness to something. If they are not responsive to anything, or to something that exceeds 150 requests, then it's off limits.

***MR. MCDONELL:*** Yeah, but that is -- pardon me for a --

But that is part of the process though. At least saying your targeted search, what the origins of it are, so we know in writing, on the record, that it is tied back to a Rule 34 document request so we know what that background is.

And then, if there are concerns about whether it's clear or not, the written targeted search is exchanged, and the parties can object or not object as they see fit and work it out. And, they'll have incentives to try to get it done.

***THE COURT:*** Have 150 RFPs already been made?

***MS. HOUSE:*** There have been numerous RFPs, and there's been numerous history on this. I mean, this --

***THE COURT:*** Is this a concern on your part? Is this

really a fight over that or not?

***MS. HOUSE:*** What you mentioned, there hasn't been any reaction, gosh, this is totally new; this is far afield. Every one of these things are clearly related to other discovery. The question is whether you have to go back, find every one of the 35 that might touch on it, mention those. It just was so unwieldy when we got their draft requests.

***THE COURT:*** In general, I lean towards what you are saying, but -- I don't want to get into trying to parse disputes about does this relate to request 34, 38, 52 and 130 or not? I mean, that just seems -- and even just the time, I picture this host of, I guess contract attorneys, running around for the next few days doing that. So, I don't want to do that.

On the other hand, I --

***MR. MCDONELL:*** It just seems to us that it's a minimally burdensome thing to do your targeted request and then identify which document requests you think --

***THE COURT:*** I guess I'm just looking at the practice. What is the end game? What is the purpose? I mean, is someone going to say, then, okay, we -- you know, I mean, I want to avoid more motions, not add to them.

***MR. MCDONELL:*** If there is an issue down the road as to whether documents, RFPs have been responded to or not, we'll know which targeted searches were intended, at least in part,

to resolve or to fulfill the obligation to search and produce documents responsive to that particular RFP. Otherwise, we've got a new discovery device, a targeted search that has no real process around it.

***THE COURT:*** The only thing that -- you know, it's not like our existing system is so wonderful.

**(Laughter.)**

***MR. MCDONELL:*** Always room for improvement.

**(Laughter.)**

***MS. HOUSE:*** And there is process. Everything about -- we put forward a process.

***THE COURT:*** Just a minute.

But, you know, I mean, is this really, are we going to -- because if there is a motion to compel saying, well, you never responded to request 134, you know, even if we know a targeted search was part of a response to 134, that there still could be an argument, but that was just a targeted search. So, I'm just trying to look at, practically, is this going to be helpful or not.

***MR. MCDONELL:*** In my view, it is. I don't think it's a great matter of principle. It's conceivable with further conferring on this point we can bridge this gap.

***THE COURT:*** I mean, I lean against it, although I am concerned about, you know, I have got to enforce limit that Judge Hamilton set.

I just think, I mean, often people -- we spend ridiculous amounts of time with something that is clearly relevant, if it is, as to did it fall under this request, or that request, and the other request, and who cares? You know and that's where I am --

***MR. MCDONELL:*** But, all the stuff has a purpose. For example, as counsel mentions, there were objections to those original requests. And, for example, both sides objected on privilege grounds to each and every one. And I wanted to know that those objections are still there, valid, on the record, and those are not being waived or --

***THE COURT:*** Okay, well --

***MR. MCDONELL:*** -- superseded, and that we don't have to restate them all.

***THE COURT:*** All right, so can I just simply say that all privilege objections apply to the targeted searches?

***MR. MCDONELL:*** I believe that would be appropriate.

***THE COURT:*** Okay.

***MS. HOUSE:*** That's fine.

And as part of the response, you can put your classic, you know, protective language, are you saying, you know, insofar as prior objections --

***MR. MCDONELL:*** But, then we are cycling all over again.

***MS. HOUSE:*** But, the point is -- was you've

referencing 30 RFPs in a targeted search makes it not --

***THE COURT:*** Okay.

***MS. HOUSE:*** Creates confusion.

***THE COURT:*** I would prefer not to do it. You can talk some more. If there are some particular reasons, though, let's try and address those. I'm happy -- do you want some language that you can agree on, along those lines, so that objections are preserved --

***MR. MCDONELL:*** Very well.

***THE COURT:*** Okay.

Board minutes: Agreed to, I think.

***MS. HOUSE:*** Yeah, that's a good one.

***THE COURT:*** All right. And so, now, you are talking about a host of future motions.

***MS. HOUSE:*** And we know how crowded your calendar is, and that is why we thought you we better talk to you about getting on that calendar.

***THE COURT:*** Well, getting on, and then do you really need to bring all these motions?

***MS. HOUSE:*** Mr. Howard wants to talk about the first one, which had actually been cycled through on the very first, I think, conference we had --

***MR. HOWARD:*** Yeah.

The one that doesn't fit in the set, I think, is the privilege document motion. We did have some colloquy about

that earlier. You expressed, I think, if I'm paraphrasing you accurately, a preference to have just a look at representative documents and categories that we might identify. And, we think that's perfectly fine. In fact, we would be happy with, you know, a small amount of briefing to have you look at what we would identify as representative documents in certain categories. And, we can even do that, you know, more quickly than the regular schedule because, I think, there will be a ripple effect from whatever your ruling is, probably, on those documents.

***MR. COWAN:*** And, I think that's fine, Your Honor, as long as we know ahead of time what specific documents are going to be at issue. We either will resolve them, or stand on our objections. I think that's fine.

***THE COURT:*** How many are you thinking?

***MR. HOWARD:*** Well,there are many documents that have been clawed back on privilege -- let me give the broad context.

There are several privilege issues that are percolating in the background. We don't think it makes sense to bring them all to you right this second. There are a couple of categories that we think we do need guidance on, for example, documents that we just think are just not privileged; documents where the privilege has been waived for one reason or another, but, where there are many other documents stacked up behind them that are like the -- what the representative

document would be.

What we would like to do is put three documents, maybe, in each category, or some very small number --

***THE COURT:*** How many categories? Three times what?

***MR. HOWARD:*** I think two categories, initially.

***THE COURT:*** Um-hmm.

***MR. HOWARD:*** And then, I think, in the hopes of getting your guidance without having to put so much before you, we'll go from there and see what more needs to be done.

***THE COURT:*** Okay. And the categories being? Do you have in mind --

***MR. HOWARD:*** Those two that I just identified I think are the two primary ones that we are thinking about.

***THE COURT:*** All right, so when could you tell the other side which documents you want to put before me.

***MR. HOWARD:*** I think that they know. I mean, we have met and conferred on a whole host of documents, but, in advance of filing, we could tell them next week.

***THE COURT:*** Like a week from today?

***MR. HOWARD:*** A week from today.

***MR. COWAN:*** You say in advance -- if we have them and we look at them -- we have gone back, just so you know, as you told us, we go in the front end, and certainly, when they are called into question, take the allegation that they're not privileged lightly. We're looking at that at our senior

associate level, at the partner level, and client-level attention.

And we will not, unless we have a good faith belief that it is privileged, we are not going to stand on it just because it was originally marked as such. So, once we get that, we will look at it. I would hope that reasonable minds won't differ on something they think is absolutely not privileged.

***THE COURT:*** If they gave it to you in a week, how long would you need to either agree or tell them you still disagree and then they can file their motion?

***MR. COWAN:*** A matter of three or four days. If we are talking about two or three documents, I don't think that's a big --

***THE COURT:*** I think we are talking about six documents in two categories.

***MR. HOWARD:*** We may be talking past each other. These are documents that they have clawed back.

***THE COURT:*** So if you --

***MR. HOWARD:*** There's no need to show them to them again.

***MR. COWAN:*** If we have clawed them back, we have re-analyzed them.

***MR. HOWARD:*** We would like to just file those and get moving.

***MR. COWAN:*** But the thing I'm concerned about is we have clawed them back, and we have told them why, that before we go into motion practice that involved -- we want to hear what they have to say about it -- we don't want them -- we don't want to claw it back and say we think it's still privileged, here's the redacted document and then, immediately them to file a motion without going through the meet and confer process.

***THE COURT:*** They are saying you clawed it back before some time ago, is what they are saying.

***MR. COWAN:*** Right.

To my knowledge, unless I'm missing something, I'm not aware that we have met and conferred on the issue they are talking about bringing other than just a clawing back.

***THE COURT:*** Well, okay, if you -- I mean, I don't need to have a conference to tell you what the Local Rules require, they require meeting and conferring. If you have, you have; if you haven't, you haven't.

If you need to meet and confer about whether you have meet and conferred --

**(Laughter.)**

***THE COURT:*** -- I don't know what to say.

***MR. COWAN:*** I don't think we need that. I think we need to understand precisely what the problems are and what they are going to seek relief from you and have an opportunity

to comment.

***THE COURT:*** All right, all right. You can show them the motion you are going to file a day in advance.

***MR. HOWARD:*** Fine.

***MR. COWAN:*** That's fine.

***THE COURT:*** When do you want to do that and then file?

***MR. HOWARD:*** I think we can file by next Friday.

***THE COURT:*** Okay. And so, we'll show it to them on next Thursday? Friday is the 1st -- yeah, so we'll show them the draft on 31st.

Show them in the morning of the 31st, okay? Can that be done?

***MR. HOWARD:*** Yes.

***THE COURT:*** Okay.

And then your opposition, if it does get filed, on Friday, a week later?

***MR. COWAN:*** Yes that's fine, on the 8th.

***THE COURT:*** And a reply two days later after that, or two working days later?

***MR. HOWARD:*** So that would be the 12th, Your Honor?

***THE COURT:*** What date would that be?

***MR. HOWARD:*** They would oppose on the 8th; we would oppose on the 13th; would that be acceptable?

***THE COURT:*** That's fine.

And I'll just take it under submission and decide what I'm going to do. I'll let you know if I need to address it. I suppose we could take it up at the case management conference.

***MR. HOWARD:*** All right.

***THE COURT:*** But I'll just rule on those documents and why, and then, you will have to decide what the implications are, and hopefully you can.

All right, what about this 30(b)(6) --

***MR. COWAN:*** Before we move off of that, there was the issue before about on a claw-back process of whether they keep the documents, et cetera; is it your understanding that they would be submitting the documents to you?

***THE COURT:*** Oh, good question. I don't really remember the issue.

***MR. COWAN:*** Our concern was that once the document is clawed back, they shouldn't be using the document for any purpose. They can certainly refer to it, based on what they have seen before it's clawed back. But trying to file a document, et cetera, if it needs to be presented under seal, we will be happy to present it to the Court in camera for the in-camera review. We don't think they should be the ones handling our clients' privileged documents until the Court determines they are, in fact, not privileged.

***THE COURT:*** It ought to be submitted in camera and

under seal. I don't know if it matters who does it.

***MR. HOWARD:*** We had anticipated submitting it attached to our motion, to brief it and discuss it as we had discussed.

***THE COURT:*** I can't remember what I said before.

***MR. COWAN:*** My understanding was that the Court had instructed them by reading the protective order. I think it's the document we were referring to, that, while they could rely on the information they got prior to the claw-back, they shouldn't be using the document itself.

***THE COURT:*** Do we have a transcript? I don't remember. Whatever I said, I'll stick with it.

***MR. MCDONELL:*** My belief is that was covered in your written order.

***THE COURT:*** It may be.

***MR. MCDONELL:*** Not from the last one, from the prior hearing.

***THE COURT:*** Could be. I do remember reading -- now that you mention it, I think I felt it read a certain way, and it may be that way. Whatever I did, just be consistent with that. If you can't use it, then they have to file it. And, you can tell them which number it is and have them file it.

I mean, in some ways this is fairly academic.

***MR. COWAN:*** It is. I think the greater concern is that there is an ongoing use of the document we're calling as

privileged and discussion internally about it. Memories fade; there is some protection by the fading of the memory, that is our concern.

***THE COURT:*** If it weren't -- if the agreement said something I was going to enforce it.

I will say that I don't think this -- this kind of thing deserves the same level of protection as, say, the secret spy documents, which --

**(Laughter.)**

***MR. COWAN:*** Understood.

***THE COURT:*** -- have to be erased from memory, if necessary, by extreme means.

***MR. COWAN:*** Fair enough. It's more a process point for us, Your Honor. We are talking about six documents. It's not going to be the end of the world. But it's more on an ongoing basis.

***THE COURT:*** Yeah, well, I can't elaborate anymore on that.

So is there anything else?

Okay, these other motions: Do you have to bring a motion on a 30(b)(6)?

***MS. HOUSE:*** Well, we have -- we still await a response. Basically, what this motion has to do with is the fact that we want to essentially get some of our time back for witnesses that we think were woefully underprepared. And since

we have such a small amount of time, we offered, or gave a very clear explanation about why it was, and we made a record at the deposition as well. We have not yet heard back from them on whether they will give us back any time. If we need to, we may need to raise that to Your Honor.

***THE COURT:*** So you are saying a seven-hour deposition really wasn't worth seven hours because the witness didn't know the answers so you should get an extra three hours?

***MS. HOUSE:*** Right, something exactly like that. In fact, we offered specific times, but we have not yet heard back. And, it's been a while.

***THE COURT:*** Okay.

***MR. MCDONELL:*** I plan to have a letter out on this tomorrow, but can I get clarity?

Is the only request a request for more time? I had understood that it was requested that further witnesses be produced on these subjects, which is a different matter.

***MS. HOUSE:*** It's a combination. The letters are very -- I just was trying to give a shorthand to the Court about what the order is about.

***MR. MCDONELL:*** They do have a letter to us. We owe them a response. And expect it tomorrow. And it all has to do with what is the proper scope of a Rule 30(b)(6) deposition. We objected to the scope but produced the witness while reserving our objections. And they think we didn't have enough

detail, we thought we did.

So, this issue will be more focused among counsel by tomorrow. If they have a motion, presumably, they will take steps to try to schedule it.

***MR. MCDONELL:*** To give you an example, they had a 30(b)(6) notice on the SAP; they wanted a witness to testify on the acquisition of TomorrowNow. That is a very broad subject, so we objected. And, we said would will produce a witness with general information about that, but they won't know all the details. And, we reserve the right to produce the details through other witnesses.

One of the questions that came up in the deposition was:

***"Q.*** Did you meet with representatives from TomorrowNow?
***"A.*** Yes, we did.
***"Q.*** How long did the meeting take?
***"A.*** I don't remember."

So now they are moving to compel because he didn't remember how long the meeting took; we think that a bit of a nit for a 30(b)(6). And that is one example.

***THE COURT:*** I will say, if that is the question, the kinds of questions you guys are going to ask me to rule on, I do not look forward to that. Those are the kind of small-time stuff, if that is, that ought to be resolved and then also

looked at -- I mean, could that answer be provided by some other means, like an interrogatory or a document of the meeting log, or something.

***MR. MCDONELL:*** Sure.

So just -- and we have talked about this, but a preview of what my letter will say, we are trying to take -- there are many complaints and classify them. So many of them, we think, are questions where the witness who actually would have the first-hand knowledge is on the deposition list already, anyway. And, our proposal is going to be to just ask the witness who already knows.

***THE COURT:*** That would probably be fine, at least in the sense that I don't know why I would rule on 30(b)(6) until that already happened.

Now, it might be that if there was tons of "I don't knows" in a 30(b)(6), then I'd say somewhere you are going to get an extra hour or two. Whether it's with that person on the list on or the 30(b)(6) mechanism, hard to say which would make more sense.

***MR. MCDONELL:*** I don't think the hours is that big a deal. The grand total of hours they are asking for is less than ten.

***THE COURT:*** Maybe that is something you can reach an agreement on.

***MR. MCDONELL:*** We'll talk about it.

***THE COURT:*** If there is a motion that does not have to be brought and decided in the sense that you very well may get the information in some other way that is perfectly acceptable, I don't see why I should expedite it.

***MS. HOUSE:*** Okay.

***THE COURT:*** All right, so, "Motion to compel re-review and de-designation of the confidential"; what is that about?

***MS. HOUSE:*** At the end of last hearing, I referenced to you the fact that we were somewhat dismayed at the incredible over-designation of highly confidential and confidential documents and previewed to you that we would need to get some relief.

Subsequent to that motion -- or to that hearing, we sent a letter with a log of the 27,000 highly confidential document designations and said, come on, guys, this stuff is supposed to be so super, super sensitive that it gets this very special treatment. We can't show it to our internal people. It's really stymying our ability to do this case, cut it out. And, moreover, here's this list.

***THE COURT:*** So what has happened?

***MS. HOUSE:*** Nothing. There has been no response.

***MR. COWAN:*** Well, we have tasked an individual, a senior-level individual, to go back and look at those.

As you can see from the detailed affidavit of how we

do the custodian review, et cetera, it's a very involved process involving a number of lawyers. Some 91 lawyers have had their hands, at some point, on some of these documents.

There are subjective differences between 91 lawyers, as you might expect, on some of that. We think the best approach, based on their list they provided, is to have a one or a very small group of folks go through the 27 as quickly as possible, and tell them which ones we will and which ones we won't, and give them a finite list on what will be either re-designated or de-designated off of that list. And, we are doing that as quickly as possible.

***THE COURT:*** I would say that usually, if there is differences among the reviewers, it's probably not highly confidential. In other words, a highly confidential is supposed to be truly, truly crown jewel-type of stuff.

***MR. COWAN:*** Potentially. And, that is why we are trying to take out the vagaries of that process to make sure to the second process that we are having things that, yes, we will be willing to come in front of you and stand on those designations through a motion practice.

We think we have a defensible process in place. It is not infallible. And, we are reviewing it in earnest to do that. We have been, today, been able to resolve all these designation issues, I think, reasonably promptly.

***THE COURT:*** So when would your process be done,

then, though?

**MR. COWAN:** Your Honor, it is hard to say, given the volume of documents we are talking about. But, we have an individual whose sole primarily duty is to get this done. And, we can start rolling them out on a rolling-out basis and letting them know that, so that they can start rolling them to the clients. And, we can do that on a weekly basis until that's done.

**THE COURT:** Do you have a priority of what -- I mean, you can direct what you want to them to look at first. I don't want to hear about it myself.

**MR. COWAN:** Yeah. If they have looked at them onesy-twosy, I would guess, if there is 27,000 documents, they have had some categorical or automatic way they've done that. Either way, we are looking at them on a onesy-twosy basis. So if they tell us which are their priorities, we'll focus on those first. Otherwise, we'll start at the top of the list and shell them out to them as we get them produced on a weekly basis.

**THE COURT:** Well, I mean, it's going through one by one, but there are some categories and the findings that, you know -- a document in a certain category is not, then I --

**MR. COWAN:** Right, absolutely. And when I say one by one, it's not one person reading every word and every line of the document. Sometimes you can tell from looking at the

document it clearly is or it clearly isn't moot, move on.

This review is being done electronically and not in paper form, and so it is time consuming, given the volume, but I think we can commit to getting on a schedule and getting it done.

***THE COURT:*** Well, I guess I think you should give them a schedule.

***MR. COWAN:*** Okay.

***THE COURT:*** When can you do that?

***MR. COWAN:*** I think we can get the first one rolled out by -- the first set rolled out by next Friday, and just get them done every --

***THE COURT:*** But, if it's a thousand documents once a week, that is half a year.

I'm not going to talk about it any further now, but sit down, come up with a schedule that gets it done in a much shorter time than that. And you have the option, if you want, of directing which gets done first.

***MR. COWAN:*** I think that makes sense, Your Honor. And I will have a better statistics next week of where we are on that process.

***THE COURT:*** Okay.

***MR. COWAN:*** Thank you.

***THE COURT:*** So let them know sometime next week what your proposal is. But, in the meantime, tell them that you

have a priority.

All right, then you have some motions you are thinking about?

***MR. MCDONELL:*** We are thinking they are not ripe. We are not asking they be scheduled now. We will take that up, as appropriate, at the next hearing.

***THE COURT:*** Okay.

Obviously, I prefer to figure out a way to head at least some of these off.

***MR. MCDONELL:*** Okay.

May I raise one other matter? And, I'm just going to ask this question purely in the abstract.

Rule 30 of the Federal Rules of Civil Procedure governing depositions includes, among other things, a provision that objections made at the depositions must be stated concisely, in an non-argumentative and non-suggestive manner. We're -- in order to head off disputes that might arise over time, does Your Honor have a clear philosophy on the rule?

***THE COURT:*** I'm a strong supporter, if that is what you mean.

***MR. MCDONELL:*** The rule as it's spoken, is the rule as it's enforced.

***THE COURT:*** Right. I have been known -- I mean, maybe you all have already done this, but, after ten years, I probably have tons of decisions that you could look at on

recurring issues. And, one of the things I have been known to do is look at the index of the deposition and look at the ratio of lines spent on objections to testimony.

***MR. MCDONELL:*** And speaking objections, in particular.

***THE COURT:*** Well, I mean, obviously, if there were valid privilege objections, et cetera, yeah. I don't like coaching and I don't like extended objections.

***MR. MCDONELL:*** Thank you, Your Honor.

***THE COURT:*** But, I mean, I can't say -- obviously, valid objections need to be made.

***MR. MCDONELL:*** Of course. Thank you.

***MS. HOUSE:*** That's it.

***MR. MCDONELL:*** Nothing further.

***THE COURT:*** All right.

***THE CLERK:*** Courts is in recess.

**(Proceedings adjourned at 3:40 p.m.)**

**---o0o---**

## CERTIFICATE OF REPORTER

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing. The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

**/s/ Sahar McVickar**

**Sahar McVickar, RPR, CSR No. 12963**

**Wednesday, July 30, 2008**