Walsh v. Apple, Inc. et al Doc. 197

# EXHIBIT 1

Dockets.Justia.com

## RESEARCH AND DEVELOPMENT
## COST SHARING AGREEMENT

This Research and Development Cost Sharing Agreement (the "Agreement") is made and entered into as of the 4th day of June, 1998 by and among J.D. Edwards World Source Company , a Delaware corporation with principal offices at 7601 Technology Way, Denver, Colorado 80237 ("Source"), J.D. Edwards Europe Ltd., a corporation organized under the laws of the Republic of Ireland with principal offices at Gardner House, Wilton Place, Dublin 2 Ireland ("Europe"), and J.D. Edwards (Singapore) Pte. Ltd., a corporation organized under the laws of Singapore with principal offices at No. 1 International Business park, The Synergy, #06-01/04 Singapore 609917 ("Singapore").

### RECITALS

WHEREAS, Source, Europe, and Singapore each engage in the business of developing, marketing, and supporting multinational, integrated enterprise software for distribution, finance, human resources, manufacturing, and supply chain management;

WHEREAS, Source, Europe, and Singapore desire to pool their respective resources for the purpose of conducting research, development and marketing with respect to integrated enterprise software for distribution, finance, human resources, manufacturing, and supply chain management and to share the risks and costs of such research, development and marketing activity and the intangible property as may be developed therefrom;

WHEREAS, Source, Europe, and Singapore agree that a cooperative effort is desirable in order to minimize duplication of effort, overall research and development risks and expenditures as well as to maximize the results of such efforts; and

WHEREAS, Source, Europe, and Singapore intend to share economic ownership and rights to, as well as to exploit, the proprietary technology and other intangible rights developed in accordance with this Agreement as described herein.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, Source, Europe, and Singapore, intending to be legally bound, covenant and agree as follows:

### SECTION 1

### DEFINITIONS

For purposes of this Agreement, the following definitions shall apply to the terms set forth below wherever they appear:

**1.1** **Aggregate Allocable R&D Costs** shall mean the sum of the R&D Costs (as

Highly Confidential Information - Attorneys' Eyes Only 

herein defined) of Source, Europe, and Singapore for an R&D Fiscal Year, or part thereof, less Specific R&D Costs.

**1.2 Allocable Marketing Costs** shall mean costs incurred by a party during an R&D fiscal year for the development, acquisition, or protection of Marketing Intangibles, if both parties agree in writing that they would both benefit from using the Marketing Intangibles.

**1.3 Confidential Information** shall mean any information disclosed by one party to the other pursuant to this Agreement which is in written, graphic, machine readable or other tangible form and is marked "Confidential," "Proprietary" or in some other manner to indicate its confidential nature, or is otherwise known to be confidential information of the disclosing party. Confidential Information may also include oral information disclosed by one party to the other pursuant to this Agreement, provided that such information is designated as confidential at the time of disclosure and is reduced to writing by the disclosing party within a reasonable time (not to exceed thirty (30) days) after its oral disclosure, and such writing is marked in a manner to indicate its confidential nature and delivered to the receiving party. All Developed Technology shall be considered Confidential Information of each party.

**1.4 Cost Share** of a party shall mean the portion of the Aggregate Allocable R&D Costs, Allocable Marketing Costs, and Specific R&D Costs allocated to the party under Section 4 of this Agreement.

**1.5 Cost Sharing Ratio** shall mean that term defined in Section 4.2.1 of this Agreement.

**1.6 Developed Technology** shall mean any Technology arising out of or constituting the results of the Research Program conducted by the parties (a "covered intangible" within the meaning of United States Treasury Regulation ("Treas. Reg.") §1.482-7(b)(4)(iv)).

**1.7 Developed Technology Documentation** shall mean that term defined in Section 7.2 of this Agreement.

**1.8 Documentation** shall mean that term defined in Section 7.3 of this Agreement and shall include all written materials or other media pertaining to a particular Technology and all information, concepts, data, and techniques included therein.

**1.9 Marketing Intangibles** shall mean and include any and all trademarks, trade names, copyrights, designs, service marks, applications and registrations therefor, packaging, marketing strategies, customer lists, other marketing information and other similar marketing intangible property relating to any of the Products.

**1.10 Payment Date** shall mean within sixty (60) days after receipt of the statement as provided in Section 5.

**1.11 Products** shall mean all products and services which utilize, embody or



Highly Confidential Information - Attorneys' Eyes Only ORCL00182316

incorporate Developed Technology including but not limited to integrated enterprise software for distribution, finance, human resources, manufacturing, and supply chain management.

**1.12** **R&D Costs** of a party shall mean and include the following costs (determined in accordance with Treas. Reg. §1.482-7(d)) incurred by a party in connection with the Research Program (as herein defined):

1.12.1 Direct costs incurred by that party during the term of this Agreement for the conduct by it of the Research Program as determined under United States generally accepted accounting principles; provided, however, that such direct costs shall not include any depreciation or amortization expenses incurred by such party;

1.12.2 Indirect costs incurred by that party properly allocable to the research and development activities, including allocable costs of general corporate administration as determined under United States generally accepted accounting principles; provided, however, that such indirect costs shall not include any depreciation or amortization expenses incurred by such party; and

1.12.3 A reasonable rental charge for each item of tangible personal property used by that party in connection with the Research Program.

**1.13** **R&D Fiscal Quarter** shall mean each three-month period commencing on November 1st of each year, or such other three-month period as may be mutually determined.

**1.14** **R&D Fiscal Year** shall mean the twelve-month period ending on October 31st of each year, or such other twelve month period as may be mutually determined.

**1.15** **Related Party** shall mean any legal entity owned or controlled, directly or indirectly, by J.D. Edwards & Company, Europe, or Singapore, as the case may be.

**1.16** **Research Program** shall mean that term defined in Section 2 of this Agreement.

**1.17** **Sales** shall mean gross sales (including sales to J.D. Edwards World Solutions) less returns and allowances and direct selling expenses.

**1.18** **Specific Development** shall mean the Developed Technology which can be utilized solely by or is of benefit solely to Source, Europe, or Singapore.

**1.19** **Specific R&D Costs** shall mean the sum of R&D Costs of Source, Europe, and Singapore for a R&D Fiscal Year, or part thereof, incurred with respect to any particular Specific Development.

**1.20** **Technology** shall mean any and all technologies, procedures, processes, designs, inventions, discoveries, know-how, show-how and works of authorship, including without limitation documentation, and all (i) issued patents, utility models and the like, and applications



Highly Confidential Information - Attorneys' Eyes Only 

therefore pending before any relevant authority worldwide, including any additions, continuations, continuations-in-part, divisions, reissues or extensions based thereon; (ii) copyrights and other rights in works of authorship; (iii) trade secrets; and (iv) Confidential Information and any other intellectual property rights constituting, embodied in or pertaining thereto.

## SECTION 2

## JOINT RESEARCH PROGRAM

**2.1 Scope of Research Program.** The parties hereto agree to combine their research and development efforts and to share the costs, risks and rights relating to the design, and development of integrated enterprise software for distribution, finance, human resources, manufacturing, and supply chain management, related and successor computer programs and technology (whether or not foreseen at the time hereof), and such other areas or items as the parties may agree to from time to time, including both basic or experimental research and product-specific research (whether relating to new product development or the improvement, adaptation or modification of existing products, the development of prototypes, as well as manufacturing and process technology) which the parties may agree to make part of the joint research and development program (the "Research Program"). The parties hereto intend that the arrangements contemplated by this Agreement constitute a "cost sharing arrangement" within the meaning of Treas. Reg. §1.482-7(a)(1).

**2.2 Acquired Intangibles.** In the event that either party acquires any intangible property relating to the Products from a non-Related Party by means of a cash purchase, license or similar transaction (excluding stock acquisitions), that intangible property may be added to the Research Program upon agreement of the parties. In that case, the amount paid by the acquiring party to acquire those rights shall be treated as an R&D Cost of that party. Acquisition costs which are measured by the productivity or use of the Product, or are otherwise determined by a variable measure, shall be treated as an R&D Cost of a party as such expense is periodically incurred. If the productivity or use is measured with respect to any one party's territory, then the cost shall be treated as a Specific R&D Cost. In the event that any party acquires any intangible property relating to Products from a non-Related Party by means of a stock acquisitions, that intangible property may be added to the Research Program upon agreement of the parties, which agreement shall include an appropriate arm's length royalty rate for the use of such intangible property.

**2.3 Contributed Related Party Intangibles.** The parties acknowledge that Source has entered into separate license agreements of even date herewith with Europe and Singapore granting certain rights from Source to the licensee relating to Source's existing Technology. The parties further acknowledge that neither party has made available to the Research Program any valuable intangible property, other than that described in such license agreement.



Highly Confidential Information - Attorneys' Eyes Only ORCL00182318

## SECTION 3

## DEVELOPMENT ACTIVITIES AND BUDGET

At the beginning of each R&D Fiscal Year, unless this Agreement shall have terminated in accordance with the provisions of Section 11, the parties (i) shall agree upon a budget for the research, development and marketing activities to be undertaken during such R&D Fiscal Year, and (ii) shall prepare a development schedule for the activities to be undertaken including an allocation of the development responsibilities of each party, including, without limitation, the location where the development activities will occur. The budget and development schedule described in the preceding sentence shall be considered an addendum to this Agreement when executed by Source, Europe, and Singapore. The parties hereto may amend or modify the Research Program (including the budget and development schedule therefor) at any time during the fiscal year as they shall agree.

## SECTION 4

## COST ALLOCATION

**4.1 Specific R&D.** All Specific R&D Costs shall be allocated in their entirety to the party to whom the particular Specific Development pertains.

**4.2 Non Specific R&D.**

4.2.1 The parties intend that the Aggregate Allocable R&D Costs shall be borne by each party based upon the reasonably anticipated benefits to be derived by each party as a result of exploitation of the Developed Technology, whether in the form of additional income generated or costs saved. As of the time hereof, the parties believe that reasonably anticipated benefits are best measured by the ratio (the "Cost Sharing Ratio") which (i) Sales derived from the business activities in which the Developed Technology is exploited by a party hereto bears to (ii) the total Sales derived from the business activities in which the Developed Technology is exploited by all parties hereto.

4.2.2 The estimate of reasonably anticipated benefits to be derived by each party as a result of exploitation of the Developed Technology and used to determine the Cost Sharing Ratio defined in Section 4.2.1 and implemented in Section 4.2.3 hereof shall be based upon projections which shall include a determination of the time period between the inception of the research and development and the receipt of benefits, a projection of the time over which benefits will be received, and a projection of the benefits anticipated for each year in which it is anticipated that the Developed Technology will generate benefits.

4.2.2.1 To the extent projections anticipate a significant variation between the parties hereto in the timing of their receipt of benefits from the exploitation of the Developed Technology, the anticipated benefits shall be based upon the present discounted value of such projected benefits to each party.



Highly Confidential Information - Attorneys' Eyes Only ORCL00182319

4.2.2.2 Projections shall, to the extent required, be based upon underlying factors such as a projection of sales as of the date of this Agreement and at the beginning of each R&D Fiscal Year.

4.2.2.3 As necessary and appropriate, the parties will review the projections and negotiate in good faith to amend the ratio in which they share the Aggregate Allocable R&D Costs, on a prospective basis to reflect changes in the shares of reasonably anticipated benefits to be derived from the Developed Technology or the reliability of Sales (as defined herein) as the most reliable estimate of those benefits. In determining whether revisions to the cost sharing methodology are necessary, the parties shall take into account changes in economic conditions, the business operations and practices of the parties, and the ongoing development of Developed Technology under this Agreement.

4.2.3 The Aggregate Allocable R&D Costs shall initially be shared among the parties as follows:

| | |
|---|---|
| Source | 70 % |
| Europe | 23 % |
| Singapore | 7 %. |

4.2.3.1 As necessary and appropriate, the parties agree to compare the relative actual Sales derived from business activities in which the Developed Technology is exploited to the Cost Sharing Ratio set forth in section 4.2.3 hereof (or such new ratio determined in accordance with section 4.2.2.3 hereof). If the parties agree that such Cost Sharing Ratio was not a reliable projection of anticipated benefits (within the meaning of Treas. Reg. §1.482-7(f)(3)) for an R&D Fiscal Year, taking into account extraordinary events beyond the control of the parties that could not have been anticipated at the time the Cost Sharing Ratio was determined, the parties shall make a payment as appropriate to effect an adjustment to the prior Cost Shares so that the Cost Shares are borne by the parties in the same ratio as relative Sales derived from the business activities in which the Developed Technology was exploited during such R&D Fiscal Year, as adjusted to reflect an arm's length rate of interest.

**4.3 Marketing Intangibles.**

4.3.1 The parties hereby acknowledge and agree that costs to develop or enhance Marketing Intangibles generally are incurred by the party that benefits from such Marketing Intangibles.

4.3.2 In cases where one party incurs an Allocable Marketing Cost, the parties intend that such cost shall be borne in the same ratio as the Cost Sharing Ratio with respect to the Product to which the Allocable Marketing Cost relates for the R&D Fiscal Year in which the Allocable Marketing Cost is incurred, as provided in Section 4.2 hereof.



Highly Confidential Information - Attorneys' Eyes Only ORCL00182320

**4.4 Accounting Methods**. Costs, revenue, and any other financial measure in this Agreement shall be determined under United States generally accepted accounting principles.

**4.5 Currency Translation**. In determining R&D Costs hereunder, any revenues received, and any expenses incurred, in currencies other than United States dollars shall be translated into United States dollars at the prevailing bookkeeping rate of exchange used by Source during the period in which such revenues and expenses accrued.

**4.6 Documentation.**

4.6.1 Each party shall maintain documentation regarding (i) the methodology and data used to establish projections of sales and anticipated benefits as well as the allocations described in Sections 4.1, 4.2, and 4.3, as modified from time to time, (ii) the total amount of costs incurred pursuant to this Agreement, (iii) the costs borne by each party hereto, (iv) the accounting method used to determine the costs and benefits of the Developed Technology (including the method used to translate foreign currencies); and (v) prior research relating to the Developed Technology. Each party shall permit duly authorized representatives of the other parties, during normal business hours, to inspect or audit all such documentation.

4.6.2 Each party which is required to file a United States income tax return agrees to attach to such return a statement indicating that it is a participant in a qualified cost sharing arrangement, and listing the other controlled participants in the arrangement. Each such party also agrees to attach a similar statement to Schedule M of any Form 5471 or Form 5472 filed with respect to a party hereto which is not otherwise required to file a United States income tax return.

## SECTION 5

## STATEMENT OF R&D ACTIVITIES

## PAYMENT OF COST SHARE

**5.1 Statement of Costs**. Within sixty (60) days following the close of an R&D Fiscal Quarter (or as soon as can be determined following the close of an R&D Fiscal Quarter) Source, Europe, and Singapore shall furnish each other a written statement, certified by an officer, setting forth that party's R&D Costs, Allocable Marketing Costs, and Specific R&D Costs incurred by that party during the R&D Fiscal Quarter.

**5.2 Settlement**. If a party's Cost Share is greater than the R&D Costs and Allocable Marketing Costs incurred by such party, such party shall pay the difference between such amounts to the other parties hereto on the Payment Date (taking into account interim payments made pursuant to Section 5.3 hereof). If one party is required to make a payment to the other two parties pursuant to the preceding sentence, the amount paid to each such other party shall be determined based on such other party's relative proportion of the R&D Costs and Allocable Marketing Costs borne by the two other parties. To the extent not otherwise prohibited under applicable local law, any



Highly Confidential Information - Attorneys' Eyes Only ORCL00182321

amounts owed by one party to another pursuant to this Section 5 may be offset or netted against other indebtedness between the parties. To the extent desired by any party hereto, payments may be made in a timely manner so as to avoid the imputation of interest, under applicable tax laws, on payments owing to or owing from a party pursuant to this Section 5.

**5.3 Interim Payments**. From time to time, the parties may make interim payments of their estimated cost sharing amounts for the then-current R&D Fiscal Quarter.

**5.4 Reallocation after Governmental Adjustment**. If any governmental body proposes to adjust the Cost Share of any party (for any year) the party whose Cost Share is proposed to be adjusted shall exhaust all effective and practical remedies, including invocation of competent authority procedures available under applicable tax treaties, to resist such adjustment. In the event the Cost Share of any party (for any year) is actually adjusted by any governmental body, the parties shall pay an appropriate correlative adjustment to the Cost Share determined under this Section in the year such adjustment becomes final.

## SECTION 6

## DEVELOPED TECHNOLOGY

**6.1 Ownership and Filings.**

6.1.1 Source, Europe and Singapore agree that, for purposes of intellectual property law, ownership of all intellectual property rights with respect to the Developed Technology should rest in one party in order to most effectively protect the Developed Technology by making it easier to prosecute claims against infringers, and agree that, for purposes of intellectual property law, Source should hold ownership of all intellectual property rights with respect to the Developed Technology, subject to the rights granted below. Title to Developed Technology which is conceived or developed by employees of any or all parties shall be and remain in Source. Europe and Singapore hereby irrevocably transfer, convey and assign to Source, in perpetuity, all right, title, and interest in any rights they may obtain in and to the Developed Technology and Source accepts such transfer, conveyance and assignment, subject to the rights granted to Source pursuant to Section 6.2 below.

6.1.2 Source shall have the sole right, and shall be solely responsible for (i) filing all applications, and obtaining and maintaining all registrations, for any Developed Technology; (ii) initiating and prosecuting all judicial and administrative actions to protect the Developed Technology; and (iii) taking all other actions necessary or appropriate to perfect, protect and enforce all such intellectual property rights throughout the world. Europe and Singapore shall provide Source with timely written notice of any and all infringements and threatened infringements of any such intellectual property rights that come to their attention during the term of this Agreement, and shall provide Source with all assistance reasonably requested by Source in connection with any judicial or administrative action initiated by Source to prevent or enjoin any such infringement or threatened infringement or otherwise to protect and enforce any or all such intellectual property rights.



Highly Confidential Information - Attorneys' Eyes Only ORCL00182322

6.1.3 In the event that Source initiates judicial or administrative action to prevent or enjoin any infringement or threatened infringement of the Developed Technology, the costs of prosecuting such judicial or administrative actions and any monetary awards arising out of such judicial or administrative actions shall be reasonably allocated among the parties based upon the country or countries in which such infringement occurred.

**6.2 Rights to Use Developed Technology**. Subject to the terms and conditions of this Agreement, Source hereby grants to Europe an exclusive, transferable, perpetual, irrevocable, royalty-free right and license in the countries set forth in Exhibit A, with right to grant and authorize sublicenses, under any Developed Technology, to practice, use and modify the Developed Technology in order to develop, reproduce, use, make, have made, sell and otherwise distribute, directly or indirectly, Products. Subject to the terms and conditions of this Agreement, Source hereby grants to Singapore an exclusive, transferable, perpetual, irrevocable, royalty-free right and license in the countries set forth in Exhibit B, with right to grant and authorize sublicenses, under any Developed Technology, to practice, use and modify the Developed Technology in order to develop, reproduce, use, make, have made, sell and otherwise distribute, directly or indirectly, Products.

**6.3 Use of Marketing Intangibles**. Each of the parties shall have the exclusive and perpetual right to use those Marketing Intangibles attributable to an Allocable Marketing Cost, on the same terms and conditions as apply to that party's rights with respect to the Developed Technology.

**6.4 No Transfer of Rights Involved**. The rights set forth under this Section 6 arise in each party ab initio upon the creation of the Developed Technology and neither Europe nor Singapore acquires its rights by sale, license or any other transfer of rights between the parties, and no consideration is payable to Source with respect to Europe's or Singapore's exercise, practice or other use of the rights in the Developed Technology, as provided herein.

## SECTION 7

## DELIVERY OF DEVELOPED TECHNOLOGY

**7.1 Disclosure of Developed Technology**. Subject to the provisions of this Section 7, each party shall exercise reasonably diligent efforts to disclose and deliver to the other party the Developed Technology, to the extent not otherwise in such receiving party's possession, as promptly as practicable during the term of this Agreement. A delivering party shall exercise reasonably diligent efforts to ensure the accuracy of all Developed Technology provided but does not warrant that all such Developed Technology will be accurate in all respects.

**7.2 Developed Technology Documentation**. All documentation relating to Developed Technology ("Developed Technology Documentation") shall be in the English language and shall be in accordance with United States standards, measurements and practices. The costs of any translation of the Developed Technology and adaptation of it for a particular country shall be



Highly Confidential Information - Attorneys' Eyes Only 

borne by the party desiring such translation.

**7.3 Delivery Restrictions.** No Developed Technology Documentation (collectively "Documentation") shall be delivered within the State of California unless such delivery is by means of remote telecommunications or unless the parties hereto are satisfied that such transfer will not incur a sales or use tax liability. Any attempted transfer contrary to the terms hereof shall be void and of no effect. If the delivery is made by remote telecommunications, the parties shall keep a detailed contemporaneous log documenting each transmission by date, time, place, and the individuals responsible for such transmission.

**7.4 Confidentiality.** Notwithstanding any failure to so mark it, all information included or embodied in the Documentation shall be deemed Confidential Information.

SECTION 8

BEARING OF RISKS,

NO ASSURANCE OF SUCCESS

Each party conducting research and development shall be solely responsible to use commercially reasonable efforts to design and develop the products, devices and processes contemplated by the Research Program. No party makes a warranty or guarantee that such product or process design or development efforts will be successful or accomplished in a timely manner or that the Developed Technology will be commercially viable. No party hereto shall be liable to the other parties hereto for failure to create Developed Technology in accordance with this Agreement. Notwithstanding anything to the contrary herein, each party shall bear its Cost Share regardless of whether any Developed Technology is in fact produced by the Research Program and regardless of whether the parties realize any income from any Developed Technology.

SECTION 9

CONFIDENTIAL INFORMATION

**9.1 Nondisclosure of Confidential Information.** Each party acknowledges and agrees that in the course of performance of this Agreement, it may obtain the Confidential Information of the other parties. Each party agrees to:

9.1.1 keep in confidence and trust all of the other parties' Confidential Information received by it,

9.1.2 not to use such Confidential Information other than as expressly permitted under the terms of this Agreement or any other agreement among the parties,



Highly Confidential Information - Attorneys' Eyes Only ORCL00182324

9.1.3 take all reasonable steps to prevent unauthorized disclosure or use of the other parties' Confidential Information, and to prevent it from falling into the public domain or the possession of unauthorized persons; and

9.1.4 disclose the Confidential Information only to those persons who need access to the Confidential Information for purposes of the party meeting and carrying out its obligations hereunder and who have executed a confidentiality agreement which protects the disclosing party's Confidential Information.

Without limiting the foregoing, all parties shall use at least the same degree of care which they use to prevent the disclosure of its own Confidential Information of like importance to prevent the disclosure of Confidential Information disclosed to it by the other parties under this Agreement.

**9.2 Limitation of Liability**. Notwithstanding the above, no party shall have liability to another party with regard to any Confidential Information of the other which:

9.2.1 was in the public domain at the time it was disclosed or comes into the public domain through no fault of the recipient;

9.2.2 was known to the recipient, without restriction, at the time of disclosure as shown by the files of the recipient in existence at the time of disclosure;

9.2.3 is disclosed with the prior written approval of the disclosing party;

9.2.4 was independently developed by the recipient without any use of the Confidential Information and by employees or other agents of (or independent contractors hired by) the recipient who have not been exposed to the Confidential Information;

9.2.5 becomes known to the recipient, without restriction, from a source other than the disclosing party without breach of this Agreement by the recipient and otherwise not in violation of the discloser's rights; or

9.2.6 is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body, provided, however, that the recipient shall provide prompt notice thereof to enable the discloser to seek a protective order or otherwise prevent such disclosure.

**9.3 Nondisclosure Agreements**. Each party shall exert its best efforts, including, but not limited to, the execution of proprietary non-disclosure agreements with employees and consultants, and legal action, to enforce compliance with the provisions of this Section 9 by its directors, officers, employees, and any third party having access to the other parties' Confidential Information.

**9.4 Remedies**. Unauthorized use by a party of Confidential Information provided to it by the other parties hereunder will diminish the value to the other party of such information.



Highly Confidential Information - Attorneys' Eyes Only 

Therefore, if a party breaches any of its obligations with respect to confidentiality and unauthorized use of Confidential Information hereunder, the aggrieved party shall be entitled to equitable relief to protect its interest therein, including but not limited to injunctive relief, as well as money damages.

**9.5 Return of Confidential Information**. On the termination of this Agreement, each party shall return to the other parties all records, notes and other documents and materials that contain or embody any of the other parties' Confidential Information in its possession as of the effective date of termination.

## SECTION 10

## GOVERNMENTAL REGULATION

**10.1 In General.** In the exercise of their respective rights, and the performance of their respective obligations, under this Agreement, each party shall comply with all applicable laws, regulations and governmental orders. Without limiting the generality of this Section 10, each party shall obtain, and shall maintain in full force and effect throughout the continuance of this Agreement, all licenses, permits, authorizations, approvals and government filings and registrations necessary or appropriate for the exercise of its rights and the performance of its obligations hereunder.

**10.2 United States Export Controls.** Without limiting the generality of Section 10.1 hereof, Europe and Singapore shall comply strictly with all applicable United States export control laws and regulations, including, but not limited to, the United States Export Administration Regulations and shall not export, reexport, transfer, divert or disclose directly or indirectly, any Products, Developed Technology, or any direct product thereof except as authorized under such United States export control laws and regulations. Europe's and Singapore's obligations under this Section 10 shall survive the termination of this Agreement for any reason whatsoever.

## SECTION 11

## TERM

**11.1 Term.** The term of this Agreement shall be one (1) year from the date hereof and shall automatically be renewed for additional one-year terms thereafter unless any party gives thirty (30) days written notice to the others prior to the end of the term of its intent to terminate this Agreement or unless terminated earlier under the provisions of this Section 11.

**11.2 Termination for Convenience.** This agreement may be canceled by any party for any reason or no reason by giving the other parties written notice sixty (60) days in advance.

**11.3 Termination on Default.** Subject to the terms set forth in this Section 11.3, if any party defaults in the performance of its material obligations hereunder, the other parties shall



Highly Confidential Information - Attorneys' Eyes Only ORCL00182326

have the option, upon written notice to the defaulting party, to terminate this Agreement. If within thirty (30) days after notice of termination, the defaulting party shall not have remedied the default, the parties shall consult in good faith for an additional thirty (30) days to develop a plan to remedy such default and if such default is not corrected after such thirty (30) days period, then this Agreement shall terminate.

**11.4 Termination in the Event of Bankruptcy.** This Agreement may be terminated by any party on notice, (i) upon the institution by any other party of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of the debts, (ii) upon the institution of such proceedings against another party, which are not dismissed or otherwise resolved in such party's favor within sixty (60) days thereafter, (iii) upon another party's making a general assignment for the benefit of creditors, or (iv) upon another party's dissolution or ceasing to do business in the normal course.

**11.5 Termination on Change of Control.** In the event that the issued and outstanding shares of either Europe or Singapore undergo an involuntary change in control, so that its status as a Related Party to Source ceases, or in the event that a substantial portion of Europe or Singapore's assets or the conduct of Europe or Singapore's business shall be substantially encumbered by extraordinary governmental action or by operation of law, Source may, at its option and in its sole discretion, terminate this Agreement with respect to either Europe or Singapore, as the case may be, effective immediately upon giving written notice of termination to such party.

**11.6 Termination on Impairment of Intellectual Property Rights.** In the event that any law, regulation or governmental order is enacted or issued, which, in the reasonable opinion of Source, jeopardizes or impairs Source's intellectual property rights in any of the Developed Technology in any country where any of the Developed Technology is used, unless Europe or Singapore, as the case may be, agrees in writing to refrain from using the Developed Technology in such country Source may, at its option and in its sole discretion, terminate this Agreement, effective immediately upon giving written notice of termination to the appropriate party.

**11.7 Survival.** Notwithstanding the expiration or termination of this Agreement, it is acknowledged and agreed that those rights and obligations which by their nature are intended to survive such expiration or earlier termination shall survive, including without limiting the foregoing, the provisions of Sections 5, 6, 9 and 10. Upon any termination of this Agreement, no party shall relinquish any of its rights to Developed Technology acquired hereunder as it exists on such termination date except as set forth in the following sentence but shall have no ownership, rights, or license to Technology subsequently created or developed by the other party. Notwithstanding the foregoing, if this Agreement is terminated pursuant to Sections 11.5 or 11.6 hereof, all rights acquired hereunder by Europe or Singapore, as the case may be, in the Developed Technology and the Marketing Intangibles shall revert immediately to Source, without requirement of notice or judicial or administrative action of any kind.

SECTION 12



Highly Confidential Information - Attorneys' Eyes Only ORCL00182327

GENERAL

**12.1 Assignment.** Except as provided herein, no party may assign, delegate or otherwise transfer any or all of its rights or obligations under this Agreement without the prior written consent of the other parties, and any purported assignment, delegation or other transfer without such consent shall have no force or effect. Notwithstanding the foregoing, the prior written authorization of the parties hereto shall not be required for the other party to assign any of its rights, or delegate or subcontract any of its obligations under this Agreement to a Related Party of that party. Subject to the foregoing, this Agreement shall bind and inure to the benefit of the respective parties hereto and their successors and assigns.

**12.2 Non-Waiver.** The failure of a party at any time to require performance by the other party or parties of any provision hereof shall not affect in any way, or act as a waiver of, the right to require the other party or parties to perform in accordance with this Agreement at any other time, nor shall the waiver of a party of a breach of a provision of this Agreement be held or taken to be a waiver of the provision itself.

**12.3 Amendments.** The terms and conditions of this Agreement may not be superseded, modified, or amended except in writing stating that it is such a modification and signed by an authorized representative of each party hereto.

**12.4 Governing Law; Forum Selection.** This Agreement shall be governed by the laws of the State of Colorado, U.S.A., without reference to conflict of laws principles. All disputes arising out of this Agreement shall be subject to the exclusive jurisdiction and venue of the Colorado state and federal courts, and the parties consent to the personal and exclusive jurisdiction and venue of these courts.

**12.5 Attorneys' Fees.** The prevailing party in any legal action brought by one party against the others shall be entitled, in addition to any other rights and remedies it may have, to reimbursement for its expenses incurred thereby, including court costs and reasonable attorneys' fees.

**12.6 Complete Agreement.** This Agreement constitutes the entire agreement among the parties as to the subject matter hereof, and supersedes and replaces all prior or contemporaneous agreements, written or oral, regarding such subject matter.

**12.7 Notices.** Any notice which any party desires or is obligated to give to the others shall be given in writing or by facsimile and sent to the appropriate address set forth above, attention: President, or to such other address as the party to receive the notice may have last designated in writing in the manner herein provided. Except as otherwise expressly provided herein, notice shall be deemed to have been received on the earlier of the date when actually received or ten (10) days after being deposited in the mail, postage prepaid, registered or certified mail, return receipt requested, or within one (1) day if by facsimile, promptly confirmed in writing, properly addressed to the recipient. Notwithstanding the foregoing, notices sent pursuant to Sections 11.5 or 11.6 hereof shall be effective when sent.



Highly Confidential Information - Attorneys' Eyes Only ORCL00182328

**12.8 Independent Contractors**. This Agreement does not create a principal or agent, employer or employee, partnership, joint venture, or any other relationship except that of independent contractors among the parties. Nothing contained herein shall be construed to create or imply a joint venture, principal and agent, employer or employee, partnership, or any other relationship except that of independent contractors among the parties, and no party shall have any right, power or authority to create any obligation, express or implied, on behalf of the others in connection with the performance hereunder.

**12.9 Headings; Counterparts**. Headings to Sections of this Agreement are to facilitate reference only, do not form a part of this Agreement, and shall not in any way affect the interpretation hereof. This Agreement may be executed in three (3) or more English language counterparts or duplicate originals, all of which shall be regarded as one and the same instrument, and which shall be the official and governing version in the interpretation of this Agreement.

**12.10 Partial Invalidity**. If any provision in this Agreement shall be found or be held to be invalid or unenforceable in any jurisdiction in which this Agreement is being performed, then the meaning of said provision shall be construed, to the extent feasible, so as to render the provision enforceable, and if no feasible interpretation would save such provision, it shall be severed from the remainder of this Agreement which shall remain in full force and effect. In such event, the parties shall negotiate, in good faith, a substitute, valid and enforceable provision which most nearly effects the parties' intent in entering into this Agreement.

**12.11 Force Majeure**. No party shall be liable for any failure of or delay in performance of its obligations under this Agreement to the extent such failure or delay is due to circumstances beyond its reasonable control, including, without limitation, acts of God, acts of the public enemy, fires, floods, wars, civil disturbances, sabotage, accidents, insurrections, blockades, embargoes, storms, explosions, damage to its plants, labor disputes (whether civil or military, foreign or domestic), all perils of the seas and other waters, failure or delay of third parties or governmental bodies from whom a party is obtaining or must obtain rights of way, easements, franchises, permits, machinery, materials, equipment, transportation, independent contracting, or supplies to grant or deliver the same, or inability to obtain labor, materials, equipment, or transportation (collectively referred to herein as "Force Majeure"), nor shall any such failure or delay give the other party the right to terminate this Agreement. Each party shall use its best efforts to minimize the duration and consequences of any failure of or delay in performance resulting from a Force Majeure event.

* * * * *



Highly Confidential Information - Attorneys' Eyes Only 

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be effective as of the date first above written.

**J.D. Edwards World Source Company**

By: ______________________

Title: Richard E. Allen (Director)

**J.D. Edwards Europe Ltd.**

By: ______________________

Title: Richard G. Snow, Jr. (Director)

**J.D. Edwards (Singapore) Pte. Ltd.**

By: ______________________

Title: Richard G. Snow, Jr. (Director)



Highly Confidential Information - Attorneys' Eyes Only ORCL00182330

Exhibit A

Europe's Territory

Europe, the Middle East and Africa

Exhibit B

Singapore's Territory

Asia Pacific including Japan and the People's Republic of China