Walsh v. Apple, Inc. et al Doc. 276



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ELIZABETH D. LAPORTE, MAGISTRATE JUDGE

```
------------------------------)
                              )
ORACLE CORPORATION, et al.,   )
                              )
                Plaintiffs,   )
                              )
     v.                       )     No. C 07-1658 (EDL)
                              )
SAP AG, et al.,               )
                              )
                Defendants.   )     San Francisco, California
                              )     Tuesday, February 10, 2009
------------------------------)       (50 pages)
```

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs: Bingham, McCutchen, LLP
Three Embarcadero Center
Promenade Level
San Francisco, California 94111
BY: GEOFFREY M. HOWARD
ZACHARY J. ALINDER
HOLLY A. HOUSE

For Defendants: Jones Day
555 California Street
26th Floor
San Francisco, California 94104
BY: JASON S. MCDONELL
SCOTT W. COWAN
ELAINE WALLACE

Also Present: Jennifer Gloss
Oracle USA, Inc.

Lisa Buccino
SAP AG



Dockets.Justia.com

Tuesday, February 10, 2009

(2:11 p.m.)

DEPUTY CLERK: Calling case Civil 07-1658, Oracle Corporation versus SAP AG, et al.

Counsel, please state your appearances for the record.

MR. HOWARD: Geoff Howard for Bingham, McCutchen, and with me, Zach Alinder, Holly House; and Jennifer Gloss from Oracle.

MR. McDONELL: Jason McDonell for defendants, along with my partner, Scott Cowan; Elaine Wallace; and Lisa Buccino from SAP.

THE COURT: Thank you.

I've got two motions. Why don't we start with the plaintiffs' motion, and let me give you some tentative thoughts on that.

The issue, of course, is the discovery of the use of Hyperion, Retek and E-Business Suite products. The Siebel issue is not specifically part of this motion, as I understand it, although there is an ongoing, somewhat, dispute on that.

MR. HOWARD: It's percolating, but we've achieved some compromise, and we're going to do some foundational discovery and only come back to you if it's necessary.

MR. COWAN: That's correct.

THE COURT: It seems to me that Oracle raises some questions about how where the declarations may be more

equivocal, or in Oracle's view, anyway, carefully phrased such that it still is wondering whether in preparing to potentially support these three products, SAP did anything wrong, and similar to the sort of things that it is known to have done, at least in Oracle's view, with the main products that were already part of the suit from the beginning.

I do tend to think that the good cause standard applies. It's not -- I tend to be persuaded by SAP. It really is sort of a suspicion still, albeit not a suspicion, you know, out of thin air -- an extrapolation regarding business model, and -- but particularly in the good cause then standard, being considered in conjunction with the fact that it's plainly less important than some of the other things insofar as I think it's not really genuinely disputed, it was -- never actually supported these products.

So we're talking about, if I am correct, understanding what was done in terms of considering offering support for these products. And the declarations themselves -- I mean, I think I would like to focus on exactly what's wrong with them in Oracle's view, and what -- why that's not so, etc., in SAP's view.

The -- then there is, if it does seem like there is good cause and there's relevance, the question does become burden.

Now, you know, there's a certain -- I don't really

want to engage in a tit-for-tat, but both sides raised burdensome arguments without putting in any declarations about them in the competing motions. But in terms of this motion, it's not clear how much of a burden would it be. But -- so that's something I would want to get nailed down.

But one possibility is that I would order a somewhat more detailed declaration to the extent that there seem to be any loopholes in this, and then see what comes up with that. And, you know, it either might open the door to more or it might slam the door, in my view.

So some of the things that I'm focusing on that I want answered during this hearing: One is the declaration is that -- this is Mr. Nelson -- never provided direct third-party support. So is there something indirect that Oracle's suspicious about or that could be clarified?

Is there anything wrong with, from Oracle's viewpoint, with using materials that were available to the general public? In Paragraph 3, Mr. Nelson says, "To my knowledge, other than materials that were available to the general public (i.e., through the Internet or other publicly available means), no one at TN downloaded or otherwise accessed...."

The terms "proprietary software" or "confidential support", I don't know that that's particularly equivocal, and I'm not necessarily concerned by the fact that somebody in a deposition, someone else said they weren't sure what that

meant, but if there's some genuine issue, some gray area in that, maybe that needs to be clarified.

The, "to my knowledge", I mean, of course, that is what you want from a declarant. On the other hand, if there's somebody else who has knowledge that he doesn't, maybe another possibility I'm open to is the idea of a request for admission or something which has to be answered in a way that's not limited to any one person's knowledge, albeit the president and CEO -- if you have to pick one person, that's about as good as you can get.

So -- so those are the kind of issues that I'm concerned with.

Let me see if there are -- I guess another one, in Mr. Ziemen's declaration, there's the "to my knowledge". Then there's "didn't access proprietary software confidential support for any purpose relating to SAP's consideration of TN providing third-party support."

I don't know that Oracle's concerned about any other reason, and if so, what it would be, and whether that needs to be addressed.

So those are the kind of issues -- in other words, I think that it's really true that there was no improper activity, and that's being stated unequivocally by people who would know, in a declaration under oath, etc., that may be sufficient. But to the extent that there's some loopholes

here, that may not be.

MR. HOWARD: May I start, your Honor?

THE COURT: Yes.

MR. HOWARD: Thank you for that. It's very helpful.

Let me first say that I think that the issues that you've identified are very much along the lines of what we asked for when we got the declaration initially as a proffer and it wasn't satisfactory, so we don't disagree with much of that. But I do want to first focus on the factual predicate, because I think we're not completely on the same page there. And this is why:

They have asserted that they did not use these products to support the customers running the software. And your Honor, I think, rightly focuses on the language in the declarations that focuses on direct support and third party support.

We have two concerns with that assertion. The first is that there are indications, and they are inferences, but there are indications that they may have provided that support because that's what the Safe Passage program was about. It was about luring customers over to the SAP side of the ledger, where it was safe, they could safely run their Legacy software while they waited to migrate to SAP software. And there is no safety in Safe Passage unless you know that your software is going to be supported while you're off support with Oracle. So

it is true they've asserted that they didn't support it. But we feel like we need to test that, and that is in particular why the lack of foundation to the knowledge of these particular declarants becomes an issue.

THE COURT: What kind of foundation would you like to see?

MR. HOWARD: For example, they're not purporting to know, any of them, what was done, what was represented to the customers who came over as part of this several hundred million dollar Safe Passage program, which lists customers with Retek and Hyperion software running on them. None of them are purporting to know what was said to those customers to get them over, which is a separate thing from actually supporting them, and what was done with them once they're there. That's point Number 1.

THE COURT: Uh-huh. Well, okay. And when we get to -- I mean, that's where I'm thinking that maybe there has to be some -- you know, I don't necessarily think the first step should be a 30(b)(6) deposition where some live human body has to answer those, but I think it may be that some degree of foundation. I mean, as I say, I think starting with the president and so on is about as good as you can get if you're going to talk with one person. And I'm not -- if it's a question of what was actually done -- in other words, if they promised to support this stuff and then they didn't do it, I

mean, yeah, maybe you have some attenuated claim about that, but I mean, really, that's not the main gravamen and a reason to expand the scope of the suit. It's whether they actually have products to get ready to do it and then actually do it.

MR. HOWARD: I agree, subject to my second and final point on this issue, which is the reason why the direct qualifier is potentially problematic. And I was interested to see that in Judge Hamilton's -- I think the Fossleman case, she called direct an evasive qualifier for a similar reason. It's possible that support was not provided directly to those customers, but the software was nevertheless used in order to achieve assurance or comfort or a mechanism for how they were going to accomplish the migration of those customers that they had gotten into Safe Passage over to SAP software.

Because again, that's the point of it. And you have to know that you're going to be able to transfer what they're running on one piece of software over to your piece of software. That entire activity, which we know was exactly the point of Safe Passage, I feel is not addressed at all in the way that these declarations have been phrased.

THE COURT: Okay. Can you explain that again? Remembering how much of a layperson I am and what that would mean.

MR. HOWARD: Sure. Remember the old days of WordPerfect?

THE COURT: More or less. Because the old days are still present in one place.

MR. HOWARD: The federal courts.

THE COURT: They live on here in amber. It's the place.

MR. HOWARD: Well, let's just say that there was a, movement to migrate the courts from WordPerfect to Microsoft Word, which everybody else uses.

THE COURT: What a novel idea.

MR. HOWARD: And let's just say you had a lot of documents that you were concerned about whether this is, you know, there are some conversions here between these two programs. Not a perfect example. But let's say you were concerned about whether you were going to be able to get your documents out of WordPerfect over to Word. You would sure want to know, you would sure want to be able to put those two pieces of software side by side and know that you're going to be able to map everything over as part of an enterprised switchover.

THE COURT: Maybe that's why we haven't done it.

MR. HOWARD: But that's why you have to have the software. So that is very concerning, and I -- it defies logic a little bit that these very sophisticated customers would move into the Safe Passage program without having some representation or road map and SAP not having the basis to give the assurance of that road map before they move over into that

column.

So those are the things, and I -- you know, it would certainly be my preference to test those through cross-examination for some of the reasons that we're going through here, but I understand that the Court may want to proceed incrementally in there.

So that's the factual -- I think that's the comment on the factual issue.

THE COURT: Uh-huh.

MR. HOWARD: With respect to the answers, I think that the one that was most directed at us is the publicly-available issue.

THE COURT: Right.

MR. HOWARD: And, you know, nothing's been said as to -- and this is part of the problem again with the declaration: Typically testimony, to be admissible, would have a factual foundation to show that it does have, does come from a basis of knowledge. This is another area among the others that you listed, Where, where did it come from? How did they get it? What exactly was it?

THE COURT: Get what?

MR. HOWARD: The software that they've said that they used. This is the problem now, that it is now I think pretty well-established, and Mr. Cowan will correct me if I'm wrong, but I believe that these declarations establish they had the

software, and they were using it. To develop these business cases, at least.

THE COURT: From your knowledge, and I will ask him, of course, but what is publicly available? I've never tried to find out myself, so I really don't know.

MR. HOWARD: I think that there are -- I don't know, with respect to these specific software lines because we don't know what it is that they are going to claim was publicly available. Typically, none of it is. And there is -- one of the reasons that we've been here.

THE COURT: Well, you can go buy it, I suppose.

MR. HOWARD: But that's the issue. I mean, what they consider publicly available in their business model is what we claim is copyright infringement in this case. What they claim was publicly available through Oracle's password protected website is what we claim they took in violation of the Computer Fraud and Abuse Act. So their label, their conclusion about what's, quote-unquote, "publicly available" we may very well not agree with.

THE COURT: So from your point of view, password protected, some customer who's paid money, gets a password and then can attain access to certain things?

MR. HOWARD: That's right. And in other cases, you know, there are agreements, we've talked about click-through agreements, for example, on the site where you would go in and

you have agree, I am licensed. You know, is that publicly available? Maybe they considered it was, and that's an issue we're fighting about, but that is exactly what we would say is violative of the various claims that we've brought.

THE COURT: Okay. Counsel?

MR. COWAN: Your Honor, a couple of issues to address. The first part of your comments -- and I'll go directly to the declarations because you focused on those first.

A couple of things. One, the, to my knowledge qualifier, Mr. Nelson left TomorrowNow in November of 2007. So I think some of that is a product of that. Mr. Nelson would have to speak. We did work with him to get these declarations put together, him and his counsel, but these declarations contain his and his counsel's input into that.

So, you know, the question as to what Mr. Nelson meant by direct I think can be dealt with real easily. They can ask him when they depose him later this month.

THE COURT: They're going to depose him anyway.

MR. COWAN: They're going to depose him anyway. They originally asked for one day, we've offered two now, on the 26th and 25th of this month. So they're free to question Mr. Nelson about anything, what he meant when he signed this declaration. They haven't deposed him yet.

THE COURT: So when is that going to be?

MR. COWAN: I believe it's -- February 25 and 26 are

the two dates that we were talking about right now.

MR. HOWARD: The scheduling is up in the air, but one thing that is certain is he will be deposed.

MR. COWAN: And he hasn't been yet.

MR. HOWARD: Correct.

MR. COWAN: So that's that point. So I don't want to venture off and try to interpret beyond what's in these documents.

THE COURT: Let me ask you this: At his deposition, are you willing to have him questioned about anything in his declaration?

MR. COWAN: Absolutely.

THE COURT: And what is the basis for his knowledge? What does he mean by direct? Does he know of anything indirect? You know, what does he mean by available to the general public, etc.?

MR. COWAN: Absolutely, your Honor. And we haven't limited their ability to question any witness on these three products.

THE COURT: Except you're not putting up a -- you're refusing a 30(b)(6) witness.

MR. COWAN: We're refusing to prepare and present a 30(b)(6) witness because of the burdens associated. To do that we would need to go look for and find all the documents that we haven't produced in this case that would relate to these

products, and a huge effort to go find anybody who had ever touched on it to make sure, from a company's standpoint, we know what the answers to those 30(b)(6) questions are with some degree of certainty. And that's part of the reason why these declarations don't have that granularity is because that's our big point, because it's burdensome to require us, in light of the fact that TomorrowNow never supported these three software lines, to go and spend the time to investigate what TomorrowNow did when it considered providing service for these three lines and what SAP did when it considered TomorrowNow providing service for these three lines.

THE COURT: Well, go on and --

MR. COWAN: As to Mr. Ziemen's declaration --

THE COURT: Is he going to be deposed, too?

MR. COWAN: He's already been deposed for two days, but -- he was deposed in September, when they could have asked him questions about Hyperion and Retek and E-BS, and they did ask him some questions. They did not, oddly enough, ask him a lot of the questions they have now that they want us to put forward in a declaration. So -- and a comment what general public or publicly available means. I think it says available to the general public.

THE COURT: That makes a question about this website issue.

MR. COWAN: Again, that's something they can ask

Mr. Nelson and get his knowledge on, on that.

THE COURT: I would think Ziemen, if he's already been deposed, ought to supplement his declaration on these questions too. I mean, you know, I think it should be transparent, in other words, I don't think -- you know, I think that it should be, Your witnesses should have to be pinned down in detail under oath that there's really no "there" there. All right? I mean, they can't eliminate perhaps the possibility that some rogue person somewhere did something, but I don't think that's enough to justify a lot of discovery. But, on the other hand, the kinds of suspicions that Oracle's raising, the declarations and the -- in the case of Mr. Nelson at deposition ought to nail those things down.

Now, if for example, let's say they were too high level to know anything about it, which would tend to kind of go against Oracle's theory, then I think -- because how could you really tag SAP with it either -- but, you know, if there was say one person totally in charge of the migration and what do we do and what should we look at at Oracle, that might be someone that, you know, you should have a declaration from.

On the other hand, I don't think you should have to, you know, investigate, you know, thousands of employees about events that were a long time ago if there's really, you know, there's really no smoke, so there's no fire.

MR. COWAN: Well, a couple of comments on that, your

Honor. One is: I agree with you that whatever is said regarding these three products needs to come from the witnesses' mouths instead of suspicions by Oracle or my characterization of what I believe to be true, neither of which are relevant. So with respect to that, I think the issue then becomes: How do you scope that, right? In terms of keeping the burden reasonable in light of what we do know. But still allow Oracle to take what discovery they think they need to take in the context of the timeframes that are set up and the limits that are in place.

THE COURT: I mean, I agree generally that they're only suspicions. On the other hand, they're not unreasonable, and that's why I said I think good cause is probably the standard. But they're not unreasonable suspicions. And so I think that -- and of course, you know, in our system, each side is an advocate, and so they're going to be looking and being concerned that there is something, you know, being artfully worded that's keeping them from something that they really would like to know.

That also means as a judge you can't let that say, therefore, Open, Sesame, because it could be an ill-founded suspicion, even though it appears reasonable from the advocate's point of view. But you're also paid to make reasonable arguments to keep your client from, you know, paying any more damages than they need to.

So I mean, I'm looking at it both ways.

MR. COWAN: Right. And I think the other thing that we need to be, in deciding the scope that we need to go back and look at, that Oracle hasn't addressed, and that you haven't raised yet, is the ownership of these products that are at issue. And what copyrights are out there that relate to these products. There has been substantial motion practice before Judge Hamilton on this very issue related to the PeopleSoft and J.D. Edwards product. One motion to dismiss that we prevailed on showing that two of the plaintiffs weren't entitled to bring the claims they were bringing in this case. And so that's --

THE COURT: I guess -- see, I don't know anything about that issue at this point. But it's a question in my mind of, you know, what order do things get done in. It doesn't really matter from a discovery point of view if one of the -- if any one of the plaintiffs has a right to raise these issues. It doesn't matter to me that the others don't. Right? I mean, the fact that Oracle acquired these companies would suggest that they acquired at least some copyrights in there.

MR. COWAN: I think the question is: Who is Oracle? Because it's a number of different companies, and we have no assurances nor any representations from the plaintiffs in this case that they, in fact, are the ones that own the property interest they are seeking to protect. They use the term "Oracle" broadly, but we haven't seen that.

But again --

THE COURT: I guess what I'm saying is, it kind of -- maybe I'm naive, but it would surprise me if Oracle paid lots of money to acquire these companies and doesn't own at least one of the entities in this suit that have a right to bring it. And I don't think the motion practice of the details of that should be in front of me. If you really have a genuine basis to think that they have no business enforcing any of these IP rights, I suppose then I should require some kind of threshold showing on Oracle. But I find that -- it seems to be contrary to common sense.

But not everything follows common sense. I'm aware of that.

MR. COWAN: I think that's why I brought it up. If the Court is inclined to order us to go forward and do more than what we've done on these issues, I think, from, you know, an incremental basis, a step for plaintiffs would be -- is to establish who owns these products, what is the products, what specifically other than just identifying the product by name they owned. Whether we had more information regarding the alleged copyright and the copyright registrations they're seeking to protect, because the footnote in their moving papers and the footnote in their second amended complaint acknowledges they haven't brought any specific copyright claims on these products until they can do further discovery to determine what

that is.

THE COURT: Right. They haven't. But I mean, again, which is the cart and which is the horse? I mean, I said that that's the reason I tend to say it has to be good cause. But I think there is enough good cause to close some of the loopholes that may be in the declarations.

And do you want to respond on that?

MR. HOWARD: On that point, your Honor, I was about to use the cart and the horse as well. We're just trying to find out some of the foundational facts here. We're perfectly prepared to make whatever showing is required if we get to the point of establishing that these are -- I mean, there are at least in one of these acquisitions $3.3 billion at stake. So it's not an insignificant issue. It's a fairly significant issue to us. These are products that haven't been the subject of discovery.

THE COURT: But I mean -- I guess what's being said is is it possible that Oracle has -- all the Oracle plaintiffs in this case don't have copyrights in any of the software at issue?

MR. HOWARD: I don't think that's possible. I don't. But --

THE COURT: Well, you would hope that they got something for the $3 billion.

MR. COWAN: My question is: Who is "they"?

MR. HOWARD: You would think --
THE COURT: Although everything that's been done in the past is being called into question now.
MR. HOWARD: Your Honor, I was going to go back to the 30(b)(6) point, because I just -- it was just an idea that I had. There was a discussion about Mr. Ziemen, and we've provided Mr. Ziemen's testimony in -- it's part of Exhibit 2, to Ms. Jones' declaration, was filed with the reply. The point of it is, though: He doesn't know anything. He says, I don't know. I don't recall. Who is this person? I don't know.
So we did ask enough questions, we felt, to establish -- it starts on Page 34.
THE COURT: See, I'm looking at -- this is the opening declaration.
MR. HOWARD: It's the reply declaration of Ms. Jeong.
MR. COWAN: Exhibit A to the reply, your Honor.
THE COURT: Okay, I see.
MR. HOWARD: And there's several pages put in there because defendants made the point in their opposition, Yeah, you guys have asked these questions, and so we wanted to provide the Court with the actual testimony, and this is it. And what we established is that he can't remember anything, which is a habit that permeates a lot of their witnesses. But that's also what happens when you don't have documents.
And so the suggestion I was going to make, since

Mr. Nelson's being deposed and since there's a representation that he's the knowledgeable person about these issues, you know, why don't they produce his documents on these issues so that we can have an informed examination and he -- you know, because there may be things that he can genuinely say he doesn't remember. But if we really want to get to the truth of it in an incremental way and a contained way, why don't they produce these documents on this software that's responsive and why doesn't he then be the 30(b)(6), and we would be willing to put off his deposition for some reasonable period of time to allow that to happen so that we can have an organized, informed opportunity to explore the issues that have been raised with respect to his declaration and that are in our motion?

THE COURT: Well, I guess -- what would it take? What are, quote, his "documents"?

MR. COWAN: I don't know the answer to that, your Honor. But that may be something we could do before he's currently scheduled to be deposed.

THE COURT: I think that if there is, you know, a manageable universe of his documents that he can look at, he should refresh himself. On the other hand, I don't know if that's the case or not since he's not there any more.

MR. COWAN: Right.

THE COURT: What I'm not willing to order at this point is a wholesale examination of all your documents that

would be required for a good 30(b)(6) deposition. And so -- and if he's only looking at his own documents, I don't think that's a exactly a 30(b)(6), either. But I think the suggestion -- why don't you look into it -- that he look into his own documents and refresh himself. Then, if at his deposition he can't remember anything on these very subjects and really has no basis for knowledge other than amnesia, which is a lack of knowledge, then that might open the door to some more searching.

But I do think the standard is good cause. I think that essentially -- and it's also the proportionality issue, even though nobody -- and the same thing is true of the second set of motions, second motion and set of papers. Nobody really demonstrated the burden. I would imagine the wider the search, the more burdensome it's going to be, and the idea that they look for everything that they have, we're nowhere near that.

MR. COWAN: Let me address that, your Honor. Part of it I think was, rightly or wrongly, an assumption that this court -- you -- have been fairly intimately involved in the history of where we are to this point in term of what the parties disputes have been, etc.

THE COURT: Yeah, and I'm reluctant to widen it. I mean, that's correct.

MR. COWAN: So that's why we didn't go into greater detail on that. Because we assumed the Court had a basis of

knowledge on where we are with respect to all the other things that are going on in this case on discovery.

THE COURT: That's why I'm very reluctant. And I mean, strictly speaking, I'm really not widening discovery very much. I'm just saying that I think if it can be done at a relatively low cost to sort of close what appear to be possibly loopholes -- they may not be loopholes, but the direct/indirect -- those sort of things that we've just discussed....

MR. COWAN: Maybe there's other witnesses. We went to Mr. Nelson for the reasons you've indicated. And Mr. Ziemen on this issue went to him because they attached documents from him, and used those documents as proof. Their proof. "Proof", in quotes.

THE COURT: Right. I agree with you that I think it's only suspicion at this point. I do think that it's not pled as something specific, and on top of that, I'm still looking at -- even if that weren't the case and I was wrong with the standard, I think I'd still be looking at the proportionality and the considerations and the case management, essentially, which is that this case is going to trial, it's already got a huge amount of issues in it that are very -- you know, everybody's as concerned as am I in keeping the train running down the track. So, you know, adding cars to it, etc., slowing it down, I mean, that's a concern.

But I -- so that's what I'm suggesting, okay. At his deposition, look into whether he can refresh himself with his own documents.

MR. COWAN: Okay.

THE COURT: Find out at his deposition what the basis of his knowledge is: Direct, indirect, publicly available, etc.

A supplemental declaration of Ziemen on the same questions.

And basically, I think, you know, use the arguments that Oracle has raised about what they are saying is ambiguous as your guide of amplification. And certainly if it's something like, I think it ought to be, explained, I mean, if what is the definition of publicly available as used in those declarations? You know, if it was accessing a password protected website and the click-through isn't, you've got to say so, and you all have to fight about whether that's legal or illegal.

But I do think in terms of proportionality analysis, though, I don't think there's any reason to believe at this point that it was ever done or offered. Maybe because this litigation was in the offering or filed. I think someone's mentioned that. Then I really don't think it should be a big focus of the case or very much expenditure of time and money.

MR. COWAN: One point, your Honor: In terms of

supplementing Mr. Ziemen's declaration, if we find in light of Mr. Howard's documents they already questioned him and he says he doesn't know, he doesn't know, he doesn't know, if in going back to him and others at our client we find another person who may have more knowledge, I assume the Court wouldn't oppose us finding another declarant besides Mr. Ziemen?

THE COURT: I think that's fine. I mean, I think if there's another declarant who was -- especially who was, you know, involved in this issue about really vetting whether to do this or support or not do it, and deciding what to access and whatnot to, that would be fine.

MR. COWAN: Okay. Because that may make more sense. Again, I need to go back and study the testimony, talk to my client, talk to the witnesses.

THE COURT: But what I am trying to do is to avoid -- I mean, I am mostly denying the motion in the sense that, you know, unless -- I mean, I still think there's, you know, at most, a tiny bit of smoke, you know, not enough to indicate a fire, that would open the door to a lot of expensive discovery on what I think so far are more suspicions than anything else.

But I would like to see a little more to allay the suspicions. And if it then becomes suspicions that I don't think, you know, have any real foundation with this additional discovery, then that's the end of it.

On the other hand, if it turns out there's a can of

worms that gets uncovered, well then, that may justify more.

MR. COWAN: One final comment, your Honor. I think it's important to get Mr. Nelson up and deposed as soon as possible on this issue.

THE COURT: I think you should go ahead with the deposition as scheduled.

MR. COWAN: Okay.

MR. HOWARD: Well, your Honor, there are other issues around that schedule, but we'll work it out as soon as we can. We want to take him.

THE COURT: I'm not taking a position on whether you have other issues. But I am saying I don't think this is a reason to delay the deposition.

MR. HOWARD: Understood. But I do think that in the course of determining whether he can be refreshed and whether there's documents they can produce, we're just talking about searching for E-BS -- E-Business Suite -- Retek, Hyperion, and trying to determine what they did. And that's just, if what they say is true, that they didn't do anything, then that just shouldn't take very much time.

THE COURT: I agree.

MR. COWAN: I understand the Court has ordered us to go look for his documents that relate to these three software applications, and if they haven't been produced, produce those before his deposition?

THE COURT: Unless there's some reason that turns out to be much harder than it appears to. But I assume you've segregated these documents in the past for other reasons.

MR. COWAN: And we just got done producing a number for him on extending timeframes, and that's one of the issues that Mr. Howard's alluding to, and we may be back to you if we haven't resolved that in the next couple of days when we talk to you on Friday.

THE COURT: And I haven't looked at anything about Friday yet. Sufficient unto the day, as they say. All right. So I think that takes care of this motion. So it's essentially granted in part; denied in part. Okay.

MR. HOWARD: Thank you, your Honor.

MR. COWAN: One thing, before I forget: Last night when we filed our joint discovery conference statement towards the end -- these processes are always, it takes till the final hour of the day they're due -- I was actually on the plane coming out late last night when we decided to attach something on the D designation proposal. There's an Exhibit C that I needed to look at to make sure it's the right one. I have done that today. We filed it today. I have the chamber's copy here.

MR. HOWARD: We've seen it, your Honor.

THE COURT: That's fine.

MR. COWAN: There's extra copies.

THE COURT: Thank you.

So let's talk about the third party support by Oracle partners. I guess in some ways this is an issue that's morphed -- I mean, it's now CedarCrestone, the original Oracle subpoena became the spring with regard to revisiting this issue, as opening the door. Then Oracle cut back the scope of that subpoena, trying to close the door. But really, it seems to me this is boiling down to CedarCrestone being an example of something you want to get into.

MR. McDONELL: Absolutely, your Honor. I don't think for one minute that we needed the fact of Oracle serving a subpoena on CedarCrestone to revisit this issue. We know the history. This was raised with Judge Legge a year ago. He looked at it, I believe -- with all due respect -- very quickly along with many, many other issues at a time when he was disinclined to focus on damages discovery at all. He did the prudent thing: Denied without prejudice, explicitly, and said, Make a further showing on down the line.

We have made that further showing to a fare-thee-well. Unlike the argument you've just heard that was rife with suspicion and guesswork, we have absolutely rock solid evidence that this is a pertinent area of inquiry, including documents which were submitted to the Court that show, contradicting Oracle's argument, that CedarCrestone is not a competitor of Oracle and therefore not to be analyzed the way these other

third party support providers like TomorrowNow, Remney Street, Versitek, and some others. We know from the documentary evidence in the case that CedarCrestone is, and has been, a competitor of Oracle, and I'm referring as an example to Exhibit 4 to my reply declarations, which, I can summarize for you quickly, is an internal Oracle document that tracks -- it's got some redactions because for confidentiality purposes we redacted out the identities of customers.

THE COURT: I have your declaration. But maybe you can show me where you are.

MR. McDONELL: Certainly.

(Pause in proceedings)

MR. McDONELL: Presenting your Honor with Exhibit 4. It's a discovery document produced by Oracle in which they track the risk they have of losing their support customers to third parties. So if you'll look at the column headings, you'll see one sort of near the middle of the page. It says, Third party name, in the top column.

THE COURT: Uh-huh.

MR. McDONELL: That third party is CedarCrestone. The notes in the immediate column to the right are identified as notes from customer. Customer name is blanked out. And there's some discussion there which appears on its face to be the customer's statement as to why they're leaving Oracle and going to CedarCrestone. And I'll read in relevant part, quote,

the customer speaking:

To that end, we will be looking to not be under maintenance with Oracle, but instead contract with CedarCrestone for ongoing support. So switching out Oracle support for CedarCrestone. And then in the third column from the right, third, last column, the current stage, Oracle tracks this customer is lost. So here's a customer that was thinking of Oracle or CedarCrestone for support. Chose CedarCrestone and was lost by Oracle.

Squarely contradicts the notion that CedarCrestone is this Oracle partner that lives only to drive customers to Oracle.

THE COURT: Let me suggest to both of you: This is how I look at it. But I'd like to be educated further. I see, my guess, but it is a guess, is that Oracle makes the most money when it services the customers itself directly and has ongoing support. It makes the least money and perhaps loses money when it has a completely independent third party providing those services, and maybe also cross-selling non-Oracle products instead of cross-selling Oracle products. Somewhere in between is the CedarCrestone authorized partner.

And probably just the way -- you know, if they can't keep the world strictly to being Oracle only, then they're better off having some partners that they do get a fee from, that they do have some control over what they do. And that

provide, you know, some -- at least they probably try to keep them cross-selling, and give them awards and things when they do. As opposed to deferred it.

And so they're still making some money but probably not as much as when they keep it totally in the house. So I view the totally independent third parties as the most relevant to damages. But I view the in-between authorized partners as maybe having some relevance, but not as much.

MR. McDONELL: And let's assume that profile you just described is the reality, and we would need the discovery to see what the actual economics are. It's square on relevant to damages because we believe that one of the theories of Oracle's damages claim will be when they lost a customer to TomorrowNow, that lost -- that customer was lost forever, and Oracle lost their revenue stream forever. If it's true that the customer then migrated back to CedarCrestone, Oracle gets a piece of the revenue stream back through that vehicle. That would reduce the amount of claim damages.

So that's the type of thing we need to explore to understand what the economics are.

MR. ALINDER: Your Honor, can I address that foundational issue that you're discussing right now? And to suggest that it's actually a little more complicated than sort of this three-tier model that we're talking about right now.

So, you're correct in that Oracle has, you know,

partners who provide many different types of services. Now, CedarCrestone, unfortunately, is just not one of those ones where they provide support or we license them to provide support. In fact, no partner, and I think the Kelly declaration I think establishes this in detail, and I'd be interested to hear what additional information SAP would like to see in a declaration along these lines, but I think it establishes that there are no partners that support customers like TomorrowNow. And that the license agreements that Oracle has with partners just simply do not even take into account this type of support.

In fact, I think the last two paragraphs: "I am not aware of any license with any Partner that would allow that partner to copy Oracle's application software and support materials to create their own fixes, patches..." etc.

"Oracle has no licensed support Partners for PeopleSoft, J.D. Edwards or Siebel applications -- including CedarCrestone. Nor has Oracle licensed any Partner to provide support for any de-supported release of PeopleSoft, J.D. Edwards or Siebel applications -- including CedarCrestone."

MR. McDONELL: So here's my dilemma, your Honor: We have and we've put into the record as Exhibit 1 to my reply declaration statements from CedarCrestone's own website, and I'd be happy to locate that for you.

THE COURT: I know you quoted it in your brief. It seemed to be somewhat to the contrary.

MR. McDONELL: I'm looking at it. It says in the upper right-hand corner --

THE COURT: Page?

MR. McDONELL: It's Exhibit 1, Page 4. We put page numbers in the lower right-hand corner.

In the upper right-hand corner, Oracle certified advantage partner. Immediately beneath that. Oracle partner network.

THE COURT: Yes.

MR. McDONELL: Some kind of award winner. And then under the heading in the main body of the document it reads, "CedarCrestone managed services, maintained, offers clients a solution for providing ongoing tax and regulatory support for unsupported PeopleSoft applications."

Now, you just heard Mr. Alinder say that Oracle partners don't support unsupported applications. Here, in black and white, it says that CedarCrestone, the Oracle partner, does support unsupported applications.

MR. ALINDER: And I think I can explain this conundrum pretty easily.

THE COURT: Go ahead.

MR. ALINDER: The conundrum that Mr. McDonell is setting forth here really is of just the fact that Oracle

licensed certain partners to do certain activity. Oracle does not license them to do things like this. That he is reading off of CedarCrestone. What they do independently of Oracle, not in partnership of Oracle, Oracle does not have knowledge really about those other than, you know, bits and pieces that it hears from customers. And indeed --

THE COURT: So they're rogue partners, essentially?

MR. ALINDER: Well, no. I guess what we would say is there are third parties that we believe can provide support legitimately. We don't have a license agreement to license them to do that support, like CedarCrestone supporting de-supported releases. As the Kelly declaration says conclusively, we don't license that. We don't license that work. And so the idea that they would be able to get the discovery from us about that just makes no sense.

THE COURT: But you're also preventing from getting it from CedarCrestone.

MR. ALINDER: Well, that's not exactly true. So what we would say is: Go, fine, get your discovery from CedarCrestone about how CedarCrestone supports customers. If you want to talk about the things that they do outside of our partnership agreement, fine. The thing that we think is irrelevant is the partnership agreement which doesn't have anything to do with these things that they're talking about on their website.

MR. McDONELL: Your Honor, they're defining this so narrowly now. We asked them in interrogatories that are in the record of this motion to identify the third party companies that support Oracle products, PeopleSoft in particular. They answered that interrogatory and did not identify CedarCrestone. Before Judge Legge we said, Gee, we don't think you've identified everybody. How about we get a list of names? How about CedarCrestone, who's on the list? No, no, no. Cedars Crestone's a partner, so you can't have any discovery of them. So then months go by and we're flailing away at this, and now finally they open the door with CedarCrestone again. We run through that door as quickly as we can, we serve CedarCrestone with a subpoena. They object. CedarCrestone objects. CedarCrestone seems to be taking Oracle's lead on the whole thing. And Oracle says, Don't push on CedarCrestone, let's just bring a motion before Judge Laporte about whether Oracle has to give you any discovery on this.

Your Honor, this has been enough of a runaround that it should really end right now. We need a meaningful disclosure from Oracle along the lines that we've asked for. It is narrowly focused. They don't want to admit that. But it is. We've carefully made our discovery requests in the forum for documents of documents sufficient to show, which should by definition eliminate burdens. We've asked for one 30(b)(6) that's of a foundational nature, and I'm sure there'll be a tug

of war of how much the witness needs to know. But we're not expecting a witness for a single 30(b)(6) deposition to know all the details. We want to know the general lay of the land. There are other companies just like CedarCrestone that Oracle knows darn well are, you know, supporting third -- providing third-party support but not doing it through the partnership agreement that they're not telling us about like they didn't tell us about CedarCrestone.

THE COURT: I'll have to say, this is a morph, to me, from how I understood the motion. It seems to me as if you're saying CedarCrestone is a hybrid. They do some things that are authorized by a license; they do other things that are not authorized that you don't know about.

MR. ALINDER: What I'm saying is, they've put into the record bits and pieces from CedarCrestone's website which suggests that CedarCrestone does other things. I think they have to go talk to CedarCrestone about that, the activities outside of a partnership agreement.

THE COURT: So it's Oracle to subpoena CedarCrestone as to support they give to Oracle products that is not under their partnership agreement?

MR. ALINDER: I think that's fair game. I think the partnership is just completely off.

THE COURT: So maybe instead of being a three-tier, this is a four-, or the middle tier is a hybrid. But do you --

you know, you talk about everybody has to have something called a worldwide license, right?

MR. ALINDER: Partner agreement.

THE COURT: Yeah. Worldwide partner agreement. And I think you said SAP is part of that.

MR. ALINDER: They are.

THE COURT: Do you have a copy of that?

MR. McDONELL: It's in the database industry. It's not this same support industry. It has to do with different types of products. Than I think they may have put some reference to it if these papers. Different animal, your Honor. We're trying to find out what the industry standards are to support PeopleSoft and J.D. Edwards' software applications.

THE COURT: Well, I think as to PeopleSoft and J.D. Edwards -- let's start with just the license itself. Is there a standard license? Or a standard partnership agreement?

MR. ALINDER: There's usually a standard license agreement. I think there are addendums.

THE COURT: What is the objection to providing that standard license agreement?

MR. ALINDER: I think the problem is, their hook for getting discovery is we need it for a hypothetical damages model. Right?

THE COURT: Right. And I will tell you that my general view is that first of all, I would think, you know, I

myself would tend to phase discovery and not allow very much damages discovery until, you know, at the very first instance. So I think that that could well be what Judge Legge's thinking was.

I find the causation argument, the secondary argument by SAP, just as I have before, not very convincing and sort of baffling. It might be that, you know, you should just -- maybe you should be asking for a list of where -- of TomorrowNow customers who went to Oracle partners. You know, maybe that's something you already have. But -- I mean, it might factor into damage analysis.

But as far as the issue of damages analysis and what is a reasonable royalty, it seems to me you're asking me to rule ultimately that that shouldn't come into evidence as opposed to whether they should get some discovery on it because as I see it, it's a benchmark. It's one -- you make some very strong arguments that it's for doing a much smaller subset of things, and probably in exchange for paying a fee, that Oracle agrees of to have done, and so, you know, you'd have some pretty strong arguments that that was much too low for a reasonable royalty, but what -- should they have that not at all? They probably should have it.

MR. ALINDER: Can I address that?

THE COURT: And if you wish to address that, too.

MS. GLOSS: I was also concerned that some of the

questions you were asking him about Oracle's business practices might not be within his knowledge. And there seems to be some misunderstanding going on. I'd be happy to try to clarify some of that.

THE COURT: That's fine.

MS. GLOSS: Oracle's partner program has a couple of components. We have partners who resell our licenses. And we have partners who are -- who intern to partnership agreements pursuant to which they act as third-party consultants, typically implementing and modifying the customer system.

THE COURT: So that ladder would be more similar to what we're talking about with TomorrowNow.

MS. GLOSS: It is more similar to what we're talking about with TomorrowNow. And part of what TomorrowNow argued early on was that they were trying to step into the shoes of the customer and just act as a third-party consultant. It's just they didn't do that. These customers, presumably, can provide consult -- I'm sorry, these partners, can provide consulting services for a customer under these agreements.

Aside from the database world, in the U.S. and Colleen Kelly's declaration addresses this, in the U.S., we do not have partners who we enter into contracts with, partnership agreements with, allowing them to provide technical support services to our customers in the U.S.

THE COURT: Right. Well, actually, I did want to get

to -- I think -- I didn't have a response about the U.S., non-U.S. issue. Or maybe I did, but I didn't fully understand it. Because I don't think -- I'm not clear that the case is limited to what's going on in the United States.

MR. McDONELL: It is not, in terms of the claims. Now ultimately, the legal rulings that we may get will establish that it is limited. But as of today, there are extra-U.S. claims.

Putting that aside, your Honor, we've also put into evidence that CedarCrestone put available on its website to have U.S.-based customers. So again, I don't know --

THE COURT: It could have you as base customers that it's not providing any services to regarding Oracle products, I suppose.

MS. GLOSS: We have an issue with the definition of "support", though. Technical support services in the industry generally refers to telephone support, updates, upgrades, regulatory tax updates. And to the extent you need to use our intellectual property, our copyrights in order to achieve that, you have to be properly licensed for either -- you have to really stand in the shoes of the customer and do only what that customer is entitled to do. Only for that customer. Or you have to be properly licensed with Oracle.

As I indicated, as Ms. Kelly indicated, in the U.S., at least, we don't license partners to provide that kind of

support using our software. And so therefore we don't get a fee for it either.

MR. McDONELL: But overseas, apparently they do.

MS. GLOSS: I can address that, too.

But CedarCrestone, to address CedarCrestone, we don't know why they put on their website what they put on their website. And if a customer tells us they are leaving to go to CedarCrestone, for quote-unquote support, that doesn't mean it's exactly the same kind of support that Oracle can provide and that SAP was providing. And so what's on CedarCrestone's website is not something that Oracle's in a position to vouch for.

THE COURT: Right. No, I understand that. But -- well, I think I --

MR. ALINDER: I think the small bit of, I guess, relevance that we can take from both sides' discussion, there are support customers that are -- sorry, support partners that are overseas. And that's also in the Kelly declaration. And this is a very small percentage. Even those support partners do not provide support, are not licensed to provide support in the same way that TomorrowNow does.

THE COURT: But what I tried to say, and I may take a recess in a minute because I think -- I don't really feel like any fog is lifting. I feel the other way around, that it's coming in.

What I tried to say was, from my perspective, and I'm the one who is got to decide this, your position that you took in your papers is too extreme. Because it's not directly relevant to damages and it's not -- the same royalty wouldn't be charged. Therefore, they have no business knowing what you do for this more or less more limited partnership thing. I agree with that. Because I think that that's the question for the trial judge. She might keep it out altogether; she might let an expert use that, their expert, as one of a number of factors, saying, you know, yes, they charge a 5 percent license fee for allowing these, and if they allowed, you know, if they also allowed us to duplicate their software and so forth, they would charge 10 percent. Things along those lines. So I think it's possible that they could use some basic information as a benchmark.

On the other hand, I don't want it to be a terribly burdensome undertaking because I don't think it's extremely strong evidence, because very clearly there's a big difference between a competitor and someone like CedarCrestone, which may have some competitive aspect, but it also definitely has some positive benefit, and Oracle is benefiting from that more than they benefit from a TomorrowNow type of operation.

MR. ALINDER: Your Honor, maybe I can offer a middle position, which is that we provide the CedarCrestone agreement and they get a chance to look at it.

THE COURT: Right.

MR. ALINDER: And they get to test what's stated in the declaration. And if there's some part as well of the declaration that they think is ambiguous, similar to what was discussed for the first motion, that they don't feel there is, you know, it's been directly stated, we'll be happy to address, you know, that issue.

THE COURT: Well, that's why I asked you, the CedarCrestone is -- that's fine, and if there's some master agreement, which I assume is the same, or the same except for some addendum or maybe something like that, I think you ought to provide it and/or tell them that.

I think, in other words, CedarCrestone has become sort of an example.

MR. ALINDER: I agree your Honor, and to the extent you'd rather have a form agreement, for example, I think we could do that still.

THE COURT: Maybe a form agreement and the CedarCrestone agreement, because then they could look at the CedarCrestone agreement in the website. I think you now have the green light to get from CedarCrestone what is not authorized by Oracle. Not necessarily forbidden by Oracle, but not specifically authorized.

MR. McDONELL: And then there's one other piece of this, your Honor. Now that this has morphed before our very

eyes from a pure partner to a partner that also does completely independent third-party support, I think we're going to need some discovery of Oracle about what they know about other of their partners that have that split personality. Because this has been hidden from us. It's -- by Oracle. They've never disclosed that CedarCrestone had this dual role. And therefore, the list we've been working with from Oracle about the third-party support players is necessarily incomplete.

So -- we can maybe meet and confer about that issue, but I do think we're going to need some discovery from Oracle about which of its partners also do independent third party support.

MR. ALINDER: And your Honor, I'm -- sure, we're happy to meet and confer about that. One thing to say that we haven't provided that discovery when the first thing they received was something that Oracle had turned over that said that a customer had left to go to CedarCrestone. So it's not there to say that we haven't been providing that.

THE COURT: I don't know what -- I'm not influenced by that at all. One way or another. But is there anything in the Kelly declaration that you are quarreling with?

MR. McDONELL: To the extent -- yes, to the extent that we've identified that it contradicts CedarCrestone's own statements about what it does. But again, it's a bunch of conclusionary statements from a witness that I can't

cross-examine.

THE COURT: But you heard what I did. I -- in the first motion, I'm not allowing cross-examination necessarily, but I am allowing amplification of the declaration to eliminate some of the conclusoriness, or what might be partial disclosure, rather. So if there's something on here, I would allow her to amplify the disclosures.

I would state generally, this appears to be a little bit more detailed. I wondered, Paragraph 5, Oracle has no license support partners. That's in the present tense. I don't know that it goes back. Perhaps that was just an oversight. But you know, the relevant time period extends somewhere back. So if that's a recent development, that might not cover the bases.

MR. McDONELL: Let me say, for example, Paragraph 3, second sentence: Oracle contracts with only a small percentage of its partners to provide support services on PeopleSoft, J.D. Edwards applications. That's what I want to know: Who are they?

THE COURT: And I think there's nothing wrong with providing a list of those people. I think --

MR. McDONELL: Probably don't want to get me started, your Honor, but they say they don't do the support over in the U.S. but they do overseas. Where? Who? What? Where?

THE COURT: In other words --

MR. ALINDER: Those limited overseas partners, though, really they don't provide support anywhere similar to what TomorrowNow did. They get a telephone call in, and then they tell Oracle that it came in. And Oracle provides the support. They're essentially the conduit.

MR. McDONELL: When do they get paid?

THE COURT: All right. Who gets paid? You mean what do they pay?

MR. McDONELL: What does a third party get paid? Is Oracle going to claim the full lost profit for that lost customer? How does the fact that part of the profit, the alleged lost profit, went to the partner factor into this? We need to know who these partners are.

THE COURT: I'll order that you give the list, the partners which are within a small percentage and give a little more detail of what they do and who pays whom. Okay? But beyond that, I mean, if there's a whole lot of different pricing structures and things like that and it's complicated, I'm not ready to say you should get that. I don't think it's irrelevant. It's pretty attenuated. So -- okay, as I was trying to indicate, I think just like in an antitrust case, there's stuff that's clearly in the same market and some stuff that's somewhat attenuated, and exactly where you draw the line, I don't have enough information to make, but if -- for discovery purposes, I think you should get some basic

information along those lines.

MR. McDONELL: In addition, you're ordering that they produce the CedarCrestone agreement and the form agreement.

THE COURT: Right. And will those have the fee schedule in there, or maybe I should ask you that.

MS. GLOSS: I'm not sure I will know all the answers with certainty until I go back and look. The question is: Which form agreement? The form agreement -- we have partnership agreements for reselling. We have partnership agreements for consulting. And then we have the non-U.S. agreements that are aimed at the countries where we generally don't have the language ability to answer the questions.

MR. ALINDER: Those are the overseas.

MS. GLOSS: Those are the three form agreements I'm aware of right now.

THE COURT: The reselling doesn't seem to be relevant.

MR. McDONELL: As a standard, it's not. But any kind of support service -- unless they're selling licenses.

THE COURT: But I think the second and third are.

MS. GLOSS: So our form consulting agreement and our form --

THE COURT: Overseas.

MS. GLOSS: Overseas agreement.

THE COURT: Yes.

MR. McDONELL: And any and all -- I don't know if

there's more than one with CedarCrestone, I assume it's one, but if it's been renewed and revised, I'd like to see it.

THE COURT: In the relevant time period.

MR. McDONELL: 2002 to 2008.

THE COURT: That's it. I mean, I do -- I think it has some relevance. I don't think it has a whole lot of relevance. That's what I'm trying to say.

MR. McDONELL: Your, Honor I've done a poor job of explaining to your Honor the relevance to this causation.

THE COURT: The art of the apology and the taking: It was my mistake, is done now.

MR. HOWARD: He's been watching the A Rod interview this morning.

THE COURT: I missed that one. We probably got to a new high or low on that score.

MR. McDONELL: I will sit down and cut myself off now. But your Honor, one day, will be --

THE COURT: No, I see it has some relevance to damages. But you know -- and maybe it's the whole way this issue has sort of come up. But I mean, it's possible to -- you know, I can see some relevance for your finding out, possibly. But it really wasn't the gravamen of this, so I wasn't certain about that, like which ones TomorrowNow shut down. Who did those people go to? If they want back to Oracle, if they went back to Partner, if they went back to the unknown. That might

be fair discovery, because, you know, if your damages are -- unless you're saying they ended with the shutting down of TomorrowNow.

MR. ALINDER: And we're providing that discovery, your Honor. The document he was talking about was the third-party risk analysis document that talks about where people went.

THE COURT: And I think that's fine. I think the -- but I think it was pretty convoluted the way the argument came up in the context of this motion.

In terms of what is a reasonable royalty, if you're really pursuing that -- I mean, I would tend to think that head-to-head competitors, if this lawsuit is any indication, would not be licensing each another, willingly. But if that really is being pursued, then, you know, I think they're entitled to at least discovery to make sure that it's sort of the range. I think it's a very strong argument that any royalty would have to be a lot higher to a licensed partner, both because of the scope of it and who it would be going to.

MR. ALINDER: And I think when they see the form agreements, they'll be satisfied that it's not --

THE COURT: Quite possibly. And now apparently there's this area where the partner may also be doing some unauthorized things that are not necessarily forbidden, the way you're saying that SAP was doing things that were illegal, but are not necessarily necessarily known to Oracle, and certainly

not part of the scope of the agreement.

MR. ALINDER: Right, and to the extent they are doing something forbidden -- you know, we don't know that, but, you know, if they take discovery and find out, then I'm sure we'll be happy.

THE COURT: You may yank those awards back.

MR. ALINDER: Right.

THE COURT: Former holder of....

All right.

MR. ALINDER: Thank you, your Honor.

MR. McDONELL: Thank you, your Honor.

MR. HOWARD: Thank you.

(Adjourned)

oOo

CERTIFICATE OF REPORTER

I, Connie Kuhl, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into written form.

Connie Kuhl

Connie Kuhl, RMR, CRR
Wednesday, February 11, 2009