BINGHAM McCUTCHEN LLP
DONN P. PICKETT (SBN 72257)
GEOFFREY M. HOWARD (SBN 157468)
HOLLY A. HOUSE (SBN 136045)
ZACHARY J. ALINDER (SBN 209009)
BREE HANN (SBN 215695)
Three Embarcadero Center
San Francisco, CA 94111-4067
Telephone: (415) 393-2000
Facsimile: (415) 393-2286
donn.pickett@bingham.com
geoff.howard@bingham.com
holly.house@bingham.com
zachary.alinder@bingham.com
bree.hann@bingham.com

DORIAN DALEY (SBN 129049)
JENNIFER GLOSS (SBN 154227)
500 Oracle Parkway
M/S 5op7
Redwood City, CA 94070
Telephone: (650) 506-4846
Facsimile: (650) 506-7114
dorian.daley@oracle.com
jennifer.gloss@oracle.com

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle International Corp., Oracle EMEA Ltd., and Siebel Systems, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE USA, INC., a Colorado corporation, ORACLE INTERNATIONAL CORPORATION, a California corporation, ORACLE EMEA LIMITED, an Irish private limited company, and SIEBEL SYSTEMS INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>SAP AG, a German corporation, SAP AMERICA, INC., a Delaware corporation, TOMORROWNOW, INC., a Texas corporation, and DOES 1-50, inclusive,<br><br>Defendants. | CASE NO. 07-CV-01658 PJH (EDL)<br><br>**FOURTH AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>**(1) COPYRIGHT INFRINGEMENT;**<br>**(2) VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT;**<br>**(3) VIOLATIONS OF THE COMPUTER DATA ACCESS AND FRAUD ACT;**<br>**(4) BREACH OF CONTRACT;**<br>**(5) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** |



Dockets.Justia.com

**(6) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**
**(7) UNFAIR COMPETITION;**
**(8) TRESPASS TO CHATTELS;**
**(9) UNJUST ENRICHMENT / RESTITUTION; and,**
**(10) AN ACCOUNTING.**

**DEMAND FOR JURY TRIAL**

Plaintiffs Oracle USA, Inc. ("Oracle USA"), Oracle International Corporation ("OIC"), Oracle EMEA Limited ("OEMEA"), and Siebel Systems Inc. ("SSI") (together "Oracle" or "Plaintiffs") for their Complaint against Defendants SAP AG ("SAP AG"), SAP America, Inc. ("SAP America"), TomorrowNow, Inc. ("TomorrowNow" or "SAP TN"), and Does 1 through 50 (collectively referred to as "SAP" or "Defendants"), allege as follows based on their personal knowledge as for themselves, and on information and belief as to the acts of others:

## I. INTRODUCTION

1. This case is about a conspiracy, led by German software conglomerate SAP AG, to engage in and cover-up corporate theft of Oracle intellectual property on the grandest scale.

2. In mid-December 2004, in response to Oracle's impending acquisition of PeopleSoft, SAP AG CEO Henning Kagermann and the SAP AG executive board of directors "decided to take a strong look at the possibility of offering PSFT support/maintenance services from SAP starting early 2005." Board member Shai Agassi immediately instructed SAP AG's James Mackey to investigate an acquisition of "the leader in this 3rd party support services, a company call[ed] TomorrowNow." Agassi explained: "the idea is to take away the maintenance revenue stream away from ORCL."

3. The SAP AG board knew it had just days to develop this new service in order to "disrupt the market." Agassi told his team: "Remember the PR value of buying [TomorrowNow] . . .The bragging rights for having more PSFT customers under service than

Oracle may be all we need for a momentum swing . . .”

4. By January 7, 2005, SAP AG executive board members Kagermann, Agassi, Werner Brandt, and Gerd Oswald received a highly confidential document: the “business case” for SAP AG’s purchase of TomorrowNow. The document represented SAP AG’s negotiations, research and conclusions over the course of the previous three weeks.

5. The presentation made clear that TomorrowNow did not operate legally. It detailed how TomorrowNow relied on “non-production” copies of PeopleSoft software for its “access to PeopleSoft system.” Under the heading “Threats,” the board was warned that “Access rights to the PeopleSoft software is very likely to be challenged by Oracle and past operating issues [of TomorrowNow] may be a serious liability if Oracle challenges (i.e., offsite production copies and the form of delivery of regulatory updates may be subject to Oracle challenge.)” As a result, the presentation predicted “likely legal action” from Oracle.

6. SAP AG’s board ignored these warnings and embraced TomorrowNow’s illegal business model for two reasons.

7. First, it decided it could not walk away from the “Opportunity” identified by the January 7 presentation to “distract” Oracle and take the PeopleSoft/JDE customer maintenance revenue and future applications sales Oracle expected to achieve with the PeopleSoft deal.[1]

8. Second, it wrongly predicted Oracle would not sue. The presentation predicted “Oracle’s legal challenges to TomorrowNow’s ability to provide derivative works/support will require Oracle to also sue its customers – a difficult situation for Oracle.”

9. If Oracle did sue, SAP AG’s board developed a plan to attempt to insulate

---

[1] “PS,” “PSFT” or “PeopleSoft” refers either to PeopleSoft, Inc. acquired by Oracle in January 2005, or to PeopleSoft-branded enterprise software applications, whether offered by PeopleSoft or Oracle. “JDE” or “J.D. Edwards” refers either to J.D. Edwards & Co., acquired by PeopleSoft, Inc. in 2003, or to J.D. Edwards-branded enterprise software applications, whether offered by J.D. Edwards, PeopleSoft or Oracle. “SEBL” or “Siebel” refers either to Siebel Systems, Inc., acquired by Oracle in September 2005, or to Siebel-branded enterprise software applications, whether offered by Siebel or Oracle.

SAP AG from the liability it knew TomorrowNow's service model represented. It would blame its customers for signing TomorrowNow's contracts, and leave the TomorrowNow "corporation in existence as a liability shield for any potential claims."

10. With this self-serving plan in place, SAP AG and SAP America bought TomorrowNow and converted it to SAP TN just two weeks later, days after Oracle closed on the deal with PeopleSoft. SAP AG did so knowing, at the SAP AG executive board level, that SAP TN's business model depended on routine, daily cross-use of misappropriated Oracle software applications and downloaded support products. Moreover, going forward, SAP AG knew that the SAP TN services it exploited to convert Oracle customers relied on SAP TN's tainted development activity to create illegal "SAP TN" software support products.

11. Following the SAP TN acquisition, rather than change the illegal SAP TN business model, SAP instead conspired to leverage the stolen Oracle intellectual property to entice customers to migrate to SAP software applications through SAP's "Safe Passage" program. SAP further conspired – at the highest levels of all three companies – to cover up the fundamental illegality of that program. In confidential internal presentations, with instructions to "PLEASE DELETE AFTER READING," SAP dubbed this conspiracy "Project Blue." Versions of these "Project Blue' presentations, which acknowledged the illegal nature of SAP TN's business, were prepared for the SAP AG executive board of directors as early as June 2005.

12. For years, SAP AG profited from SAP TN's illegal business model, without breathing a word about it to Oracle, SAP AG's existing and prospective customers, or the investing public. SAP AG and SAP America did not change SAP TN's corrupt business model because they considered SAP TN a crucial element in their plan to undermine Oracle's customer base and brand and to build their own customer base and brand at Oracle's expense.

13. Defendants' theft of Oracle software continued for several years – and even well after Oracle filed this action. By mid-2007, several months after Oracle brought this lawsuit, SAP finally could have decided to do the right thing by discontinuing any activity based on the pirated Oracle software. SAP was (and has always been) in total control of SAP TN, and so could have immediately changed SAP TN's business practices. Instead, having re-confirmed

in internal interviews that SAP TN relied on cross-use of copies of customer software as "part of their business model for supporting clients," SAP executives made a conscious decision to continue business as usual at SAP TN – making and using the illegal local copies of their customers' software to support multiple other customers. This deliberately-infringing activity, condoned by SAP executives, continued *for one and one-half years after Oracle filed its initial Complaint* not because SAP TN executives considered the SAP TN business model "ethical" (SAP AG's new CEO admitted in October 2008 it was not), but instead for three purely selfish business reasons: (1) to preserve the asset value of SAP TN for an eventual sale to recoup the money SAP paid for it; (2) to sell more SAP software to and continue to receive support revenue from the customers who would continue to receive SAP TN's illegal service and support; and (3) to maintain its self-reported high reputation for customer service and customer support. By continuing to run SAP TN's corrupt business model after Oracle filed this lawsuit until October 2008, SAP continued to authorize and direct vast additional instances of infringement – all to artificially inflate its own revenues and reputation at Oracle's expense.

* * * *

14. Oracle – a leading developer of database and applications software – initially brought this lawsuit after discovering that SAP had engaged in systematic, illegal access to, and taking from Oracle's computerized customer support systems.

15. Oracle amended its claims because discovery in this case has revealed that the focus of its original claims – SAP's massive illegal downloading of Software and Support Materials from Oracle's password-protected computer systems – is just one element of a larger scheme by SAP to steal and misuse Oracle's intellectual property. In addition to the illegal downloads, SAP – with the knowledge of members of the SAP AG executive board of directors – made thousands of copies of Oracle's underlying software applications on its computer systems. SAP warehoused Oracle's code in "generic software environments" that it used to service SAP's customers, train employees, create fake "SAP" branded fixes for distribution, and generally to support a business model that was illegal to its core. Oracle now amends the Complaint again following further discovery showing that SAP's infringement and other

unlawful conduct extended in full to Oracle's Siebel software line as well. In addition, it now appears SAP also infringed Oracle's copyrighted database technology software.

16. As alleged in Oracle's prior Complaints, in the illicit downloading component of its scheme, SAP, through SAP TN, stole thousands of proprietary, copyrighted software products and other confidential materials that Oracle developed to service its own support customers.[2] SAP gained repeated and unauthorized access, in many cases by use of pretextual customer log-in credentials, to Oracle's proprietary, password-protected customer support websites. From these websites, SAP has copied and swept into its servers thousands of copyrighted Oracle Software and Support Materials. As a result, SAP compiled a massive illegal library of Oracle's copyrighted software code and other materials. This storehouse of stolen Oracle intellectual property is part of what enables SAP, through SAP TN, to offer cut rate support services to customers who use Oracle software, and to attempt to lure them to SAP's applications software platform and away from Oracle's.

17. Oracle's own records show at least 10,000 illegal downloads by SAP between September 2006 and February 2007. However, Oracle has now obtained SAP's internal records, which confirm that SAP has spent years systematically taking unauthorized support materials from Oracle's systems, most recently using a dedicated bank of twenty servers in a "download center" and a customized software tool called "Titan." SAP programmed Titan specifically to ignore any access or use restrictions for any particular customer log-in credential. Instead, SAP designed Titan to gain any form of access with any active log-in credential, and to "scrape" Oracle's websites for bug fixes, patches, updates and instruction manuals. At the time Oracle filed its prior Complaints, Titan and other tools had filled SAP storage vaults with more than ***five terabytes*** worth of Oracle's Software and Support Materials. On just one of SAP's

---

[2] These copyrighted materials, which include program updates, software updates, bug fixes, patches, custom solutions, instructional documents, knowledge management solutions, FAQs, Tech Notes and Alerts related to Oracle software products, including the PeopleSoft, JDE and Siebel families of software products, are referred to throughout as "Software and Support Materials."

servers, Oracle discovered nearly ***8 million*** downloaded Oracle Software and Support Materials.

18. For years, SAP dumped these materials into a co-mingled, master download library, and "exploded" the software support packages into their constituent objects to facilitate later indexing and searching by product. SAP accessed these master download libraries as needed when customers needed a fix – regardless of which log-in credential SAP had used to download a particular fix in the library, regardless of whether the customer getting the fix had any license to receive it, and regardless of whether the customer had a support contract with Oracle entitling them to receive that fix.

19. But these downloads of Software and Support Materials, though massive, were just one part of SAP TN's fundamentally illegal business model:

- Beginning as early as 2002, SAP TN co-founders Andrew Nelson and Seth Ravin decided that SAP TN would expand its services and, in doing so, would create and keep on its computer systems illegal copies of Oracle's ***underlying software applications***;
- Nelson and Ravin directed SAP TN to warehouse dozens of these copies simply as "generic software environments" and use them as a "sandbox" to service other customers, train its employees, and create phony SAP TN-branded fixes to sell to its customers;
- In particular, SAP TN used these generic copies of Oracle software to "develop" (by copying Oracle software or creating illegal derivative works from it) SAP TN-branded "tax and regulatory updates," and deliver them to its customers paying for SAP TN support of each Oracle software release;
- In at least hundreds of instances, in a process created by Nelson and Ravin, SAP TN did this by first updating one "generic" environment with the Oracle-authored update code that SAP TN would download from Oracle's systems with one customer's log-in credential. SAP TN would then use software comparison tools to compare this "updated" generic software environment to a generic copy (also obtained from some unidentified customer) of an earlier

release of the same software. SAP TN then copied the differing code and used it to "develop" (again, by creating an illegal derivative work) what it called an SAP TN "retrofit update" in another "generic" environment. In the course of this development process, SAP TN would normally make at least four, and sometimes many more, generic copies of Oracle's software applications. In effect, there was no original development at all but merely repeated, illegal copying and use of the Oracle software code;

- In at least hundreds of other instances, SAP TN simply used these generic environments copied from customers' Oracle software to develop and test SAP TN "authored" (again, illegally created) updates that it delivered to its customers. After it bought SAP TN, SAP AG directly assisted in this process using its own software support resources;
- Many of SAP TN's environments, including generic environments, in turn ran upon copies of Oracle's database software that were not licensed for commercial or production use. After purchasing SAP TN, SAP AG and SAP America refused to purchase Oracle database licenses for SAP TN use, even though as an authorized Oracle database reseller, they knew full well the permissible uses of database copies, and even though SAP TN described the licenses as "urgently needed to support [SAP TN's] PeopleSoft customers using this technology";
- In total, SAP TN made thousands of copies of Oracle's software, and distributed thousands of individual fixes, for a fee, through its illegal "generic retrofit" and "direct update" models;
- In addition to the code associated with these retrofit software updates, SAP TN provided its customers with stolen Oracle instruction manuals, guides, notes and other support documentation related to the updates. It did this by "copying and pasting" downloaded Oracle documentation into re-branded SAP TN documentation that was, according to the sworn testimony of SAP

TN's third employee, "essentially identical" and "virtually verbatim with small changes" as the Oracle documentation. SAP TN then distributed these copied documents to its customers with a cover letter signed by its CEO, Andrew Nelson; and,

- SAP TN prepared operations manuals to instruct SAP TN employees how to download Oracle documentation and alter it to conceal its origin and make it look like SAP TN's. These instructions mandated specific, but minor changes to Oracle materials, stating for example, "Go to Document Properties and change author to TomorrowNow," or "[w]here the [Oracle] document talks about the appendix, edit so that the TomorrowNow document says 'summary.'"

20. The illegal downloads and the illegal software copies are part of an integrated, illegal business model. Without this stolen intellectual property, SAP TN could not operate. For example, whenever SAP TN wished to advertise support services for a new Oracle software product, it would need to first obtain a "seed" copy of the software. It needed this first copy so it could train its employees to support the software and create a generic software environment from which to "recycle" its support efforts and scale them across other customers. For these reasons, SAP TN's internal business plans specify that the first SAP TN customer on a new Oracle software release must contractually agree with SAP TN to provide copies of its Oracle software CDs to SAP TN.

21. SAP AG and SAP America have made repeated false statements about their own involvement in, and benefit from, SAP TN's theft.

22. While admitting that "inappropriate" downloads took place, in a July 3, 2007 press conference, SAP AG CEO Henning Kagermann stated that a "firewall" existed between SAP AG and SAP TN that prevented SAP AG from having access to the Oracle software downloaded by SAP TN. That was not true:

- SAP AG and SAP America employees accessed SAP TN's systems through a special link on SAP TN's website;

- SAP TN employees accessed SAP AG and SAP America's systems through "SAPnet," an internal network through which SAP AG provided assistance to SAP TN's illegal development efforts;
- SAP TN, SAP America and SAP AG employees routinely emailed content and intellectual property among themselves; and,
- At the time Oracle filed its lawsuit, SAP had before it a detailed roadmap for connecting virtually every piece of the SAP TN network to the SAP AG network.

23. These facts show that, despite Kagermann's public pronouncement, no "firewall" existed between SAP TN and SAP America or SAP AG. In fact, SAP TN did transmit copyrighted Oracle software code by email to SAP AG – a fact SAP AG has now admitted under oath.

24. Even worse, discovery in this case has revealed that SAP AG and SAP America knew from the start that SAP TN's business depended on this extensive illegal scheme – going far beyond SAP TN's downloading activity – to copy, keep, use and sell Oracle's software as its own. On December 21, 2004, one of the key members of SAP's due diligence team – a former PeopleSoft employee – reported directly to board member Agassi: "I am not sure how TomorrowNow gets access to Peoplesoft software, but its [sic] very likely that TomorrowNow is using the software outside the contractual use rights granted to them . . ." A week later, he reiterated the point: "The access rights to the PeopleSoft software is very likely to be challenged by Oracle."

25. Undeterred, SAP AG and SAP America initially sought assurances that SAP TN respected Oracle's intellectual property rights. SAP TN's owners flatly refused to give any such assurances. Instead, they warned that Oracle likely would sue SAP when it raised SAP TN's profile through the "Safe Passage" program.

26. SAP AG and SAP America bought SAP TN anyway in January 2005.

27. Immediately, because of apparent ongoing concerns about the propriety of keeping and using (and cross-using) thousands of copies of Oracle's software, SAP half-

heartedly considered and then tabled “Project Blue.” Project Blue was a codename for a secret project to begin to remove the infringing Oracle software from SAP TN computers and support customers remotely. “Blue” referred to supporting customers without locally hosting or using the infringing copies of Oracle software. “Yellow” referred to the status quo – keeping the illegal copies of Oracle software on SAP’s computers and using them for general purposes.

28. SAP TN prepared a series of secret “Project Blue” presentations for itself and members of the SAP AG executive board of directors. These presentations revealed that SAP TN’s business fundamentally depended on generic bootleg copies of Oracle’s software applications. Yet SAP still did nothing to stop the theft and instead took steps to expand it into other Oracle products:

- SAP continued to accept the benefits of SAP TN’s daily infringement of Oracle’s copyrights because, in the words of SAP TN’s founder Andrew Nelson, this “strategic investment” would allow SAP TN to “grow in profit while remaining a strategic weapon in SAP’s fight against Oracle”;
- SAP expanded SAP TN’s illegal model to include Oracle’s Siebel software just days after Oracle acquired Siebel, and added Oracle’s Retek and Hyperion software to its Safe Passage sales program immediately after those acquisitions as well; and,
- In March 2007, SAP AG’s executive board was about to approve, or had already approved, the expansion of SAP TN’s service offering to Oracle eBusiness Suite customers. A presentation to executive board member Gerd Oswald stated this expansion would “support SAP’s strategy and Board area strategy” and “leverage service as [a] competitive weapon in order to restrict competition.”

29. According to its business model, SAP TN could not have offered Siebel or eBusiness Suite support services, or considered offering Retek and Hyperion support services, without first obtaining illegal “sandbox” copies of that software for testing, research and development. In authorizing SAP TN to consider and, in the case of Siebel, actually offer these

services, SAP AG's executive board of directors had no reason to believe that SAP TN would not likewise engage in illegal acquisition and use of Oracle's software.

30. Through all of 2006, and into 2007 (and, discovery has revealed, also into 2008 for over a year after Oracle brought this lawsuit), SAP AG did not require SAP TN to remove the illegal Oracle software copies from its systems by implementing Project Blue. Rather, SAP AG and SAP America instead allowed SAP TN to expand its offerings to these other Oracle software applications, and to bring in new so-called "Safe Passage" customers who would migrate from Oracle to SAP applications. SAP AG and SAP America provided leads, helped with and participated in negotiations whenever fruitful, and ran joint marketing campaigns, including a "Zero Dollar" campaign where a customer could "Get [its] PS/JDE/SEBL support [from SAP TN] at NO COST while you migrate to SAP [AG]" to "ensure we move these customer[s] off Oracle completely."

31. Confidential internal SAP communications reveal that SAP may not have won nearly as many customers through its Safe Passage program if it did not have the help of SAP TN's illegal service offering. For example, in May 2006 during SAP's negotiations with potential customer National Foods Limited, "TomorrowNow was able to give 'substantial teeth' to the SAP license bid, with the offer of combining both JDE and PeopleSoft support and maintenance services for the foreseeable future, whilst they work on the SAP implementation plans." Many other examples of SAP TN's efforts to win customers for SAP can be found throughout SAP's and SAP TN's records.

32. By early 2007, Project Blue had gone nowhere. SAP TN objected to giving up the infringing local software copies and engaged in self-described "delay tactics." SAP AG and SAP America refused to give up the software sales SAP TN's illegal activities helped them make. According to confidential notes from a call with Thomas Ziemen of SAP AG, Andrew Nelson confesses: "Project Blue - Taking much longer than expected. Don't feel we can get payroll development in external environments. Focus on new non-payroll environments. ***Will provide formal proposal to you [Ziemen] to present to board for review.***" (emphasis supplied)

33. In sum, SAP's "illegal library" of downloaded Oracle Software and Support Materials described in Oracle's original Complaint is just the beginning. Pursuant to approved corporate protocols, with the knowledge and complicity of members of the SAP AG board of directors, SAP TN has spent years compiling and improperly using Oracle's software applications and downloaded Software and Support Materials. Despite this knowledge, SAP AG board members have still chosen to assist and enable SAP TN's illegal activities, and to boast on earnings calls about Safe Passage customer wins obtained with SAP TN's assistance. SAP conspired to conceal SAP TN's corrupt business model from Oracle, its customers and the investing public, so that it could continue to pocket the money from these unlawful sales. As explained in further detail below, this theft and cover-up appears to be an essential – and illegal – part of SAP's competitive strategy against Oracle.

34. Oracle filed this action to bring the truth about SAP's actions to light, force a return to fair competition, and redress the harm that SAP has caused by its illegal conduct. SAP's infringement and other illegal, wrongful, and unfair business practices threaten to cause irreparable harm to Oracle, its many employees, customers and shareholders. Oracle has no adequate remedy at law for the harm threatened and caused by these acts.

## II. THE PARTIES

35. Oracle USA is a Colorado corporation duly authorized to do business in the State of California, with its principal place of business in Redwood City, County of San Mateo, State of California. Oracle USA develops and licenses certain intellectual property, including copyrighted enterprise software programs, and provides related services. Oracle USA is the successor to PeopleSoft USA, Inc. ("PeopleSoft") and a successor in interest to certain PeopleSoft, J.D. Edwards, and Siebel entities.

36. OIC is a California corporation duly authorized to do business in the State of California, with its only place of business in Redwood City, County of San Mateo, State of California. OIC owns and licenses certain intellectual property, including copyrighted enterprise software programs used around the world. Intellectual property rights formerly held by certain PeopleSoft, J.D. Edwards, and Siebel entities were transferred to OIC as part of the acquisitions

of PeopleSoft and Siebel by Oracle. OIC is the owner of the copyrights at issue in this action.

37. OEMEA is an Irish private limited company with its principal place of business in Dublin, Ireland. Directly and through its subsidiaries, OEMEA licenses certain intellectual property, including copyrighted enterprise applications software programs used around the world, and provides related services. OEMEA is a successor in interest to certain PeopleSoft and J.D. Edwards entities.

38. SSI is a Delaware corporation duly authorized to do business in the State of California, with its principal place of business in Redwood City, County of San Mateo, State of California. SSI developed, owned, and licensed certain intellectual property, including copyrighted enterprise software programs.

39. SAP AG is a German corporation with its principal place of business in Walldorf, Germany.

40. SAP America is a Delaware corporation with its principal place of business in Newtown Square, Pennsylvania. SAP America is a wholly-owned subsidiary of SAP AG.

41. SAP TN is a Texas corporation with its principal place of business in Bryan, Texas. SAP TN is a wholly-owned subsidiary of SAP America. The corporate relationship of the three named defendants is set forth in the chart below.




42. Oracle is currently unaware of the true names and capacities of Does 1 through 50, inclusive, whether individual, partnership, corporation, unincorporated association,

or otherwise, and therefore sues these defendants by such fictitious names. Due to the surreptitious nature of Defendants' actions, and the complicated nature of their scheme, the identities of the Doe Defendants have been concealed from Oracle, preventing Oracle from identifying these Defendants by name. After discovery, which is necessary to ascertain the true names and capacities of these Defendants, Oracle will amend its complaint to allege the necessary identifying details.

43. Defendants all are doing business in and/or have directed their activities at California, and specifically this judicial district. By way of example only, SAP America and SAP TN advertise, promote, sell, license, service, and support customers in California and in this judicial district. SAP AG negotiates and enters into software license and support agreements directly within the United States and, specifically in this judicial district, negotiates certain software-related contracts directly with Oracle that contain provisions by which SAP AG consents to the jurisdiction of California courts and the application of California law. SAP AG also holds an annual meeting of its Board of Directors in Palo Alto, California, and finances the sales and promotional activities of both SAP America and SAP TN throughout the United States and in California.

44. At all material times, through its 100% ownership of both SAP America and SAP TN, SAP AG had both the right and the authority to control the actions of both corporations. Similarly, at all material times, through its 100% ownership of SAP TN, SAP America had both the right and authority to control the actions of SAP TN.

45. At all material times, each of the Defendants, including Does 1 through 50, was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator of the others, had full knowledge of and gave substantial assistance to the alleged activities, and in doing the things alleged, each was acting within the scope of such agency, service, employment, partnership, joint venture, representation, affiliation, or conspiracy, and each is legally responsible for the acts and omissions of the others.

## III. JURISDICTION

46. Oracle's first cause of action arises under the Federal Copyright Act, 17

U.S.C. §§ 101 *et seq*., and its second cause of action arises under the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq*. Accordingly, this Court has subject-matter jurisdiction over this action pursuant to 18 U.S.C. § 1030(g), 28 U.S.C. § 1331, and 28 U.S.C. § 1338.

47. This Court has supplemental subject matter jurisdiction over the pendent state law claims and parties under 28 U.S.C. § 1367, because these claims are so related to Oracle's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

## IV. VENUE

48. Venue in this district is appropriate, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the dispute occurred in this district, a substantial part of the property that is the subject of the action is situated in this district, and the Court has personal jurisdiction over each of the parties as alleged throughout this Complaint.

## V. INTRADISTRICT ASSIGNMENT

49. Assignment is proper in this division under Civil L.R. 3-2 (c) and (d), because a substantial part of the events giving rise to the claims occurred in San Mateo County and a substantial part of the property that is the subject of the action is situated in San Mateo County.

## VI. FACTUAL ALLEGATIONS

### A. Oracle's Software And Support Materials

50. Oracle is the world's largest enterprise software company, and the first to receive J.D. Power & Associates' global certification for outstanding service and support based on measuring customer satisfaction worldwide. Oracle develops, manufactures, markets, distributes, and services software designed to help its customers manage and grow their business operations. Oracle's software offerings include database, middleware, and applications software programs.

51. As is typical in the enterprise software industry, Oracle does not sell ownership rights to its software or related support products to its customers. Instead, Oracle's customers purchase licenses that grant them limited rights to use specific Oracle software

programs with Oracle retaining all copyright and other intellectual property rights in these works. In addition, licensed customers can, and typically do, purchase some set of technical support services that include the right to obtain upgraded products such as updates, bug fixes, or patches to those software programs the customers have expressly licensed from Oracle and have the right to use for purposes authorized by Oracle.

52. Oracle's license agreements with its customers may vary according to the products licensed, including because the customers originally contracted with PeopleSoft, JDE, and/or Siebel, but all of the relevant license agreements for what is now Oracle software set comparable rules for access to, and use of, that software. Among other things, those rules prohibit access to, or use of, any portion of the software not expressly licensed to and paid for by the licensee, and any sublicense, disclosure, use, rent, or lease of the software to third parties.

53. Oracle's license agreements define Oracle's confidential information to include, without limitation, Oracle's software, its object and source code, and any associated documentation or service offerings. Licensees may designate third parties to help maintain Oracle's software, but only subject to the terms of the relevant license agreement between the licensee and Oracle. Those agreements generally preclude the third party from installing the software on a server, or accessing the source code of the software. The License Agreements generally prohibit the licensee or any third party from using the software offsite without notice to Oracle, prohibit disclosure to third parties, and prohibit any use other than by the customer for production, backup, archival and in-house disaster recovery purposes. As defined in one illustrative license agreement, "software" specifically includes the update products made available to customers as part of the support contracts that customers purchased from Oracle.

54. Through its Terms of Use, Oracle also restricts access to the customer support websites used by Oracle customers and/or their authorized agents to access and download Oracle software, including for its JDE, PeopleSoft, and Siebel, Software and Support Materials licensed to Oracle customers. For example, the Terms of Use on Oracle's Customer Connection support website, which relates to Oracle's PeopleSoft and JDE software, stated:

> You agree that access to Customer Connection…will be granted only to your designated Oracle technical support contacts and that the Materials [on the support website] may be used solely in support of your authorized use of the Oracle Programs for which you hold a supported license from Oracle. Unless specifically provided in your licensing or distribution agreement with Oracle, the Materials may not be used to provide services for or to third parties and may not be shared with or accessed by third parties.

55. The Terms of Use explicitly describe the confidential nature of the material on Customer Connection: "the information contained in the Materials [available through Customer Connection] is the confidential proprietary information of Oracle. ***You may not use, disclose, reproduce, transmit, or otherwise copy in any form or by any means the information contained in the Materials for any purpose***, other than to support your authorized use of the Oracle Programs for which you hold a supported license from Oracle, without the prior written permission of Oracle." (emphasis supplied).

56. Access to the secured areas of Customer Connection is also governed by Special Terms of Use. By using the secured website, the user agrees to accept and comply with these Special Terms of Use. The Special Terms of Use provide that access is only permitted via the user's "personal username and password" and that all materials on the secured website are confidential and proprietary. The Special Terms of Use clearly provide that: "Use of such CONFIDENTIAL and PROPRIETARY information and materials for any other purpose is strictly prohibited."

57. Prior to downloading Software and Support Materials from Oracle's support websites, a user must also specifically agree to additional terms of use and restrictions specified in Oracle's Legal Download Agreement:

> Your username and password are provided to you for your sole use in accessing this Server and are confidential information subject to your existing confidentiality agreement with Oracle / PeopleSoft / JDEdwards. If you do not have a confidentiality agreement in effect with Oracle / PeopleSoft / JDEdwards, you are hereby notified that your username and password are confidential information and may only be distributed to persons within your organization who have a legitimate business purpose for accessing the materials contained on this server in furtherance of your relationship with Oracle / PeopleSoft / JDEdwards.

58. The Legal Download Agreement also puts the user on notice as to the confidential, proprietary and copyrighted nature of the Software and Support Materials available for download:

> Any software that is made available to download from this server ("Software") is the copyrighted work of Oracle / PeopleSoft / JDEdwards and/or its affiliates or suppliers. All Software is confidential information of Oracle / PeopleSoft / JDEdwards and its use and distribution is governed by the terms of the software license agreement that is in effect between you and Oracle / PeopleSoft / JDEdwards ("License Agreement"). The Software is part of the Licensed Products under the License Agreement and may only be downloaded if a valid License Agreement is in place between you and Oracle / PeopleSoft / JDEdwards. The Software is made available for downloading solely for use by licensed end users according to the License Agreement and any reproduction or redistribution of the Software not in accordance with the License Agreement is expressly prohibited. WITHOUT LIMITING THE FOREGOING, COPYING OR REPRODUCTION OF THE SOFTWARE TO ANY OTHER SERVER OR LOCATION FOR FURTHER REPRODUCTION OR REDISTRIBUTION IS EXPRESSLY PROHIBITED.

59. The Legal Download Agreement further restricts use of documents downloaded from the website:

> Permission to use Documents (such as white papers, press releases, product or upgrade announcements, software action requests, datasheets and FAQs) from this server ("Server") is granted, provided that (1) the below copyright notice appears in all copies and that both the copyright notice and this permission notice appear, (2) use of such Documents from this Server is for informational and non-commercial or personal use only and will not be copied or posted on any network computer or broadcast in any media, and (3) no modifications of any Documents are made. Use for any other purpose is expressly prohibited.

60. In addition, users accessing specific materials, such as a Software Application Request ("SAR") through the SAR Search Web Application, agree to additional legal restrictions. These terms notify the user that the software available to download from Oracle is Oracle's copyrighted material. The terms further provide that the "software is part of the Licensed Products under the License Agreement" and "is made available for downloading solely for use by licensed end users according to the License Agreement. Any reproduction or redistribution of the Software not in accordance with the License Agreement is expressly

prohibited." To download a SAR, the user must click on a button indicating that it accepts these terms.

61. Similarly, Oracle's password protected SupportWeb website had separate Terms of Use governing access to, downloading of, copying of and further use or distribution of Siebel-related support materials. Those Terms of Use stated: "By using the Site, you agree to follow and be bound by the following terms and conditions concerning your use of the Site ("Terms of Use")…." As with the PeopleSoft and JDE Terms of Use, these Siebel Terms of Use prohibited users from downloading, copying, viewing or printing the materials made available on that website other than "solely for personal, informational, non-commercial purposes" and also prohibited the user from modifying or altering those materials "in any way." The Siebel Terms of Use further provided that "Except where your use constitutes 'fair use' under copyright law, you may not otherwise use, download, upload, copy print, display, perform, reproduce, publish, license, post, transmit or distribute any information from this Web site in whole or in part without the express authorization of Oracle." The Siebel Terms of Use further stated: "Any use of software and accompanying documentation you download from the Site is subject to the terms of a software license agreement between you and Oracle. You must read the license agreement and indicate your agreement to its terms prior to installing or using the software."

### B. Oracle Threatens To Unseat SAP

62. On January 7, 2005, Oracle completed its acquisition of PeopleSoft to emerge as the second-largest provider of business software applications in the world and the first to rival SAP AG in market share, size, and geographic and product scope. As SAP America's Vice President of Operations, Richard Knowles, testified on June 23, 2004 at the trial on the Department of Justice's unsuccessful effort to block Oracle's acquisition of PeopleSoft, the combination stood to revitalize Oracle overnight as a competitor in the business software applications business. SAP AG suddenly found itself in a far different competitive environment than the one in which it had grown comfortable. As SAP AG reeled, events unfolded at a rapid pace: eleven days after its announcement, Oracle launched the newly-united company and unveiled, at its headquarters with more than 48,000 people joining by Webcast and phone, how

the nearly 50,000-strong combined workforce of Oracle and PeopleSoft would provide unparalleled innovation and support to 23,000 business applications software customers throughout the world.

63. SAP AG's and SAP America's top executives publicly downplayed the threat that a combined Oracle and PeopleSoft entity would pose to its competitive position for business software applications. SAP AG CEO Henning Kagermann claimed that even with PeopleSoft, Oracle would "not [be] a competitor which could really hurt us." After the merger, he even claimed to wish Oracle "good luck" in competing with SAP AG.

64. But SAP AG had no answer for the business proposition the new Oracle offered. Not only do many SAP AG customers use Oracle's superior database software programs, but now Oracle offered a deeper, broader product line of enterprise applications software programs to compete against SAP AG.

65. Rather than improve its own products and offerings, SAP AG instead considered how to undermine Oracle. One way was to hit at Oracle's customer base – and potentially increase its own – by acquiring and bankrolling a company that claimed the ability to compete with Oracle support and maintenance services on Oracle's own software products, despite not owning any of the software code for, or intellectual property rights to, these same products.

### C. SAP AG's Purchase Of SAP TN And Knowledge Of Its Illegal Business Activities

66. In the world of enterprise software applications, revenue comes from three basic activities: (a) licenses of the underlying software applications; (b) consulting relating to the implementation and operation of the software; and, (c) support contracts to keep the software updated and upgraded.

67. In December 2004, SAP TN was a small software services company, headquartered in Bryan, Texas and founded by former PeopleSoft software engineers, developers, and support technicians. It claimed to compete with PeopleSoft, JDE, and later, Oracle, by providing low-cost maintenance and support services to PeopleSoft and JDE (and

later Siebel) customers running assorted versions of these software programs. SAP TN claimed that it could cut customer maintenance and support bills in half and give customers a reprieve from software upgrade cycles by allowing customers to remain on older, often outdated, versions of PeopleSoft, JDE, or Siebel software rather than moving to later versions by implementing upgrades that the customers would receive by paying for support services from the software vendors themselves. As one industry journalist explained, SAP TN promised to offer such cheap support "because it is not investing millions of dollars in research and development for future versions of the software; it instead focuses on simply keeping the software up and running for an annual fee."

68. As described in a glossy spread in a leading industry publication, in December 2004, just weeks before Oracle would close the PeopleSoft acquisition, SAP TN president Andrew Nelson got "the magic phone call" from Jim Mackey, the "front man for SAP AG's mergers and acquisitions strategy." Mackey made Nelson an offer "he couldn't refuse."

69. To retain full control over every detail of its scheme to lure away customers from Oracle, and to use SAP TN to do it, SAP AG proposed to buy SAP TN outright and make it a wholly-owned – and wholly-beholden – subsidiary. Acquiring SAP TN was not a mere investment by SAP AG, but a calculated competitive move. As one industry observer put it, SAP AG bought "another arrow in its quiver to hunt after Oracle's customers." Aligning with SAP AG made little sense for SAP TN, however, because to the extent SAP AG successfully undermined Oracle by having its customers move from Oracle's software to SAP AG's software, SAP TN would eventually lose its customer base. So SAP AG had to make the price right – and accept a known risk.

70. The pre-deal negotiations with SAP TN reveal the breadth of SAP AG's knowledge – and its lack of concern – about SAP TN's thefts. Based on repeated warnings about how SAP TN's business model likely relied on illegal use of Oracle software, SAP America and SAP AG asked for "a representation regarding the infringement of PeopleSoft's intellectual property rights . . . that . . . would survive indefinitely . . . [and] would not be subject to any basket or cap on indemnity."

71. But SAP TN's two shareholders, Seth Ravin and Andrew Nelson, refused to make any representation that SAP TN had respected PeopleSoft's (soon to be Oracle's) intellectual property rights. Instead, Ravin reminded SAP of "discussions that were had regarding the increased likelihood of SAP being the subject of a lawsuit as a result of the very public and very aggressive move to offer alternative support to Oracle/PeopleSoft clients." SAP TN insisted this exposure to legal action by Oracle "is a real risk that must be borne primarily by SAP as a business and strategic investment risk," and threatened to suspend due diligence activities on the deal.

72. In response, SAP AG's Jim Mackey emailed Ravin directly: "Do not let your attorneys shut down the process. Keep the negotiations and diligence going. Appropriate compromises will be reached." In the end, the "appropriate compromise" was that SAP TN offered no assurances whatsoever that it had respected Oracle's intellectual property rights, and instead gave an indemnity from Ravin and Nelson totaling $2 million to cover costs relating to SAP TN's violations of Oracle's intellectual property. This indemnity term represented a spectacular twenty percent of the total $10 million price SAP AG and SAP America paid for SAP TN. Thus, SAP AG and SAP America knew or had reason to know – before they even acquired SAP TN – that SAP TN's business model posed a huge potential infringement problem.

73. In barely a month, SAP TN agreed to the deal and cast its lot with SAP AG. In January 2005, through SAP America, SAP AG acquired SAP TN. In connection with the SAP TN acquisition, SAP America's CEO, Bill McDermott, crowed "There's nothing that I love more than to win." But win at what cost? SAP appears to have taken a short cut to equip itself to support Oracle's software programs at half Oracle's price. SAP stole much of the Software and Support Materials – and software itself – directly from Oracle. SAP AG and SAP America knew it – and ignored it – from the start.

**C. SAP's Safe Passage Scheme**

74. When Oracle acquired PeopleSoft, it increased its potency as a competitor to SAP for enterprise applications software and related services. Industry observers noted this fundamental shift in the competitive landscape. One industry analyst stated that, "Oracle Corp.

is developing a 'super set' of applications, combining features from the PeopleSoft and JDE software and its CEO Larry Ellison has been vocal about his intentions to take market share away from SAP. Oracle said it has thousands of developers building the new application suite, called Project Fusion, aimed at taking market share from No. 1 ranked SAP." Another mused, "After the acquisition of PeopleSoft earlier this year, Oracle officially became a player on SAP's turf."

75. SAP AG's hasty acquisition of SAP TN was widely perceived as a response to the new competitive threat from Oracle. SAP's own statements confirmed it.

76. On January 19, 2005, SAP AG's top executives unveiled SAP AG's acquisition of SAP TN as the centerpiece of its new "Safe Passage" scheme. SAP AG's CEO, Henning Kagermann, identified SAP TN as instrumental to the parent company's "Safe Passage" program, publicly indicating that SAP TN was authorized and intended to implement SAP AG's goals. SAP advertised its "Safe Passage" program as explicitly designed to transition customers away from Oracle products and onto the SAP software platform. SAP AG spokesman Bill Wohl vowed that SAP AG would use SAP TN to "keep the pressure on Oracle" by exploiting legacy PeopleSoft customers' perceived unease about Oracle's commitment to supporting legacy PeopleSoft software.

77. As reported in industry publications, SAP TN's services "form[ed] the basis of [SAP AG's] Safe Passage initiative, a program aimed at siphoning off valuable software maintenance revenue from Oracle and persuading Oracle customers to switch software products [to SAP]." The Senior Vice President and Chief Operating Officer of SAP Asia Pacific, Colin Sampson, admitted that the SAP TN acquisition was "an integral part" of SAP's Safe Passage program, which in turn was part of SAP's "ongoing strategy to compete with Oracle." And SAP TN certainly knew its role was to achieve SAP AG's and SAP America's ends: as SAP TN's CEO, Andrew Nelson, stated, "We're owned by SAP. We want them to be successful."

78. But although SAP America CEO, Bill McDermott, committed to throw "a lot of additional resources" behind SAP TN (which consisted of only 37 employees in total), SAP appeared to focus more on growing the SAP TN sales force rather than investing in or

expanding SAP TN's tiny development team. Indeed, SAP TN did not appear to have the development capability to meet the support commitments advertised in the "Safe Passage" brochures at any price, much less the 50% discount promoted by SAP. It certainly did not match Oracle's investment in development resources, or even come close to it. These facts raised questions about how SAP could offer the type of comprehensive technical support services on Oracle programs that customers of enterprise applications typically require.

79. Nevertheless, industry observers deemed the "Safe Passage" program "measurably more aggressive," and a sign that "SAP has taken the gloves off."

80. After the acquisition, SAP TN's new parent companies directed it to begin to implement a two-phase plan to serve as the centerpiece of the Safe Passage scheme and to increase SAP's enterprise application market share. First, to lure the support business over from Oracle, SAP would offer cut-rate pricing combined with the promise of essentially unlimited future support to former PeopleSoft and JDE support customers. Second, in connection with converting Oracle customers to SAP support (via SAP TN), SAP would aggressively campaign to migrate those customers to an SAP enterprise software platform. As SAP AG Managing Director Alan Sedghi admitted, SAP AG would try to use SAP TN as a means of "speeding-up" the migration of PeopleSoft and JDE users to SAP AG platforms.

81. The CEOs stated the proposition more bluntly. In April 2005, SAP America CEO Bill McDermott claimed, "The SAP Safe Passage offering gives companies an affordable way to protect their current investments, ease integration with SAP NetWeaver(TM) and begin the process of innovating their businesses today." A month later, at the SAP AG annual meeting, SAP AG CEO Henning Kagermann confirmed: "We worked with [SAP TN] to very quickly set up a comprehensive program for SAP customers running PeopleSoft and JD Edwards solutions."

82. SAP implemented Phase One immediately. As reflected on SAP AG's website: "*SAP* offers Safe Passage for PeopleSoft, JD Edwards, and Siebel customers – If Oracle's options have you worried, consider another option: SAP. SAP provides solutions, technology *and maintenance services*." (emphasis supplied) SAP America's website promised

that "*SAP* and TomorrowNow can cut your maintenance costs by as much as 50% through 2015," and elsewhere says that "Safe Passage maintenance and support are delivered worldwide through TomorrowNow." (emphasis supplied) SAP TN's website confirmed its acceptance and undertaking of the SAP-controlled Safe Passage program: "TomorrowNow can also provide our support services as part of the SAP Safe Passage Program."

83. Beginning in January 2005, SAP sales representatives unleashed a torrent of marketing materials designed to exacerbate and leverage perceived, albeit unfounded, PeopleSoft and JDE customer uncertainty about the prospects for long-term, quality support from Oracle. An April 2005 SAP AG press release apparently aimed to increase perceived doubt among Oracle customers by announcing a "second wave" of "Safe Passage." To exploit the fear it intended to create, SAP AG's "second wave" included "an intensive customer recruitment campaign, offering significantly lower cost maintenance alternatives to Oracle customers running PSFT/JDE solutions" through 70,000 direct mail solicitations to Oracle customers. These lower cost alternatives advertised by SAP AG were to come directly through SAP TN.

84. To implement Phase Two of its plan (luring Oracle customers to the SAP enterprise software platform), SAP AG did not simply sit back and leave the recruiting of potential Safe Passage customers to SAP TN's sales force. Instead, it took a hands-on approach. It deployed its salespeople to contact potential customers and push them to switch to SAP TN's services. If customers declined to convert to SAP TN, the SAP AG sales personnel would pressure the customers to drop Oracle products outright in favor of SAP AG's suite. To give teeth to these commingled sales efforts, SAP AG offered maintenance support through SAP TN, officially "bundled" with SAP AG enterprise software as a centerpiece of the Safe Passage program.

85. SAP executives touted the Safe Passage program's limited success in its first year. SAP AG's CEO, Henning Kagermann, promised SAP AG would use SAP TN and the Safe Passage program to "fight for" more customers. By March 2006, SAP AG boasted in a press release that more than 200 customers had signed up for Safe Passage, the program it implemented partly through SAP TN, and which it claimed "offers companies SAP solutions,

technology, maintenance services, investment protection and a clear road map to the next generation of business software."

86. However, as Oracle continued to take market share and expand its product offerings, including through its September 12, 2005 announcement that it would acquire Siebel Systems, SAP grew more desperate, and more aggressive. In October 2005, SAP announced it would extend its Safe Passage program to Siebel customers, including apparently instantaneous round the clock support from SAP TN – whose engineers at that time presumably had spent virtually no time to develop Siebel support software products. As reported on Forbes.com after Oracle's announcement of its impending Siebel acquisition, "SAP AG plans to announce . . . that it will offer technical support for more of rival software maker Oracle Corp.'s own products [the Siebel products] for a far cheaper price." SAP's "cheaper price" (referred to elsewhere as "cut rate" support) continued at "50 cents on the dollar for maintenance fees," but its services were expanded to support more Oracle product lines and a wider range of customers. SAP America CEO, Bill McDermott, confirmed that SAP intended to use the Siebel acquisition as another opportunity to lure Oracle customers to SAP stating that SAP is "not distracted by the challenges of integrating multiple code bases, companies and corporate cultures." It appears that SAP only could offer instantaneous, round the clock Siebel code support, within a few weeks of Oracle's acquisition announcement, because SAP TN surreptitiously had acquired, studied and developed a service model based on illegal copies of Siebel software. Based on its standard business model, it appears likely that SAP TN did the same thing with Oracle's eBusiness Suite, Hyperion and Retek software.

87. All the while, SAP AG demanded reports detailing implementation of the Safe Passage program and other schemes against Oracle with code-names like "Turn Up The Heat" and the "Oracle Disruption Plan." SAP AG apparently even gave away free support from SAP TN in efforts to steal Oracle's applications software customers.

88. By July 2006, SAP AG CEO Henning Kagermann conceded that SAP had lost as much as 2% market share to Oracle. At the same time, curiously, SAP AG continued to tout the success of Safe Passage. In a July 2006 earnings call, Léo Apotheker, then SAP AG's

President of Customer Solutions and Operations and currently SAP AG's co-CEO, boasted that Safe Passage "continues to do really well," including because SAP AG "extended the program in order to offer it as well to Siebel customers." By extending the Safe Passage program to Siebel customers, and in conjunction with opening new SAP TN offices around the world, Apotheker claimed that SAP now had "a global network of [SAP TN] capabilities" – enough to "gain[] significant traction." The Siebel offering was not the only way SAP AG "expanded" Safe Passage. Notably, it also encouraged the SAP AG and SAP America sales teams to work more closely with SAP TN to jointly sell SAP TN services and SAP AG software applications to current and prospective customers.

89. SAP's April 2007 Annual Report further confirms that SAP has used SAP TN as a tool to try to convert Oracle customers to SAP's software platform. As reflected on pages 187-190 of the Annual Report, SAP TN loses money in every region in which it operates. SAP has no business incentive to tolerate substantial operating losses in its subsidiary without SAP TN providing a significant off-setting benefit. Here, that takes the form of enhanced opportunities for SAP to sell its enterprise software applications to support customers attracted to SAP TN's discount pricing – which is made possible through the theft and use of Oracle's intellectual property.

**D. A Deal Too Good To Be True**

90. Although SAP put a brave face on its ability to compete with the increasingly potent Oracle applications offerings, some industry analysts wondered whether a small company like SAP TN, even after having expanded its ranks to 150 employees, could actually develop and offer the hundreds of regulatory updates, bug fixes, patches, and other labor-intensive support items that a customer would need to maintain useful, optimally functioning Oracle software, without infringing on Oracle's intellectual property. Oracle, by comparison, maintains a development force of more than 15,000 software and support engineers to create and help implement the code fixes, patches, and updates that comprise the advanced support services required by Oracle's licensed customers.

91. It was not clear how SAP TN could offer, as it did on its website and its

other materials, "customized ongoing tax and regulatory updates," "fixes for serious issues," "full upgrade script support," and, most remarkably, "30-minute response time, 24x7x365" on software programs for which it had no intellectual property rights. To compound the puzzle, SAP continued to offer this comprehensive support to hundreds of customers at the "cut rate" of 50 cents on the dollar, and purported to add full support for an entirely different product line – Siebel – with a wave of its hand. The economics, and the logic, simply did not add up.

92. Oracle has now solved this puzzle. To stave off the mounting competitive threat from Oracle and to do so without making the requisite investment, SAP unlawfully accessed, copied, and wrongfully used Oracle's enterprise software applications and Software and Support Materials. It did so with the knowledge and consent of the SAP AG executive board of directors.

**E. SAP's Theft By Downloading**

**1. SAP TN Compiles A Massive Download Library**

93. SAP TN's use of its so-called Titan scraping tool resulted in such high levels of downloads that Oracle discovered its scheme. In late November 2006, there occurred unusually heavy download activity on Oracle's password-protected customer support website for its PeopleSoft and J.D. Edwards product lines. That website permits licensed Oracle customers with active support agreements to download a wide array of Software and Support Materials. Oracle has invested billions of dollars in research, development, and engineering to create these materials. Customers who have contracted for support with Oracle have log-in credentials to access Customer Connection and download Software and Support Materials. However, Oracle's support contracts limit customers' access and download rights to Software and Support Materials pertaining to the customers' licensed products. Customers have no contractual right to download Software and Support Materials relating to software programs they have not licensed from Oracle, or for which the customers did not purchase support rights.

94. The Software and Support Materials are a subset of the technical support services that Oracle makes available to its customers that have licensed Oracle software programs and purchased the right to receive technical support services related to them. The full

suite of technical support services (also known as “support” or “maintenance”) generally includes three types of offerings that Oracle, like most other enterprise software vendors, makes available to its licensed customers:  (i) telephone or email access to Oracle’s support technicians regarding the operation of Oracle’s software; (ii) software program code for the customers’ licensed software programs which adds new functionality or features to the software (generally referred to as “software updates”), or that addresses errors or “bugs” in the software program (generally referred to as “software patches”); and (iii) “knowledge management” articles that help with problem solving and provide suggestions relating to the customer’s use of licensed software programs.  Because of the complexity of enterprise software applications and the business environments in which they run, regular software updates and patches and knowledge management articles are critical components of a software maker’s support offering.

95. To analyze and improve on its industry leading support services, Oracle asks each customer searching for a solution on Oracle’s Customer Connection website to click on a button after each search to indicate whether or not a particular search result helped solve the customer’s problem.  If the customer selects the “No, continue search” option, the support system responds by offering the customer further options.  Oracle regularly compiles this data to assess whether its system helped customers resolve their support issues, with the aim of continually improving the support system for customers.

96. In late 2006, Oracle noticed huge, unexplained spikes in the number of downloads from Customer Connection by one person, a user suspiciously named “TomNow.” Oracle also observed anomalies in the number of times customers on the online support website had clicked the “No, continue search” option.  These clicks numbered in the thousands for several customers, and Oracle discovered that each response – each answer by users pretending to be the customer – occurred in a matter of seconds or less.  Given the extreme speed at which the activity occurred, these clicks could not reflect real responses from any human customers actually reading the solutions they had accessed.  Instead, these click patterns showed that the users had employed an automated process to move with lightning speed through the entire library of Software and Support Materials on the Customer Connection website.  And, apparently, to

make a copy of them all.

97. Oracle embarked on a time-consuming and costly investigation to assess the damage done to its customer response database and fully understand the sources of the unauthorized downloads. In the course of this investigation, Oracle discovered a pattern. Frequently, in the month before a customer's Oracle support expired, a user purporting to be that customer, employing the customer's log-in credentials, would access Oracle's system and download large quantities of Software and Support Materials, including dozens, hundreds, or thousands of products beyond the scope of the specific customer's licensed products and permitted access. Some of these apparent customer users even downloaded materials after their contractual support rights had expired.

98. This systematic theft of Oracle's Software and Support Materials did not originate from any actual customer location. Rather, the access originated from an internet protocol (IP) address in Bryan, Texas, an SAP America branch office location and home of its wholly-owned subsidiary SAP TN. SAP TN is a company that purports to provide technical support services on certain versions of Oracle's PeopleSoft, JDE and Siebel software programs. The Bryan, Texas IP address used to access and download Oracle's Software and Support Materials is connected directly to SAP's computer network. Indeed, Oracle's server logs have recorded access through this same IP address by computers labeled with SAP TN identifiers using SAP TN IP addresses. When Oracle first noticed that the unlawful access and downloads originated almost exclusively from one IP address in Bryan, Texas, Oracle shut down access to that IP address. If the access and downloads had been legitimate, the customer or vendor would have called in right away to get its access reinstated. Instead, a new IP address, also linked to SAP TN, sprouted up almost immediately and the unlawful access and downloading resumed.

99. These SAP TN Bryan, Texas offices, housed the SAP "download center" with twenty or more "download servers" running the Titan program and other computer scripts virtually around the clock.

100. In many instances, including the ones described above, SAP TN employees used the log-in IDs of multiple customers, combined with phony user log-in

information, to gain access to Oracle's system under false pretexts. Employing these techniques, SAP TN users effectively swept much of the contents of Oracle's system onto SAP TN's servers. These "customer users" supplied user information (such as user name, email address, and phone number) that did not match the customer at all. In some cases, this user information did not match anything: it was fake. For example, some users logged in with the user names of "xx" "ss" "User" and "NULL." Others used phony email addresses like "test@testyomama.com" and fake phone numbers such as "7777777777" and "123 456 7897." In other cases, SAP TN blended log-in information from multiple customers with fake information. For example, one user name connected to an SAP TN IP address appears to have logged in using the credentials of *seven* different customers in a span of just 15 days – all from SAP TN computers in Bryan, Texas. **All of these customers whose IDs SAP TN appropriated had one critical fact in common: they were, or were just about to become, new customers of SAP TN – SAP AG's and SAP America's software support subsidiary whose sole purpose is to compete with Oracle.**

101. Although it is now clear that the customers initially identified by Oracle as engaged in the illegal downloads are SAP TN customers, those customers do not appear to have themselves directly engaged in the download activity; rather, the unlawful download activity observed by Oracle and described here originates directly from SAP's computer networks. Oracle's support servers have even received hits from URL addresses in the course of these unlawful downloads with SAP TN directly in the name (e.g. *http://hqitpc01.tomorrownow.com*). Indeed, for many of these downloads, Oracle noticed that SAP TN did not even bother to change the false user information from customer to customer when it logged in.

102. The wholesale nature of this unlawful access and downloading was extreme. SAP appears to have downloaded virtually *every* file, in *every* library that it could find. SAP's business model required it to continually refresh its collection of Oracle's Software and Support Materials. As Kathy Williams, Director of Support Services at SAP TN, said in an internal communication to her fellow managers, "How can we support a client that can never upgrade or have access to any fixes beyond what they have now? George [Lester] and I see this

as a very big risk to TomorrowNow?" To resolve this "risk," and keep itself in business, SAP simply stole Oracle's materials wholesale, and with no regard to whether it or its customers were licensed to the materials it downloaded. In some instances, SAP would not even bother to wait for negotiations with a prospective customer to conclude – it would use a prospective client's credentials to download materials, then keep these "pre-deal" downloads to use with other customers even if the "prospect" never actually became an SAP customer. For example, in the case of Canada Lands Company (which never became an SAP customer), SAP TN admits, "they were a prospect and we kept the folder around since the beginning, the downloads were very incomplete and we would look for fixes here for customers like Praxair and Yazaki." Further, discovery has revealed that SAP's Siebel support services relied on the same massive, unlicensed downloading scheme.

**2. SAP TN's Access Was Unauthorized**

103. SAP TN's unauthorized access to, copying of, and use of Software and Support Materials from Oracle's system, and its customers' software releases, violated the terms of the Oracle customers' License Agreements, the Oracle customer support websites' Terms of Use, the Customer Connection Special Terms of Use, the Legal Download Agreement, and the SAR legal restrictions. These terms included agreements:

- Not to access or use any portion of the Software, including updates, not expressly licensed and paid for by the Licensee;
- Not to directly or indirectly, sublicense, relicense, distribute, disclose, use, rent, or lease the Software or Documentation, or any portion thereof, for third party use, or third party training;
- Not to access the customer support system if not the customer's authorized and designated Oracle technical support contact;
- Not to use the Materials on the support website except in support of the customer's authorized use of the Oracle Programs for which the customer holds a supported license from Oracle;
- That the customer username and password are for the customer's sole

use in accessing this support server;

- That the customer username and password may only be distributed to or used by persons in the customer's organization who have *a legitimate business purpose for accessing the materials contained on the support server in furtherance of the customer's relationship with Oracle*; and,
- That the Materials on the support website are confidential information subject to existing confidentiality agreements.

104. Oracle's Siebel-related license agreements contain similar terms and restrictions. An illustrative Siebel license agreement kept by SAP TN in its files grants the customer use of the software "solely for [the customer's] own internal business operations." Furthermore, the software cannot be used "to train persons other than named Users."

105. Oracle's Developer License contains similar terms and restrictions, requiring that software licensed under the Developer License not be used for internal data processing, for any commercial or production purposes, or for any purpose except the development of an application prototype.

106. SAP has intimate familiarity with these important restrictions and conditions relating to Oracle's Software and Support Materials. SAP AG and SAP America specifically tasked former PeopleSoft employees with the job of investigating and reporting on SAP TN's business model as part of the pre-acquisition due diligence. SAP TN's management, and a significant number of its employees, formerly worked at PeopleSoft and JDE. Of SAP TN's ten-member management team, six list prior employment experience with PeopleSoft, JDE, or Oracle, including: (1) Andrew Nelson, President and CEO; (2) Bob Geib, V.P. North American Sales; (3) Laura Sweetman, V.P. Global J.D. Edwards Support; (4) Mel Gadd, V.P. Quality; (5) Nigel Pullan, V.P. International Sales; and, (6) Shelley Nelson, V.P. Global PeopleSoft Support. SAP TN later added John Tanner III, a former Siebel Director, to its management team as the Global Vice President of Support Services. In addition, former PeopleSoft and Siebel employees who worked for SAP at the time, such as Wade Walden, who

is reflected as the person performing many of the downloads at issue, appear to have applied their familiarity with Oracle's customer support websites to directly participate in and perfect the illegal downloading scheme. Consistent with this evidence, SAP TN's then Vice President, Nigel Pullan (who has since "resigned"), recently suggested that SAP intentionally targets Oracle's employees to extract their knowledge of Oracle's new products: "As new releases start to come out, the people that we hire, we make sure that they have skillsets in those new releases." SAP had copies of Oracle's license agreements and Terms of Use in its possession, including for Siebel. SAP TN admitted to discussing those terms and using them for example as reference materials. In short, SAP cannot credibly claim ignorance of Oracle's access rules.

107. Notwithstanding SAP's knowledge of Oracle's license agreements with its customers, the support website terms of use, and the confidential, proprietary, and copyrighted nature of Oracle's Software and Support Materials, Oracle learned that SAP TN accessed and downloaded the Software and Support Materials when it either had no legitimate basis to access Oracle's restricted website, or in a way that grossly violated the limited access rights it did have. Further, during the period of time between when the customer's support license lapsed and when Oracle decommissioned the customer's password credentials, SAP TN *still* accessed and downloaded Software and Support Materials using the old customer passwords. SAP TN did so despite its knowledge that it had no legal right or legitimate purpose to access Oracle's system *at all* after the customer's support license lapsed.

108. SAP TN did not innocently download the Software and Support Materials – the purpose was to copy them from customer support websites and store them on SAP TN's servers for later use in marketing and providing support services to Oracle customers. The rate that SAP TN accessed many of these materials – at intervals of just seconds or less – shows that no one reviewed them in real time. Further, the scope of the downloaded Software and Support Materials – across *multiple* libraries in *multiple* lines of business – for customers that had no license to take, or need for, those products, suggests that SAP TN took the Software and Support Materials to stockpile a library to support its present and prospective customers.

109. SAP TN's internal documents confirm that, in at least one instance, its

downloading was so massive that it sent Oracle's Siebel-related customer support website into failover. Despite having "crashed the Oracle website," SAP TN's wholesale downloading of Oracle's customer support materials continued.

110. SAP TN conducted these high-tech raids as the agent and instrumentality of SAP AG and SAP America and as the cornerstone strategy of their highly-publicized "Safe Passage" program. Further, to the extent SAP TN had any legitimate basis to access Oracle's site as a contract consultant for a customer with current licensed support rights, SAP TN committed to abide by the same license obligations and usage terms and conditions described above applicable to licensed customers. Indeed, *anyone* accessing such Software and Support Materials on the Oracle support website must agree to Oracle's terms and conditions, which restrict access to support only for products that a company has licensed, and impose strict confidentiality requirements. SAP TN reviewed and agreed to the terms and conditions on Oracle's support website before proceeding, and therefore committed its theft knowingly and intentionally, and in conscious disregard of Oracle's copyrights and other protected intellectual property, contractual restrictions on the use of its intellectual property, and the integrity of its computer systems.

**3. Specific Examples Of SAP TN's Unlawful Customer Downloads**

111. SAP TN's improper access to, and taking from, Oracle's Customer Connection website is too pervasive, and covers too many individual violations, to comprehensively detail here. Oracle has uncovered unlicensed downloads linked to SAP TN on behalf of numerous customers, including without limitation, Abbott Laboratories, Abitibi-Consolidated, Inc., Bear, Stearns & Co., Berri Limited, Border Foods, Caterpillar Elphinstone, Distribution & Auto Service, Fuelserv Limited, Grupo Costamex, Helzberg Diamonds, Herbert Waldman, Honeywell International, Interbrew UK, Laird Plastics, Merck & Co., Metro Machine Corp., Mortice Kern Systems, Inc., National Manufacturing, NGC Management Limited, OCE Technologies, B.V., Ronis, S.A., Smithfield Foods, SPX Corporation, Stora Enso, Texas Association of School Boards, VSM Group AB, and Yazaki North America. By way of example

of the nature and extent of SAP's theft, Oracle sets forth below illustrative instances of SAP TN's illegal conduct regarding several of its customers.

112. **Honeywell.** Honeywell International ("Honeywell") is listed on SAP TN's website as a client. In the approximately three and a half year period before Honeywell switched to SAP TN, it averaged just over 20 downloads of Software and Support Materials per month. Then, after switching to SAP TN, a user employing Honeywell's log-in ID downloaded at least 7,000 Software and Support Materials in less than two weeks in January 2007. Most of these excessive downloads came during the course of *four days*, during which "Honeywell" was downloading almost *1800 solutions per day*. At least 2,000 of the Software and Support Materials taken in this period were solutions that Honeywell was not licensed to take at all. In one specific library containing solutions for Enterprise One software, "Honeywell" downloaded at least 450 distinct unlicensed solutions on January 16, 2007 and nearly 400 more the next day. These downloads spanned virtually every library in every line of business – far beyond the products to which Honeywell had authorized access as an Oracle customer. This unlawful downloading even stretched across product families. Honeywell used and licensed PeopleSoft software applications, but Oracle discovered users downloading JDE products with Honeywell's credentials. Oracle subsequently connected many of the illegal downloads to an SAP TN IP address and to SAP TN's employee, Wade Walden – a former PeopleSoft employee now employed by SAP.

113. **Merck.** Merck & Company, Inc. ("Merck"), one of the largest pharmaceutical companies in the world, licenses and receives support for many Oracle software products. Merck's support rights for its JDE software products expired on January 1, 2007. In the three months prior to that date, users purporting to be "Merck" logged into the Oracle support system and downloaded at least 5,500 distinct Software and Support Materials for JDE software. At least 2,800 of these downloads related to JDE software products for which Merck had no license. But, the unauthorized downloads did not stop there. Users logging into Oracle's support system with Merck's credentials continued to download Software and Support Materials into March 2007. Many of these "Merck" downloads came directly from an IP address in Bryan,

Texas that belongs to SAP TN, and some were traced to a computer with SAP TN's initials in the title, "TN-DL03." In many cases, SAP TN users employed fake identification information to download the Software and Support Materials, using names such as "xx" "ss" and "NULL," and phone numbers such as "4444444444" and "999 999 9999." Neither Merck nor SAP TN had any license, authorization or other right to access and download the 2,800-plus unlicensed Software and Support Materials from Oracle.

114. **OCE.** OCE-Technologies B.V. ("OCE") is located in the Netherlands and appears as a customer on SAP TN's website. In the months leading up to the expiration of OCE's support rights for its Oracle products, users employing OCE's credentials downloaded a large number of Oracle products relating to US Payroll, Canadian Payroll, Homebuilder Management, and Real Estate Management – none of which make sense for a European customer supporting its European business. From December of 2006 to January of 2007, SAP TN users logged into Oracle's support system using OCE's credentials (and, in some cases, false user names) and downloaded at least 5,600 distinct Software and Support Materials. These downloads included at least 1,800 distinct items for which OCE had no license. There is little chance that SAP TN intended OCE as the beneficiary of these massive sweeps, since OCE does not run many of the software programs to which these downloads relate, and neither OCE nor SAP TN have any license, authorization, or other right to access and download these Software and Support Materials. Like the other companies, these illegal downloads are associated with the same IP address belonging to SAP TN in Bryan, Texas, including specifically to a computer with SAP TN's initials in the title, "TNL-02." Similar to the other customer examples, many of these "OCE" users entered phony identification information, such as the name "user" and phone numbers such as "123 456 7897," "9999999999," and even "xxx xxx xxxx." This systematic sweep of products across numerous licensed and unlicensed Oracle product lines and libraries dramatically exceeded the access for which OCE (and SAP TN acting on its behalf) had any right or authority, and could serve no legitimate or lawful business purpose.

115. **SPX.** SPX Corporation ("SPX") dropped all Oracle support on December 10, 2006 and became an SAP TN customer, listed on SAP TN's website. For the nine month

period prior to October 2006, SPX averaged approximately eleven downloads per month from Oracle's support system. Then, between October and December 2006, users purporting to represent SPX accessed and downloaded at least 9,000 distinct Oracle Software and Support Materials (far more than SPX could legitimately access or use). These SPX downloads included at least 1,500 distinct Software and Support Materials for which SPX had no license. At least 200 distinct downloads just on December 9, 2006 were Software and Support Materials related to unlicensed Payroll software. In some cases, these users logged in using SPX credentials, but used fake identification information like the name "NULL" and phone numbers like "7777777777" and "999 999 9999." Many of these SPX downloads, like the others, originated from the same IP address belonging to SAP TN, and some were traced to a computer with SAP TN's initials in the title, "tn-wts01."

116. **Metro Machine.** Metro Machine Corp. ("Metro Machine") dropped all Oracle support effective on January 1, 2007 and switched to SAP TN, as reflected on SAP TN's website. In the month before Metro Machine dropped its support rights with Oracle, users purporting to represent Metro Machine logged onto Oracle's support servers and downloaded at least 600 distinct Software and Support Materials. At least 50 of those downloads related to software programs that Metro Machine had not licensed from Oracle. In addition, users logging into Oracle's support system with Metro Machine's credentials continued to download Software and Support Materials into March 2007. Oracle has traced these illegal and unauthorized downloads to the same SAP TN IP address employed for the other downloads described above.

117. **Yazaki.** Yazaki North America, Inc. ("Yazaki") is a large supplier of automotive products headquartered in Michigan. It dropped all Oracle support effective on January 3, 2007. In the month leading up to the expiration of Yazaki's support rights for its Oracle products, users employing Yazaki's credentials downloaded an enormous number of Oracle Software and Support Materials relating to Canadian Payroll, Homebuilder Management, and Real Estate Management, and many other software products, which make no sense for a U.S. automotive supply company supporting its U.S. business. In two weeks, from December 15, 2006 to December 29, 2006, SAP TN users logged into Oracle's support system using Yazaki's

credentials and downloaded at least 11,000 distinct Software and Support Materials. These downloads included at least 1,500 distinct items for which Yazaki had no license. There is little chance that SAP TN intended Yazaki as the beneficiary of these massive sweeps, since Yazaki does not run many of the software programs to which these downloads relate, and neither Yazaki nor SAP TN has any license, authorization, or other right to access and download these Software and Support Materials. Like the other companies, these illegal downloads are associated with the same IP address belonging to SAP TN in Bryan, Texas. Similar to the other cases, "Yazaki" users entered phony identification information, such as mixing the user ID "Joel_Joyce" with a different user name "Jeff Livermore" and an email address related to a different customer, SPX, "rosbie@spxmks.com," and a phony phone number "4444444444." This systematic sweep of products across numerous licensed and unlicensed Oracle product lines and libraries substantially exceeded the access for which Yazaki (and SAP TN acting on its behalf) had any right or authority, and could serve no legitimate or lawful business purpose.

**F. SAP's Theft By Illegally Copying And Using Oracle Software Applications**

118. The downloads are just a piece of a larger scheme. For years, dating at least to 2003, SAP TN created thousands of copies of Oracle's actual software applications. These software copies included Oracle's PeopleSoft-branded Human Resource Management, Customer Relationship Management, Enterprise Performance Management, Financial Data Management, Portal, and Student Administration product lines, and Oracle's J.D. Edwards branded Distribution, Financials, Human Resources, and Manufacturing product lines. They also included Oracle's Siebel software, and may also have included Oracle's eBusiness Suite, Hyperion and Retek software.

119. SAP TN's internal records reveal that it instructed Oracle customers, who were about to switch to SAP TN, how to order CDs containing "all software available and licensed" to them from Oracle, so customers could turn those software applications, in their entirety, over to SAP TN. SAP TN's detailed instructions even encourage Oracle customers to lie to Oracle by, for example, telling Oracle that SAP TN's offices are a "new 'company' location" where Oracle software should be installed – despite plain language in Oracle's license

agreements requiring a customer site to be physically located on property owned or leased by the customer. SAP TN used these CDs to create local environment copies of Oracle software on SAP TN computers for development, testing, training and research for other customers. Since Oracle provides customers the ability to load and license additional software from these CDs, SAP TN even undoubtedly copied software from these CDs to which the customer who sent them had no license.

120. Sometimes, SAP TN would not even bother to use the CDs it got from its customers. Instead, it would simply reuse the same environment over and over again for multiple customers, each time assigning the new copy a customer-specific identifier. According to SAP TN's corporate witness, it was "just a matter [of] efficiency to have a single source environment to use to create the specific client environments."

121. SAP TN acquired, created and maintained thousands of illegal copies of Oracle's software releases on its internal computer systems and generally treated the software as its own. SAP TN would "integrate" its stolen downloaded Software and Support Materials into new local software environments it would create, in order to "update" that environment to support the customer. Thus, the thousands of copies of Oracle software that SAP TN maintained on its systems, apart from the illicit existence and use of the software itself, each may be further tainted by the insertion into it of Software and Support Materials taken with a different customer's log-in credential.

122. As core parts of its daily business operations, SAP TN engaged in at least the following types of illegal activities with these copies of Oracle's enterprise applications software:

- SAP TN maintained entire copies of Oracle's enterprise software applications on SAP TN's computer systems without authorization or license. SAP TN internal documents indicate it had approximately 250 copies of various Oracle software releases in active use when Oracle filed suit. Another several thousand existed on SAP TN computers in backup form that SAP TN would restore and use for various illegal purposes;

- According to SAP TN's sworn testimony, each of these several thousand software copies may have illegally downloaded software patches or updates contained within them;
- For each particular Oracle software release that it wanted to "support," SAP TN used unauthorized and unlicensed copies of Oracle software to create "generic" or "sandbox" environments;
- In addition to the generic, all-purpose software copies, SAP TN also maintained thousands of copies of Oracle's software releases for the ostensible purpose of supporting the customer who previously had licensed that software. SAP TN has admitted under oath that it constructed some of these software copies with software not licensed by that customer or provided by that customer to SAP TN. It has also admitted it used even these supposedly customer-specific software copies as reference and development tools to support other customers;
- SAP TN used these "generic" and "customer specific" software copies to support multiple customers, with no regard for which customer had originally provided the copy of the Oracle software that SAP TN was using;
- SAP TN used these software copies for general development of its SAP-branded fixes, for otherwise supporting other customers, and for general testing, research, and training; and,
- SAP TN did not limit itself to possession of Oracle software provided by SAP TN's active customers. If an SAP customer left SAP's service, SAP TN considered itself entitled to keep the Oracle software copy provided by that customer on SAP TN computers for "reference" – and did so many times.

123. Each instance of each such use constitutes an illegal, unauthorized use of Oracle's software copy. This cross-use of the software copies was an essential part of the SAP TN business model, and fundamental to the success of the SAP Safe Passage program.

124. SAP TN additionally misused Oracle database software licensed under the

Developer License in violation of that Developer License by using it for internal data processing or commercial or production purposes. Oracle's database software was used in violation of that Developer License to support "about 40% of [SAP TN's] customer base."

125. Because SAP TN's assets essentially consist of, and SAP TN generated so many of its support deliverables by using, illegal copies and downloads of Oracle's software, it is unclear that SAP AG could effectively sell any of SAP TN's assets, as it publicly said it intended to do, in 2008, prior to the filing of Oracle's prior Complaint. SAP TN's business processes relied on repeated copyright infringement, and its assets consisted of thousands of co-mingled illegal downloads and software environments. Indeed, SAP AG's stated intent to sell SAP TN raised additional questions about whether SAP AG intended to perpetuate its own illegal conduct by selling for profit infringing copies of Oracle's software. After keeping SAP TN running for almost three years, including eighteen months after Oracle sued, all the while using known illegal software copies and creating knowingly illegal derivative support deliverables for its customers, SAP finally concluded that these very activities made a sale impossible. SAP shut down SAP TN in October 2008, admitting that SAP TN could not be operated in an ethical manner.

### G. Oracle's Software And Support Materials Are Registered With The Copyright Office

126. The Software and Support Materials and software applications that SAP TN copied from its customers and downloaded from Oracle's systems included numerous works that are protected under the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq*. These protected works are original works of authorship, owned by Oracle. Defendants' acts violated Oracle's exclusive rights to reproduce, create derivative works, publish, publicly display, offer for sale, and distribute these works. Defendants' acts were willful and intentional and constitute both direct and indirect copyright infringement under the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq.*

127. **The Copyright Registrations.** With literally thousands of software programs available for licensing, Oracle does not typically obtain copyright registrations on all

programs or related Software and Support Materials as it generally does not find itself in the position of having to enforce its copyrights to stop infringement. However, upon discovering Defendants' mass downloading, Oracle registered copyrights on the Software and Support Materials taken and infringed by SAP TN.

128. The massive nature of the illicit downloads by SAP TN make it impossible to detail comprehensively each copyright violation in this Complaint. However, Oracle has now obtained from the Register of Copyrights over 40 certificates of registration that cover a wide range of Software and Support Materials taken by SAP TN and software applications copied and used by SAP TN. These include registrations of a number of Oracle knowledge management solutions, numerous versions of Oracle's JDE and Siebel software applications, service packs of JDE updates, and specific unlicensed Software and Support Materials taken by SAP TN. Collectively, these registrations cover thousands of unlicensed Software and Support materials, and software environments unlawfully copied by SAP TN.

129. Examples of SAP's infringement of registered copyrights include the following. On December 5, 2006, SAP TN used SPX's log-in ID to download a Payroll ESU, JJ13072, for EnterpriseOne software version 8.11 SP1. Oracle registered this ESU with the United States Copyright Office, *See* Registration No. TX 6-541-027. SAP TN used the log-in ID of another customer, Merck, to download an EnterpriseOne 8.12 Blend Management ESU, JK10093, on December 13, 2006. Oracle also registered this ESU with the Copyright Office. *See* Registration No. TX 6-541-045. Further, SAP TN logged in on December 18, 2006 using the log-in credentials of Yazaki and downloaded a Customer Relationship Management ESU, PH11676, for EnterpriseOne software version 8.11, which is now registered with the Copyright Office. *See* Registration No. TX 6-541-035. SAP TN also used the log-in ID of OCE to download a payroll update for World Software version A7.3, A738217431, on December 21, 2006. Oracle registered this update with the Copyright Office as well. *See* Registration No. TX 6-541-043. None of these customers was licensed to copy these works. Nor was SAP licensed to copy them in the names of those customers.

130. Oracle also owns preexisting copyright registrations that cover many of

the software programs copied by SAP TN to illegally create environments on its own systems.

131. **The DST Solution.** In at least one instance, SAP TN has also, publicly displayed, distributed, and thereby profited from Oracle's copyrighted Software and Support Materials. In December 2006, Oracle developed a knowledge solution related to the recent early change to Daylight Savings Time (the "DST Solution"). The DST Solution is a narrative document with specific instructions for how to conform certain Oracle software to the new Daylight Savings Time change. Oracle fielded more than a thousand service requests from its customers related to the Daylight Savings Time change, and its DST Solution helped resolve more than 750 of them.

132. Oracle traced downloads of the DST Solution to SAP TN's IP address on January 8, 2007 and January 15, 2007. Oracle also noticed that SAP TN posted a "PeopleSoft Daylight Savings Time solution" on its website. SAP TN's "solution" is substantially similar in total – and in large part appears to be copied identically from – Oracle's DST Solution. SAP TN's copied version even includes minor errors in the original DST Solution that Oracle later corrected. SAP TN's version also substitutes an SAP TN logo in place of the original Oracle logo and copyright notice. SAP's own internal investigation revealed that "it appears clear" that an SAP TN employee "copied a significant portion" of SAP TN's version of the DST solution from Oracle's solution.

133. Oracle has registered the downloaded version of its DST Solution that SAP TN copied and created derivative works from, and later distributed and publicly displayed, as well as a later version that SAP TN also downloaded shortly before Oracle filed its original Complaint, Registration Nos. TX 6-541-019 and TX 6-541-018. No customer is licensed to create derivative works from, distribute or publicly display Oracle's Software and Support Materials, and neither is SAP.

**H. Project Blue And Safe Passage: SAP Adds Ill-Gotten Gains To Its Coffers**

134. SAP TN claims to have delivered thousands of fixes and more than 1000 tax and regulatory updates to Oracle's former customers. Not coincidentally, SAP TN has illegally downloaded thousands of fixes and updates from Oracle's restricted customer support

website and made and used thousands of copies of Oracle's software applications. SAP AG and SAP America directed this download and copying scheme, ratified it, never disavowed it, and financially benefited from it – all while pressuring SAP TN to win more customers through Safe Passage. As one SAP TN employee put it when reporting on the joint "Oracle Disruption Plan" – what SAP internally named the follow-up to its Safe Passage program – "SAP Germany is tracking these leads now and wants to see progress."

135. Senior management at SAP AG and SAP America knew the details of SAP TN's unlawful activities – and proceeded to hide them for more than two years until Oracle filed this lawsuit.

136. SAP AG and SAP America knew about and provided guidance concerning SAP TN's illegal downloading activities. As far back as 2005, SAP AG and SAP America lawyers specifically advised SAP TN to cease downloading Oracle support materials into co-mingled master "libraries." SAP AG and SAP America advised SAP TN to create customer-specific folders in which to house the downloads for new customers. But SAP AG and SAP America gave no instruction to break up or stop using the existing, co-mingled download libraries that SAP TN had populated with millions of PeopleSoft-branded Oracle downloads. And while SAP TN devoted several months to breaking apart the JDE master library into customer-specific folders (without curing its underlying illegality), it apparently received no parallel instruction to sort out the exponentially larger – and more lucrative – PeopleSoft "master" download library.

137. SAP AG and SAP America also knew about the central role illegal copies of Oracle software releases played in SAP TN's business.

138. By June 2005, concerned about the risks inherent in their possession and use of Oracle's software applications, the tight familial group leading SAP TN – founder Andrew Nelson, his wife Shelley Nelson (who was at the time the Vice President of PeopleSoft Support), and his brother Greg Nelson (who was at the time the Chief Information Officer) – had circulated a highly confidential draft "Blue" presentation with instructions in the subject line to "PLEASE DELETE AFTER READING." In it, Greg Nelson presented a

"Feasibility/Cost/Benefit" analysis of "going blue," (discontinuing SAP TN's illegal business model) and concluded that moving SAP TN's model to all remote support would "decrease efficiency" and increase the human capital cost – and reduce the profitability – of SAP TN's business. Most importantly, "If we are all blue [no local software copies available to use] . . . since all Development and testing will be done remotely, ***no sharing or recycling of work***. Require more developer hands in lieu of massive automation." (emphasis supplied).

139. In other words, it would cost SAP TN more to service its customers legally – a prospect SAP TN could not accept. As Greg Nelson cautioned: "When we need a seed environment [a generic, all-purpose software copy for development, research, and training], we need to entice a customer to be Yellow [have possession of the Oracle software on SAP's computers]." The group opposed the move and engaged in admitted "delay tactics" to preserve the efficiencies inherent in the illegal business model.

140. By June 30, 2005, SAP TN had worked up a revised presentation for members of the SAP AG board of directors that stated emphatically: "Yellow is what we do now - In House Hosting." The presentation identified a laundry list of activities that SAP TN performed with its illegal local software copies that it would have to transfer in a remote hosting model, including: marketing, equipment, downloading, primary development, testing, and backup/restore. The presentation raised a series of obstacles to implementing "Project Blue," including "got to find a way to download from client site." It also again focused on the problem of how SAP TN could generate its copycat updates for its customers running certain versions of Oracle's PeopleSoft-branded Human Resources payroll without keeping generic Oracle environments on its systems.

141. While SAP AG, SAP America and SAP TN debated Project Blue, they each took careful steps to avoid detection. In August 2006, SAP TN prepared for a visit by industry analyst Gartner. A confidential internal SAP TN memo warned "[r]emind Shelley [Nelson, SAP TN's Vice-President of Support Services] to ***be careful and not talk about client environment and legality*** . . . ." (emphasis supplied). A few months later, in connection with creating a document intended to explain to SAP TN customers how SAP TN actually provided

its service, SAP TN's Vice-President of JDE Support Services, Laura Sweetman (a former JDE employee experienced with the JDE software), noted that SAP TN's policy of creating "a fix-master demo environment in [SAP TN's] datacenter for every customer" had "IP issues." SAP TN then abandoned the "Guide to TomorrowNow Support Services" project.

142. In the meantime, the SAP AG board of directors apparently had no interest in forcing the migration from SAP TN's admittedly illegal local software environment model to a legal hosted one – not when SAP TN was such a crucial part of its plan to lure customers away from Oracle.

- National Foods Limited, May 2006 – "During an intense negotiation period, TomorrowNow was able to give 'substantial teeth' to the SAP license bid, with the offer of combining both JDE and PeopleSoft support and maintenance services for the foreseeable future, whilst they work on the SAP implementation plans."
- Mutual of Omaha, August 2006 – "[T]his quarter we are running a special sales program, jointly sponsored between TN and SAP, and we were able to offer some significant pricing incentives through the SAP/TN 'Turn Up The Heat' Campaign. . . . Specifically, Mutual of Omaha will consider bringing in [SAP] for a Value Engineering study -- a critical step in the SAP sales methodology, and gives them appropriate executive level access. This is a significant commitment from the customer, and a great example of TomorrowNow creating future software sales pipeline for SAP."
- The Home Depot, October 2006 – SAP "was highly interested in winning away The Home Depot from Oracle." SAP TN CEO, Andrew Nelson, told SAP America CEO, Bill McDermott, that SAP TN would knock its fees down from "$600k per year down to $30k if you tell me you need this" and if McDermott could address Home Depot's concerns about the legality of SAP TN's services. The price was worth it – the deal would give SAP a "marketing deliverable" to use with other customers.

- Direct Energy, October 2006 – "Randy Wheeler, SAP [Account Executive], contacted [SAP TN] mid-August with a prospect running PeopleSoft. . . . Now that we have displaced Oracle, we have effectively created future sales pipeline for SAP."

143. Similarly, when SAP announced in 2006 that it would provide support services for Oracle's Siebel product line, SAP had an opportunity to develop and provide those support services in a legal manner from the start. Instead, the SAP AG board of directors expedited the SAP TN support offering for Siebel. In doing so, not one board member asked whether SAP TN continued to use local software environments to support PSFT and JDE customers. Not one board member bothered to specify that SAP TN should not make local copies of Siebel software. In short, despite what it may say now, SAP AG's board of directors knew that SAP TN's business model relied on illegal conduct, they condoned and facilitated the expansion of that conduct across the globe, and they further perpetuated that corrupt model into new product lines due to their own desperation at Oracle's growing competitive presence.

144. SAP America and SAP AG also knew about SAP TN's widespread misuse of Oracle's database software. SAP TN requested that SAP either authorize a purchase of Oracle commercial-use database licenses and maintenance or that SAP TN be allowed to use SAP's existing database license with Oracle for the same purposes. As late as 2007, and possibly until it was wound down eighteen months after Oracle filed this lawsuit, SAP TN still had not obtained an Oracle database license.

145. As these examples illustrate, SAP used Oracle's stolen intellectual property to provide maintenance services and unfairly compete against Oracle, thereby illegally winning business and a number of customers from Oracle, and artificially inflating its market share.

## I. Defendants Conspired With And Aided And Abetted Each Other

146. Defendants willfully, intentionally, and knowingly agreed and conspired with each other to engage in the alleged wrongful conduct, including Defendants' copyright infringement, interference with Oracle's business relationships and other unfair business

practices, as well as Defendants' trespass on, and computer fraud concerning the Software and Support Materials.

147. Defendants did the acts alleged pursuant to, and in furtherance of, that agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, or adopting the acts of the others.

148. As a direct and proximate result of the acts in furtherance of the conspiracy, Oracle has suffered injury, damage, loss, and harm, including, but not limited to, loss of profits from sales to current and potential customers of Oracle support services and licenses for Oracle's software programs. The wrongful conduct committed pursuant to the conspiracy was a substantial factor in causing this harm.

149. Defendants also had full knowledge of or should have reasonably known of the true nature of the wrongful conduct of each other Defendant, and aided and abetted such wrongful conduct, including copyright infringement, interference with Oracle's business relationships and other unfair business practices, as well as Defendants' trespass on, and computer fraud concerning the copyrighted Software and Support Materials, by providing substantial assistance and/or encouraging the others to act.

150. SAP AG and SAP America condoned and encouraged SAP TN's activities, including through the Safe Passage program and Project Blue. Indeed, despite Project Blue, SAP AG monitored the Safe Passage program closely, "tracking these leads" from Germany, and pushing SAP TN "to see progress." SAP AG and SAP America account executives repeatedly fed leads to SAP TN sales personnel and worked closely with them throughout the sales and negotiations process, presenting joint service offerings to prospective customers with the goal of creating applications revenue for SAP. A year after the acquisition of SAP TN, to facilitate the joint sales and marketing process further, SAP AG specifically encouraged – and required – closer cooperation between the sales and marketing teams at SAP AG, SAP America and SAP TN. Thus, SAP AG and SAP America knew about, permitted, encouraged, directed and profited from SAP TN's wrongful use of these materials.

151. Defendants also aided and abetted the described wrongful conduct of the

other Defendants by giving substantial assistance and/or encouragement that, separately considered, was wrongful in and of itself.

152. As a direct and proximate result of the aiding and abetting of these acts, Oracle has suffered injury, damage, loss, and harm, including, but not limited to, loss of profits from sales to current and potential customers of Oracle support services and licenses to Oracle software programs. The wrongful conduct aided and abetted by the Defendants was a substantial factor in causing this harm.

153. Defendants' intentional agreement to commit, and commission of, these wrongful acts, and aiding and abetting of these wrongful acts, was willful, malicious, oppressive, and in conscious disregard of Oracle's rights, and Oracle is therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

## First Claim for Relief

### Copyright Infringement

(By OIC Against All Defendants)

154. OIC incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

155. OIC owns a valid and enforceable copyright in all of its software applications and Software and Support Materials, which are creative works of original authorship. OIC has pre-existing, or has obtained from the Register of Copyrights, Certificates of Registration that cover many of the software applications and Software and Support Materials taken and copied by SAP TN.

156. OIC has also obtained, through transfer agreements, all rights, title, and interest in registered and unregistered copyrights formerly owned by certain PeopleSoft, J.D. Edwards, and Siebel entities.

157. OIC owned one or more exclusive rights in certain copyrights at issue in this case at a point in time during which Defendants infringed those exclusive rights.

158. Defendants have infringed copyrights in Oracle software applications and Software and Support Materials, including the software applications and Software and Support

Materials covered by these certificates. These certificates are identified, dated and numbered as follows:

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Shop Floor Control program | March 7, 1995 | TXu 619-303 |
| EDI Interface (6) program | March 7, 1995 | TXu 619-304 |
| Configuration Management program | March 7, 1995 | TXu 619-305 |
| Master Production Scheduling program | March 7, 1995 | TXu 619-306 |
| Capacity Requirements Planning program | March 7, 1995 | TXu 619-307 |
| WorldCASE Development Environment program | March 7, 1995 | TXu 619-308 |
| Equipment Management (5) program | March 7, 1995 | TXu 619-309 |
| General Ledger & Basic Financial program | March 7, 1995 | TXu 619-310 |
| Enterprise Facility Planning program | March 7, 1995 | TXu 619-311 |
| Accounts Receivable program | March 7, 1995 | TXu 619-312 |
| Warehouse Management program | March 7, 1995 | TXu 619-313 |
| Inventory Management program | March 7, 1995 | TXu 619-314 |
| Sales Order Processing/Sales Analysis program | March 7, 1995 | TXu 619-315 |
| Purchase Order Processing program | March 7, 1995 | TXu 619-316 |
| Product Data Management program | March 7, 1995 | TXu 619-317 |
| Financial Reporting (FASTR) program | March 7, 1995 | TXu 619-318 |
| WorldCASE Foundation Environment (3) program | March 7, 1995 | TXu 619-319 |
| Accounts Payable program | March 7, 1995 | TXu 619-320 |
| Financial Modeling, Budgeting & Allocations program | March 7, 1995 | TXu 619-321 |
| PeopleSoft HRMS 7.0 | December 15 1998 | TX 4-792-577 |
| PeopleSoft HRMS 7.5 | December 15, 1998 | TX 4-792-575 |
| PeopleSoft HRMS 8.0 | November 20, 2000 | TX 5-291-440 |
| PeopleSoft 8 HRMS SP1 | March 26, 2001 | TX 5-501-312 |
| PeopleSoft 8.3 HRMS | February 1, 2002 | TX 5-469-032 |
| PeopleSoft 8.8 HRMS | June 11, 2004 | TX 6-093-947 |
| PeopleSoft 8 Customer Relationship Management | September 27, 2001 | TX-5-456-777 |
| PeopleSoft 8.8 Customer Relationship Management | June 11, 2004 | TX 6-015-317 |
| PeopleSoft Financials, Distribution & Manufacturing 7.5 | December 15, 1998 | TX 4-792-574 |
| PeopleSoft 8 Financials and Supply Chain Management: Service Pack 2 | September 27, 2001 | TX-5-456-780 |
| PeopleSoft 8.4 Financials and Supply Chain Management | August 5, 2002 | TX-5-586-247 |
| PeopleSoft 8.8 Enterprise Performance Management | June 11, 2004 | TX-5-993-616 |
| PeopleSoft 8 Student Administration Solutions | November 30, 2001 | TX 5-431-289 |
| PeopleTools 7.5 | November 20, 1998 | TX 4-792-578 |
| PeopleTools 8.0 | September 5, 2000 | TX 5-266-222 |
| PeopleTools 8.10 | September 5, 2000 | TX 5-266-221 |
| PeopleTools 8.4 | August 5, 2002 | TX 5-586-248 |
| Initial release of JD Edwards EnterpriseOne XE | April 26, 2007 | TX 6-541-033 |
| ESU for JD Edwards EnterpriseOne Xe | May 3, 2007 | TX 6-541-051 |
| Cumulative Update 8 for JD Edwards | April 26, 2007 | TX 6-541-048 |

| | | |
|---|---|---|
| EnterpriseOne Xe | | |
| Initial release of JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-050 |
| ESU for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-046 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-034 |
| Initial release of JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TX 6-541-049 |
| ESU for JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TX 6-541-036 |
| Initial release of JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-038 |
| ESU for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-037 |
| Cumulative Update 2 for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-032 |
| Initial release of JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-028 |
| ESU for JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-035 |
| Initial release of JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-040 |
| ESU for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-027 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-039 |
| Initial release of JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-041 |
| ESU for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-045 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-042 |
| Initial release of JD Edwards World A7.3 | April 26, 2007 | TX 6-541-029 |
| Code Change for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-043 |
| Cumulative Update 16 for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-031 |
| Initial release of JD Edwards World A8.1 | April 26, 2007 | TX 6-541-047 |
| Code Change for JD Edwards World A8.1 | April 26, 2007 | TX 6-541-044 |
| Cumulative Update 6 for JD Edwards World A8.1 | May 1, 2007 | TX 6-545-421 |
| Initial release of JD Edwards World A9.1 | April 26, 2007 | TX 6-541-030 |
| ECRM89: Common Errors on Mobile Sales | April 26, 2007 | TX 6-541-020 |
| EAP WTHD06: 1099 IRS changes for the year 2006 | April 26, 2007 | TX 6-541-023 |
| JD Edwards World -- 1099 Changes for Tax Year 2006 | April 26, 2007 | TX 6-541-026 |
| E1: 1099: Year 2006 1099 ESUs | April 26, 2007 | TX 6-541-024 |
| Changes to Daylight Savings Time for 2007 (DST) | April 26, 2007 | TX 6-541-025 |
| E1: 07/77: Quantum for Payroll Tax v.280 | April 26, 2007 | TX 6-541-022 |
| GM--Grants issues resolved by FMS ESA 8.9 Bundle #10-653723 (Oct 06) | April 26, 2007 | TX 6-541-021 |
| PeopleTools Third Party Daylight Saving Time Required Modifications | April 26, 2007 | TX 6-541-019 |
| PeopleTools Third Party Daylight Saving Time Required Modifications (Revised) | April 26, 2007 | TX 6-541-018 |
| PeopleSoft 8.01 & 8.31 Payroll Tax Update 05-F Year-End Processing: Canada | May 2, 2008 | TX 6-838-549 |

| | | |
|---|---|---|
| PeopleSoft Payroll 1200457000 - User Documentation | May 2, 2008 | TX 6-838-537 |
| PeopleSoft Application Update Installation Instructions (UPD595817) | May 2, 2008 | TX 6-838-544 |
| PeopleSoft Financials and Supply Chain Management (FIN/SCM) 8.0 | November 20, 2000 | TX 5-291-439 |
| PeopleSoft 8 EPM SP3 | March 30, 2001 | TX 5-345-698 |
| PeopleSoft 8.3 Enterprise Performance Management | March 11, 2002 | TX 5-485-839 |
| PeopleSoft 8.1 Customer Relationship Management | March 20, 2002 | TX 5-493-450 |
| PeopleSoft 8 FIN/SCM SP1 | March 26, 2001 | TX 5-501-313 |
| PeopleSoft 7.0 financials, distribution & manufacturing 7.0 | December 15, 1998 | TX 4-792-576 |
| PeopleSoft Benefits Administration 7.50 | June 14, 1999 | TX 5-072-090 |
| PeopleSoft Benefits Administration 7.0 | June 15, 1999 | TX 4-258-824 |
| PeopleSoft Payroll Interface 7.50 | June 21, 1999 | TX 3-772-292 |
| PeopleSoft Pension Administration 7 | June 21, 1999 | TX 3-772-290 |
| PeopleSoft Pension Administration 7.50 | June 21, 1999 | TX 3-772-291 |
| PeopleSoft Payroll 7 | June 22, 1999 | TX 4-501-140 |
| PeopleSoft Payroll Interface 7 | June 22, 1999 | TX 4-501-138 |
| PeopleSoft Human Resources 7 | June 28, 1999 | TX 4-994-865 |
| PeopleSoft Human Resources 7.50 | June 28, 1999 | TX 5-013-123 |
| PeopleSoft Payroll 7.50 | June 28, 1999 | TX 5-013-125 |
| PeopleSoft Payroll Interface 7 Higher Education | June 28, 1999 | TX 5-013-124 |
| PeopleSoft Time and Labor 7 | June 28, 1999 | TX 5-013-128 |
| PeopleSoft Time and Labor 7.0 | June 28, 1999 | TX 4-994-866 |
| PeopleSoft Time and Labor 7.50 | June 28, 1999 | TX 4-994-867 |
| Database of Documentary Customer Support Materials for PeopleSoft Software | July 1, 2009 | TXu1-607-454 |
| Database of Documentary Customer Support Materials for J.D. Edwards Software | July 1, 2009 | TXu1-607-455 |
| Siebel 6.3 Initial Release and Documentation | June 29, 2009 | TX 6-941-989 |
| Siebel 7.0.5 Initial Release and Documentation | June 29, 2009 | TX 6-941-988 |

| | | |
|---|---|---|
| Siebel 7.5.2 Initial Release and Documentation | June 29, 2009 | TX 6-941-990 |
| Siebel 7.7.1 Initial Release and Documentation | June 29, 2009 | TX 6-941-993 |
| Siebel 7.8 Initial Release and Documentation | June 29, 2009 | TX 6-941-995 |
| Siebel 8.0 Initial Release and Documentation | June 29, 2009 | TX 6-942-000 |
| Siebel 8.1.1 Initial Release and Documentation | June 29, 2009 | TX 6-942-001 |
| Database of Documentary Customer Support Materials for Siebel Software | July 1, 2009 | TXu1-607-453 |
| Oracle 8i Enterprise Edition, release 2 (8.1.6) | February 2, 2001 | TX 5-222-106 |
| Oracle Relational Database Management System (RDBMS): Release 8.0.4 | November 21, 2001 | TX 5-392-842 |
| Oracle Relational Database Management System (RDBMS), Release 8.0.5 | November 21, 2001 | TX 5-392-861 |
| Oracle9i Database Enterprise : Edition Release 1 | June 13, 2003 | TX 5-673-281 |
| Oracle9i Database Enterprise : Edition Release 2 | June 13, 2003 | TX 5-673-282 |
| Oracle Database 10g: Release 1 | January 16, 2009 | TX 6-938-648 |
| Oracle Database 10g: Release 2 | June 29, 2009 | TX 6-942-003 |

159. These registrations generally cover, but are not limited to, numerous versions of Oracle software, including the updates, patches and fixes incorporated in each relevant version, service packs of Oracle updates, patches and fixes, and individual exemplar Software and Support Materials, including certain Oracle knowledge management solutions and certain Oracle updates, patches and fixes, all of which SAP TN copied without a license. The registrations listed above also cover numerous Oracle software releases that SAP TN copied to create "local customer environments."

160. OIC also has the following registrations that cover "Current Development Environments" for certain software releases:

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Current development environment for JD Edwards EnterpriseOne Xe | April 26, 2007 | TXu1-345-109 |
| Current development environment for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TXu1-345-111 |
| Current development environment for JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TXu1-345-112 |
| Current development environment for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TXu1-345-113 |
| Current development environment for JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TXu1-345-114 |

| | | |
|---|---|---|
| Current development environment for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TXu1-345-115 |
| Current development environment for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TXu1-346-350 |
| Current development environment for JD Edwards World A7.3 | April 26, 2007 | TXu1-345-110 |
| Current development environment for JD Edwards World A8.1 | May 1, 2007 | TX 6-545-422 |

Discrete portions of these registered Current Development Environments also contain updates, patches and fixes that SAP TN copied without a license. Defendants infringed these discrete portions of the registered Current Development Environments by taking without license the Software and Support Materials that are substantially similar to these discrete portions.

161. Through the acts alleged above, Defendants have violated the exclusive rights of OIC to reproduce and make copies of its copyrighted software applications and Software and Support Materials, including materials covered by the registrations listed above, by:

- repeatedly copying entire releases of Oracle's software, and related documentation, to SAP TN's own local systems, without authorization or license, to create "local customer environments";
- creating unlicensed works derived from these software copies and related documentation to support SAP TN's other customers;
- using these software copies for other improper business purposes, including, without limitation, training employees, troubleshooting, researching general and specific support issues, and marketing to prospective customers;
- "exploding" the source code of certain Software and Support Materials on to SAP TN's local machines in order to catalogue them to facilitate creation of unlicensed works in its own name;
- downloading Oracle's copyrighted Software and Support Materials onto its computers in violation of 17 U.S.C. § 106; and,

- repeatedly copying, co-mingling and cross-using the downloaded Software and Support materials to populate different customer folders, support other customers, and as a general resource to provide support in the ordinary course of SAP TN's business.

162. Defendants have also violated the exclusive rights of OIC to control the distribution, creation of derivative works and public display of copyrighted works by downloading, copying, creating derivative works from and/or distributing Oracle's Software and Support Materials and/or derivative works to Defendants' customers, via posting to its website, by electronic mail, through file transfer protocol, or otherwise, including at least Oracle's DST Solution, in violation of 17 U.S.C. § 106.

163. Defendants were not authorized to copy, download, reproduce, create derivative works from, distribute, or publicly display Oracle's copyrighted software applications and Software and Support Materials except as authorized by and in support of a specific licensed customer, using only (in the case of Software and Support Materials) that licensed customer's log in credentials, and with respect only to Software and Support Materials for which that customer had a current right to have and use.

164. In addition to directly infringing the exclusive rights of OIC, Defendants have contributorily and/or vicariously infringed the exclusive rights of OIC in Oracle software applications and Software and Support Materials by controlling, directing, intentionally encouraging, inducing or materially contributing to the copying, distribution, publicly display or creation of derivative works from Oracle's copyrighted software applications and Software and Support Materials. Defendants also obtained a direct financial benefit from the above alleged infringing activities while declining to exercise their right to stop it or limit it.

165. Defendants knew or should have known that copying, distributing, public display of, and creating derivative works of and from Oracle's software applications and Software and Support Materials, which Defendants copied in the name of customers who had no license to copy, distribute, publicly display or create derivative works from those materials, infringed the exclusive rights of OIC in those materials.

166. OIC is entitled to damages in an amount to be proven at trial, including profits attributable to the infringement not taken into account in computing actual damages under 17 U.S.C. § 504(b). OIC is entitled to statutory damages under 17 U.S.C. § 504(c) based on Defendants' infringements – after the dates of copyright registration – of certain copyrighted works used to create SAP TN's "local customer environments" and the subsequent individual further copying and use of each such environment.

167. Defendants' infringement of the exclusive rights of OIC has also caused OIC irreparable injury. Unless restrained and enjoined, Defendants will continue to commit such acts. OIC's remedies at law are not adequate to compensate them for these inflicted and threatened injuries, entitling OIC to remedies including injunctive relief as provided by 17 U.S.C. § 502, and an order impounding or destroying any and all infringing materials pursuant to 17 U.S.C. § 503.

## Second Claim for Relief

**Violation of Federal Computer Fraud and Abuse Act**

**(18 U.S.C. §§ 1030(a)(2)(C), (a)(4) & (a)(5))**

(By Oracle USA and OIC Against All Defendants)

168. Oracle USA and OIC incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

169. Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing a computer used for interstate commerce or communication, without authorization or by exceeding authorized access to such a computer, and by obtaining information from such a protected computer.

170. Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4), by knowingly, and with intent to defraud Oracle USA or OIC, accessing a protected computer, without authorization or by exceeding authorized access to such a computer, and by means of such conduct furthered the intended fraud and obtained one or more things of value, including but not limited to Oracle's Software and Support Materials.

171. Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C.

§ 1030(a)(5)(A)(i), by knowingly causing the transmission of a program, information, code, or command and as a result intentionally causing damage without authorization to a protected computer owned by Oracle USA.

172. Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(5)(A)(ii) and (iii) by intentionally accessing a protected computer without authorization, causing damage to Oracle USA or OIC, recklessly or without due regard for their actions.

173. The computer system or systems that Defendants accessed as described above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

174. Oracle USA and OIC have suffered damage and loss by reason of these violations, including, without limitation, harm to Oracle USA's and OIC's data, programs, and computer systems, and other losses and damage in an amount to be proved at trial, but, in any event, in an amount well over $5000 aggregated over a one-year period.

175. Defendants' unlawful access to and theft from Oracle USA's computers have caused Oracle USA and OIC irreparable injury. Unless restrained and enjoined, Defendants will continue to commit such acts. Oracle USA's, and OIC's remedies at law are not adequate to compensate them for these inflicted and threatened injuries, entitling Oracle USA and OIC to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

## Third Claim for Relief

### Computer Data Access and Fraud Act - Cal. Penal Code § 502

(By Oracle USA and OIC Against All Defendants)

176. Oracle USA and OIC incorporate by reference the allegations of paragraphs 1 through 125, 134 through 153, and 169 through 175 of this Complaint as though fully set forth here.

177. Defendants have violated California Penal Code § 502(c)(2) by knowingly and fraudulently, and without permission, accessing, taking, copying, and making use of programs, data, and files from Oracle USA's computers, computer systems, and/or computer networks.

178. Defendants have violated California Penal Code § 502(c)(3) by knowingly, fraudulently, and without permission accessing and using Oracle USA's computer services.

179. Defendants have violated California Penal Code § 502(c)(6) by knowingly, fraudulently, and without permission providing, or assisting in providing, a means of accessing Oracle USA's computers, computer systems, and/or computer networks.

180. Defendants have violated California Penal Code § 502(c)(7) by knowingly, fraudulently, and without permission accessing, or causing to be accessed, Oracle USA's computers, computer systems, and/or computer networks.

181. Oracle USA or OIC own certain data that comprises Software and Support Materials obtained by Defendants as alleged above.

182. As a direct and proximate result of Defendants' unlawful conduct within the meaning of California Penal Code § 502, Defendants have caused damage to Oracle USA and OIC in an amount to be proven at trial. Oracle USA, and OIC are also entitled to recover their reasonable attorneys' fees pursuant to California Penal Code § 502(e).

183. Oracle USA and OIC are informed and believe that the aforementioned acts of the Defendants were willful and malicious in that Defendants' acts described above were done with the deliberate intent to injure Oracle USA's and OIC's business and improve its own. Oracle USA and OIC are therefore entitled to punitive damages.

184. Oracle USA and OIC have also suffered irreparable injury from these acts, and due to the continuing threat of such injury, have no adequate remedy at law, entitling Oracle USA and OIC to injunctive relief.

## <u>Fourth Claim for Relief</u>

## Breach of Contract

(By Oracle USA Against All Defendants)

185. Oracle USA incorporates by reference the allegations of paragraphs 1 through 125, 134 through 153, and 169 through 184 of this Complaint as though fully set forth here.

186. Defendants agreed to be bound by the licenses and/or Terms of Use on Oracle's customer support websites, including the Terms of Use, the Special Terms of Use, the SAR legal restrictions, and/or the Legal Download Agreement when Defendants accessed or downloaded Software and Support Materials from Oracle's customer support websites.

187. Oracle USA has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of Oracle's customer support websites' Terms of Use, the Special Terms of Use, the SAR legal restrictions, and the Legal Download Agreement.

188. Defendants have breached Oracle's customer support websites' Terms of Use, the Special Terms of Use, the SAR legal restrictions, and/or the Legal Download Agreement by, among other things:

- Accessing or using portions of the Software and Support Materials, not expressly licensed to and/or paid for by Defendants or the customers in whose name Defendants accessed Oracle's customer support websites and took the Software and Support Materials;
- Accessing the content available through Oracle's customer support websites, in the form of the Software and Support Materials, without being an authorized and designated Oracle technical support contact;
- Using the Software and Support Materials other than in support of a customer's authorized use of Oracle software for which a customer holds a supported license from Oracle;
- Using the Software and Support Materials without a legitimate business purpose;
- Using the Software and Support Materials in ways other than the furtherance of a relationship with Oracle; and,
- Accessing or using Software and Support Materials other than for personal, informational or non-commercial purposes.

189. As a result of Defendants' breach of Oracle's customer support websites'

Terms of Use, the Special Terms of Use, the SAR legal restrictions, and the Legal Download Agreement, Defendants have caused damage to Oracle USA in an amount to be proven at trial.

## **Fifth Claim for Relief**

### **Intentional Interference With Prospective Economic Advantage**

(By Oracle USA, OIC, and OEMEA Against All Defendants)

190. Oracle USA, OIC, and OEMEA incorporate by reference the allegations of paragraphs 1 through 125, 134 through 153, and 169 through 189 of this Complaint as though fully set forth here.

191. Oracle USA, OIC, and OEMEA have and had an expectancy in continuing and advantageous economic relationships with current and prospective purchasers and licensees of Oracle's support services and software, which are conducted through Oracle USA, OIC and, OEMEA.

192. These relationships contained the probability of future economic benefit in the form of profitable support service contracts and software licenses. Had Defendants refrained from engaging in the unlawful and wrongful conduct described in this complaint, there is a substantial probability that support customers of Oracle USA, OIC and OEMEA would have initiated, renewed, or expanded support contracts and software licenses with those Oracle entities, rather than with Defendants.

193. Defendants were aware of these economic relationships and intended to interfere with and disrupt them by wrongfully:

- gaining unauthorized access to Oracle USA's computer systems through Oracle's password-protected customer support websites in violation of the agreements governing such access;
- gaining unauthorized access to the Software and Support Materials available on Oracle USA's computer systems through Oracle's customer support websites, in violation of the agreements governing such access, including by using log in credentials of customers with no right or license to the Software and Support Materials taken by Defendants;

- breaching the agreements governing access to, and use of, the websites and the Software and Support Materials available through it,
- luring Oracle USA's, OIC's and OEMEA's current and prospective customers by making promotional and marketing statements regarding Defendants' ability to provide support services for Oracle software that were only possible because of Defendants' improper access to, and taking from, Oracle USA's computer systems through Oracle's customer support websites;
- using information learned through the improper access to, and taking from, Oracle USA's computer systems through Oracle's customer support websites to provide support services to Defendants' customers; and,
- gaining unauthorized access to Oracle's software releases through deceptive representations to Oracle USA's, OIC's and OEMEA's customers, causing customers to breach their license agreements with Oracle, copying their software releases wholesale hundreds of times onto Defendants' local systems, and using those copies for various improper purposes, including without limitation to develop unauthorized SAP TN-branded support products for distribution to their customers.

194. Defendants' conduct was wrongful by a measure beyond the fact of the interference itself. Defendants gained unauthorized access to Oracle USA's computer systems through Oracle USA's password-protected customer support websites, breached the agreements governing access to, and use of, Oracle's customer support websites and the Software and Support Materials available through Oracle's customer support websites, and wrongfully used the property that they found there to advertise their services, and otherwise obtain and retain the current and prospective clients of Oracle USA, OIC and OEMEA. Simultaneously, Defendants manipulated those customers to obtain copies of Oracle software releases, which were then copied to Defendants' own computer systems and used to lure away current and prospective clients of Oracle USA, OIC and OEMEA.

195. This conduct, as alleged above, constitutes violations of numerous state and federal statutes and codes, including, but not limited to, violation of the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., receipt of stolen property, Cal. Penal Code § 496, unauthorized access to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343, violation of RICO, 18 U.S.C. § 1962, fraud and related activity in connection with an access device, 18 U.S.C. § 1029, and violation of the Stored Communications Act, 18 U.S.C. §§ 2701-11. Defendants' conduct also constitutes trespass to chattels, breach of contract, and unjust enrichment.

196. As a result of Defendants' acts, the above-described relationships have been actually disrupted, causing certain current and prospective support clients to contract with Defendants instead of with Oracle USA, OIC and OEMEA for those clients' software support and maintenance and, in some cases, for their enterprise software.

197. As a direct and proximate result of Defendants' actions, Oracle USA, OIC and OEMEA have suffered economic harm, including, but not limited to, loss of profits from sales or licenses to current and potential customers of support services and enterprise software programs. Defendants' wrongful conduct was a substantial factor in causing this harm.

198. Unless Defendants are restrained by appropriate injunctive relief, their actions are likely to recur and will cause Oracle USA, OIC and OEMEA irreparable injury for which there is no adequate remedy at law.

199. Defendants' interference with Oracle USA's, OIC's and OEMEA's prospective economic advantage with its current and future customers, as described above, was willful, malicious, oppressive, and in conscious disregard of Oracle USA's, OIC's and OEMEA's rights, and Oracle USA, OIC and OEMEA are therefore entitled to an award of punitive damages to punish Defendants' wrongful conduct and deter future wrongful conduct.

## Sixth Claim for Relief

**Negligent Interference With Prospective Economic Advantage**

(By Oracle USA, OIC and OEMEA Against All Defendants)

200. Oracle USA, OIC and OEMEA incorporate by reference the allegations of

paragraphs 1 through 125, 134 through 153, and 169 through 199 of this Complaint as though fully set forth here.

201. Oracle USA, OIC and OEMEA have and had an expectancy in continuing and advantageous economic relationships with current and prospective purchasers and licensees of Oracle's support services and software, which are conducted through Oracle USA, OIC and OEMEA.

202. These relationships contained the probability of future economic benefit in the form of profitable support service contracts and enterprise software licenses. Had Defendants refrained from engaging in the unlawful and wrongful conduct described in this complaint, there is a substantial probability that the support customers of Oracle USA, OIC and OEMEA would have initiated, renewed, or expanded support contracts and enterprise software licenses with Oracle USA, OIC and OEMEA, rather than with Defendants.

203. Defendants knew or should have known about the economic relationship, described above, and knew or should have known that these relationships would be interfered with and disrupted if Defendants failed to act with reasonable care in their access of Oracle's customer support websites and use of Oracle's Software and Support Materials. Defendants failed to act with reasonable care. Instead, they:

- gained unauthorized access to Oracle USA's computer systems through Oracle USA's password-protected customer support websites in violation of the agreements governing such access;
- gained unauthorized access to the Software and Support Materials available on Oracle USA's computer systems through Oracle's customer support websites, in violation of the agreements governing such access, including by using log in credentials of customers with no right or license to the Software and Support Materials taken by Defendants;
- breached the agreements governing access to, and use of, the websites and the Software and Support Materials available through it;

- lured Oracle USA's, OIC's and OEMEA's current and prospective customers by making promotional and marketing statements regarding Defendants' ability to provide support services for Oracle software that were only possible because of Defendants' improper access to, and taking from, Oracle USA's computer systems through Oracle's customer support websites;
- used information learned through the improper access to, and taking from, Oracle USA's computer systems through Oracle's customer support websites to provide support services to Defendants' customers; and,
- gaining unauthorized access to Oracle's software releases through deceptive representations to Oracle USA's, OIC's and OEMEA's customers, causing those customers to breach their license agreements with Oracle, copying their software releases wholesale hundreds of times onto Defendants' local systems, and using those copies for various improper purposes, including without limitation to develop unauthorized SAP TN-branded support products for distribution to their customers.

204. Defendants' conduct was wrongful by a measure beyond the fact of the interference itself. Defendants gained unauthorized access to Oracle USA's computer systems through Oracle USA's password-protected customer support websites, breached the agreements governing access to, and use of, Oracle's customer support websites and the Software and Support Materials available through it, and wrongfully used the property that they found there to advertise their services, and otherwise obtain and retain Oracle USA's, OIC's and OEMEA's current and prospective clients. Simultaneously, Defendants manipulated Oracle's customers to obtain copies of Oracle software releases, which were then copied to Defendants' own computer systems and used to lure away Oracle USA's, OIC's and OEMEA's current and prospective clients.

205. This conduct, as alleged above, constitutes violations of numerous state and federal statutes and codes, including, but not limited to, violation of the Federal Computer

Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., receipt of stolen property, Cal. Penal Code § 496, unauthorized access to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343, violation of RICO, 18 U.S.C. § 1962, fraud and related activity in connection with an access device, 18 U.S.C. § 1029, and violation of the Stored Communications Act, 18 U.S.C. §§ 2701-11. Defendants' conduct also constitutes trespass to chattels, breach of contract, and unjust enrichment.

206. As a result of Defendants' acts, the above-described relationships have been actually disrupted, causing certain current and prospective support clients to contract with Defendants instead of Oracle USA, OIC and OEMEA for their software support and maintenance and, in some cases, for their enterprise software.

207. As a direct and proximate result of Defendants' actions, Oracle USA, OIC, and OEMEA have suffered economic harm, including, but not limited to, loss of profits from sales or licenses to current and potential customers of support services and enterprise software programs. Defendants' wrongful conduct was a substantial factor in causing this harm.

208. Unless Defendants are restrained by appropriate injunctive relief, their actions are likely to recur and will cause Oracle USA, OIC and OEMEA irreparable injury for which there is no adequate remedy at law.

## Seventh Claim for Relief

### Unfair Competition - Cal. Bus. & Prof. Code § 17200

(By Oracle USA, OIC, OEMEA, and SSI Against All Defendants)

209. Oracle USA, OIC, OEMEA, and SSI incorporate by reference the allegations of paragraphs 1 through 125, 134 through 153, and 169 through 208 of this Complaint as though fully set forth here.

210. Defendants have engaged in unlawful business acts or practices by committing acts including computer fraud, trespass, breach of contract, interference with business relationships, and other illegal acts and practices as alleged above, all in an effort to gain unfair competitive advantage over Oracle USA, OIC, SSI, and OEMEA.

211. These unlawful business acts or practices were committed pursuant to

business activity related to providing business applications software and related support and maintenance for that software.

212. The acts and conduct of Defendants constitute fraudulent, unlawful, and unfair competition as defined by California Bus. & Prof. Code §§ 17200, *et seq*.

213. Defendants' conduct constitutes violations of numerous state and federal statutes and codes, including, but not limited to, violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq*., receipt of stolen property, Cal. Penal Code § 496, unauthorized access to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343, violation of RICO, 18 U.S.C. § 1962, fraud and related activity in connection with an access device, 18 U.S.C. § 1029, and violation of the Stored Communications Act, 18 U.S.C. §§ 2701-11. Defendants' conduct also constitutes trespass to chattels, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, and unjust enrichment.

214. Defendants have improperly and unlawfully taken commercial advantage of Oracle USA's, OIC's, OEMEA's, and SSI's investments in their confidential, proprietary, and copyrighted Software and Support Materials and underlying software applications. In light of Defendants' conduct, it would be inequitable to allow Defendants to retain the benefit of the funds obtained though the unauthorized and unlawful use of that property.

215. Defendants' unfair business practices have unjustly minimized Oracle USA's, OIC's, OEMEA's, and SSI's competitive advantages and have caused and are causing Oracle USA, OIC, OEMEA, and SSI to suffer damages.

216. As a result of such unfair competition, Oracle USA, OIC, OEMEA, and SSI have also suffered irreparable injury and, unless Defendants are enjoined from such unfair competition, will continue to suffer irreparable injury, whereby Oracle USA, OIC, OEMEA, and SSI have no adequate remedy at law.

217. Defendants should be compelled to disgorge and/or restore any and all revenues, earnings, profits, compensation, and benefits they may have obtained in violation of California Business & Professions Code § 17200 *et seq*., including, but not limited to, returning any revenue earned from the unlawful and unfair use of Oracle USA's, OIC's, OEMEA's, and

SSI's stolen property, and should be enjoined from further unlawful, unfair, and deceptive business practices.

## <u>Eighth Claim for Relief</u>

## Trespass To Chattels

(By Oracle USA Against All Defendants)

218. Oracle USA incorporates by reference the allegations of paragraphs 1 through 125, 134 through 153, and 169 through 217 of this Complaint as though fully set forth here.

219. At all times mentioned in this Complaint, Oracle USA had legal title or license to and actual possession of Oracle's customer support websites, its access-restricted internet-based support systems, and the copies of Software and Support Materials on those support systems, as described above.

220. Defendants intentionally interfered with Oracle USA's use or possession of both Oracle's customer support websites and Oracle's related internal databases and systems, and the copies of Software and Support Materials housed for licensed access through Oracle's customer support websites.

221. Defendants' trespass and interference proximately caused damage to Oracle, including, but not limited to, damage to the functionality of Oracle USA's computer systems and data, damage to Oracle USA's rights to dominion and control over its property, and damage to the confidential nature of the information on Oracle USA's websites. As a result, Defendants caused Oracle USA's property to greatly diminish in value and deprived Oracle USA of the intended uses of its computer systems.

222. Oracle USA is entitled to recover any and all damages it sustained as a result of such trespass, in an amount to be determined at trial.

223. Defendants' trespass interfered with, and damaged, the integrity and functionality of Oracle USA's computer systems and data. Defendants will continue to commit such acts and other competitors will be encouraged to sweep Oracle USA's websites, potentially to the point of denying effective access to customers and preventing Oracle USA from using its

systems and data for their intended purpose. Defendants' trespass therefore threatens to cause irreparable harm to Oracle USA, for which Oracle USA's remedy at law is not adequate to compensate it for the injuries inflicted and threatened.

**<u>Ninth Claim for Relief</u>**

**Unjust Enrichment/Restitution**

(By Oracle USA, OIC, OEMEA, and SSI Against All Defendants)

224. Oracle USA, OIC, OEMEA, and SSI incorporate by reference the allegations of paragraphs 1 through 125, 134 through 153, and 169 through 223 of this Complaint as though fully set forth here.

225. Defendants unjustly received benefits at the expense of Oracle USA, OIC, OEMEA, and SSI through Defendants' wrongful conduct, including Defendants' breach of the agreements governing access to and use of Oracle's customer support websites, interference with Oracle USA's, OIC's, OEMEA's, and SSI's business relationships and other unfair business practices, as well as Defendants' trespass on, and computer fraud concerning the Software and Support Materials, which took substantial time and money for Oracle entities including Oracle USA, OIC, OEMEA, and SSI to develop. Defendants continue to unjustly retain these benefits at the expense of Oracle USA, OIC, SSI and OEMEA. It would be unjust for Defendants to retain any value they obtained as a result of their wrongful conduct.

226. Oracle USA, OIC, SSI and OEMEA are entitled to the establishment of a constructive trust consisting of the benefit conferred upon Defendants by the revenues derived from their wrongful conduct at the expense of Oracle entities including Oracle USA, OIC, SSI and OEMEA as alleged above, and all profits derived from that wrongful conduct. Oracle USA, OIC, SSI and OEMEA are further entitled to full restitution of all amounts in which Defendants have been unjustly enriched at Oracle USA's, OIC's, SSI's and OEMEA's expense.

**<u>Tenth Claim for Relief</u>**

**An Accounting**

(By Oracle USA, OIC, OEMEA, and SSI Against All Defendants)

227. Oracle USA, OIC, OEMEA, and SSI incorporate by reference the

allegations of paragraphs 1 through 125, 134 through 153, and 169 through 226 of this Complaint as though fully set forth here.

228. Since at least September 2006, Defendants have obtained business through the use of unlawful conduct including, but not limited to:

(a) Breaching the agreements governing access to or use of Oracle's customer support websites;

(b) Intentionally and/or negligently interfering with Oracle USA's, OIC's and OEMEA's prospective economic advantage with its existing and potential customers;

(c) Improperly, willfully, and unlawfully taking commercial advantage of the investment in its Software and Support Materials by Oracle entities including Oracle USA, OIC, OEMEA, and SSI, for the purpose of sabotaging Oracle USA's, OIC's, OEMEA's, and SSI's ability to do business and compete in the market; and,

(d) Fraudulently accessing and intentionally trespassing on Oracle USA's password-protected customer support websites, without authorization or consent, in furtherance of their unlawful and deceptive scheme as described above.

229. Defendants have received money as a result of their misconduct, at the expense of Oracle USA, OIC, OEMEA, and SSI, and some or all of such money is rightfully due to Oracle USA, OIC, OEMEA, and SSI.

230. The amount of money due from Defendants to Oracle USA, OIC, OEMEA, and SSI is unknown to Oracle USA, OIC, OEMEA, and SSI and cannot be ascertained without an accounting of the income and gross profits Defendants have obtained through their wrongful and unlawful conduct. Oracle USA, OIC, OEMEA, and SSI are entitled, therefore, to a full accounting.

## Prayer For Relief

WHEREFORE, Oracle respectfully prays for the following:

A. For a preliminary and permanent injunction restraining Defendants, their officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them, from the following:

(1) Copying[3], distributing, using, or creating derivative works from Oracle Software and Support Materials or software environments in any way, including for any business purpose, except as otherwise allowed by express license from Oracle or as otherwise set forth below;

(2) Copying, distributing or storing, or facilitating copying, distribution or storage of, any Oracle Software and Support Materials directly or indirectly from or to any of Defendants' offices, computer systems or networks;

(3) Using any bot, scraper, spider, or other software tool (including without limitation Titan and its predecessor scripts) to access, copy, distribute or use any Oracle Software and Support Materials in any way, including for any business purpose;

(4) Facilitating the downloading of any Oracle Software and Support Materials from any Oracle support website for, or on behalf of, any customer who does not have a valid, existing and currently-Oracle-supported software license for the specific materials being downloaded from Oracle entitling that customer to have and use those Software and Support Materials;

(5) Facilitating the access to, use of, or downloading from any Oracle support website for, or on behalf of, any customer other than by using that specific customer's valid login credentials;

(6) Facilitating the copying, distribution or use of any Oracle Software and Support Materials for, or on behalf of, any customer who did not have a current, valid, existing software and support license from Oracle entitling that customer to have and use those Software and Support Materials, at the time they were downloaded or obtained by or on behalf of the customer;

(7) Regardless of the location of any specific Software and

---

[3] As used in this Prayer, "copying" includes downloading from a website or digital storage media.

Support Materials or software environments, copying, distributing or using Software and Support Materials or any software environments obtained through or for one customer to support a different customer;

(8) Supporting, maintaining or facilitating the support or maintenance of software for any customer using a copy of any Oracle, J.D. Edwards, PeopleSoft, or Siebel software, including any generic or customer-specific software environments, except to the extent that (i) that customer licensed the software from Oracle, (ii) the customer received the software copy directly from Oracle, (iii) the software environment was created using that customer's software, and, (iv) the software and software environment is maintained exclusively at the customer's physical location;

(9) Facilitating the copying, distribution or use of, any Oracle Software and Support Materials or any software environment without keeping a record, which Oracle may inspect upon three (3) business days' written notice, that accurately reflects all Software and Support Materials or software environments (a) copied, distributed or used, organized by customer name, (b) the date(s) of the copying, distribution or use, and (c) all other entities involved in the copying, distribution or use, including name of the entity, principal contact, and contact information; and,

(10) Otherwise engaging in acts of unfair competition, copyright infringement, trespass, computer fraud, and interference with Oracle's business relationships;

B. That the Court order Defendants to file with the Court and serve on Oracle within thirty (30) days after the service on Defendants of such injunction a report in writing, under oath, setting forth in detail the manner and form in which Defendants have complied with the injunction;

C. For an Order directing Defendants to return Oracle's property, including, without limitation, Oracle's confidential, proprietary, and copyrighted Software and Support Materials, including data, internal documents, and valuable updates, patches, fixes, and other computer code, that Defendants took from Oracle, as set forth in this Complaint;

D. For an order impounding or destroying any and all infringing

materials pursuant to 17 U.S.C. § 503;

E. For an Order awarding Oracle punitive damages in a sum to be determined at trial, on the basis of Defendants' willful and deliberate unauthorized computer access and fraud, intentional interference with Oracle's prospective economic advantage, trespass, aiding and abetting and conspiracy;

F. For restitution and disgorgement of all ill-gotten gains unjustly obtained and retained by Defendants through the acts complained of here;

G. For an Order finding a Constructive Trust for Oracle's benefit, consisting of all revenues received by Defendants from their wrongful conduct which should rightfully have been received by Oracle and all profits derived from that wrongful conduct, and directing Defendants to pay all such sums to Oracle;

H. For damages to be proven at trial;

I. For statutory damages pursuant to 17 U.S.C. § 504;

J. For prejudgment interest;

K. For an accounting;

L. For an Order awarding Oracle its attorneys' fees and costs; and,

M. For an Order awarding Oracle such other and further relief as the Court deems just and proper.

DATED: ________, 2009

BINGHAM McCUTCHEN LLP

By: ______________________________
Geoffrey M. Howard

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle International Corp., Oracle EMEA Ltd., and Siebel Systems, Inc.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs Oracle USA, Inc., Oracle International Corp., Oracle EMEA Ltd., and Siebel Systems, Inc. demand a trial by jury on all issues triable by a jury.

DATED: ________, 2009

BINGHAM McCUTCHEN LLP

By: ______________________________

Geoffrey M. Howard

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle International Corp., Oracle EMEA Ltd., and Siebel Systems, Inc.